## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE AMERICAN PSYCHIATRIC ASSOCIATION, THE NEW YORK STATE PSYCHIATRIC ASSOCIATION, on their behalf and in an associational capacity on behalf of their members, and MILEN BEYENE, VALERIA CALDERON, ELIZABETH CANTY, BONNIE DORIS ELLIOTT, DANIEL RICCOBONO, and NIMROD SHIMRONY, on behalf of themselves and all others similarly situated,<br><br>        v.<br><br>EMBLEMHEALTH, INC., and EMBLEMHEALTH PLAN, INC.,<br><br>                Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

The American Psychiatric Association ("APA") and the New York State Psychiatric Association ("NYSPA," and together with the APA, the "Association Plaintiffs"), on their behalf and in an associational capacity on behalf of their members, and Milen Beyene, Valeria Calderon, Elizabeth Canty, Bonnie Doris Elliott, Daniel Riccobono, and Nimrod Shimrony (collectively, the "Plan Member Plaintiffs"), on behalf of themselves and all others similarly situated, bring the following complaint against Defendants EmblemHealth, Inc. and EmblemHealth Plan, Inc. (together, "EmblemHealth" or "Defendants"). All Plaintiffs allege the following based upon personal information as to allegations regarding themselves, on their own investigation, and on the investigation of their counsel, and on information and belief as to all other allegations.

## NATURE OF THE ACTION

1.    The Office of the New York Attorney General issued a report which highlighted a crisis affecting New Yorkers that has obstructed their ability to access needed mental health care:

> As New York continues to experience a mental health crisis, millions of New Yorkers struggle to access and afford mental health treatment. The Attorney General's recent mental health hearings, complaints filed with the Health Care Bureau Helpline, and survey data show a significant unmet need across the state for mental health services.
>
> New Yorkers rely on health plan provider directories to access affordable, quality health care services. However, when provider directories contain inaccurate listings or unavailable providers—known as "ghost networks"—consumers often cannot access treatment using their health insurance benefits. As a result, they are forced to choose between paying out of pocket if they can or going without treatment, which can harm their health.

The Office of the New York Attorney General, *Inaccurate and inadequate: Health plans' mental health provider network directories* (2023), https://ag.ny.gov/sites/default/files/reports/mental-health-report_0.pdf ("NYAG Report").

2.    EmblemHealth is a health insurance company that serves more than three million people in New York City and the tristate area.  EmblemHealth has imposed a significant barrier to its plan members' ability to access to mental health care with its "ghost network."

3.    "Ghost networks" of mental health providers are directories published by health insurance companies that list the mental health providers that are purportedly "in-network" for a given plan, but in reality, are not.  "Ghost networks" are replete with errors and duplications, making them inaccurate, deceptive, and misleading.

4.    "Ghost networks" cause serious harm to those seeking mental health care and to psychiatrists and other mental health providers.  Such networks falsely advertise provider information and use providers' names and credentials to artificially inflate an insurer's network,

obstructing plan members' ability to find an in-network mental health provider and to evaluate the true breadth of the provider network.  Individuals in need are left being forced to pay excess costs for out-of-network providers, or to delay or forego mental health treatment altogether.

5.      The illegality at the heart of this Complaint is simple: EmblemHealth misrepresents that its insurance plans offer a broad and accessible network of psychiatrists and other mental health providers, when they do not.  EmblemHealth illegally profits from its "ghost network," and injures both plan members and providers alike.

6.      Members of EmblemHealth's health benefit plans have been, and continue to be, injured by EmblemHealth's misconduct.  Plan members and potential members are misled to believe that EmblemHealth's network of mental health providers is broad enough that they can obtain mental health care if and when they need it.  Instead, EmblemHealth's network of mental health providers is a "ghost network," and many plan members cannot access in-network mental health care and do not receive the value of their health benefits.  That is exactly what happened to the six Plan Member Plaintiffs, who assert their claims in this Complaint on behalf of themselves and a class of similarly-situated EmblemHealth plan members.

7.      Psychiatrist members of the Association Plaintiffs have also been, and continue to be, injured by EmblemHealth's misconduct.  By falsely affiliating and falsely advertising Association Plaintiffs' members, EmblemHealth confuses and deceives plan members, including by using the names and credentials of psychiatrists to artificially inflate its network.  This causes reputational harm to members of the Association Plaintiffs, and imposes administrative burdens on them.  In addition, because the "ghost network" scheme allows EmblemHealth to *appear* to have an adequate provider network, it avoids increasing reimbursement rates for psychiatrists.  The Association Plaintiffs bring their claims on behalf of themselves and their injured members.

8.     EmblemHealth's misconduct is driven by an age-old motive: to increase its revenue. By falsely affiliating and falsely advertising the Association Plaintiffs' members, EmblemHealth artificially inflates the size and quality of its mental health provider network, which allows EmblemHealth to attract more members, and therefore more premiums and/or administrative fees. EmblemHealth is also able to charge inflated premiums and/or fees, on the basis of its illusorily broad network of providers.

9.     The NYAG report identified significant inaccuracies in EmblemHealth's directory of mental health providers. The NYAG Report summarized the results of "secret shopper" calls it made to mental health providers who were listed in the EmblemHealth directory, with a "ghost listing" identified for *82% of the calls*, and a provider available *only 18% of the time*.

10.     In addition, a *majority* of the mental health providers in EmblemHealth's directory are listed multiple times, making it appear that its provider network is vastly larger than it is.

11.     EmblemHealth's inaccurate directory also makes it appear as if the network includes many more psychiatrists than it does—indeed, a *majority* of the results returned by a search on the directory for "psychiatrist" are not psychiatrists, artificially inflating the number of psychiatrists and the credentials of EmblemHealth's network of providers.

12.     EmblemHealth's "ghost network" is also replete with other inaccuracies and misleading information that lead plan members and potential plan members to believe they will have access to mental health care when they need it, when in reality:

- a majority of the listed providers are affiliated with large private entities that members are unable to contact directly;
- almost half of the listed providers are telehealth-only providers;
- many providers are hospital-based and only see hospitalized patients; and
- many listings have incorrect contact information, making it impossible for members to contact such providers.

13.     As set forth in this Complaint, EmblemHealth's inaccurate and misleading provider directory constitutes unlawful deceptive acts and practices, false advertising, and violations of statutory and regulatory requirements.   Further, EmblemHealth's provider directory violates federal unfair competition law by falsely advertising and misusing the names, identities and reputations of psychiatrists.  These violations are also knowing and willful, and serve to unjustly enrich Defendants, at the expense of the Plan Member Plaintiffs and similarly-situated EmblemHealth plan members, and members of the Association Plaintiffs.

14.     Nearly 1 in 10 adults in the United States experienced a mental health crisis in 2024-2025, but only approximately 50 percent of those who need care are able to access it. Johns Hopkins Bloomberg School of Public Health, *Nearly 1 in 10 Adults in the U.S. Experienced a Mental Health Crisis Last Year* (2025),  https://publichealth.jhu.edu/2025/mental-health-crisis-hits-nearly-1-in-10-us-adults; National Institute of Mental Health, *Mental Health Treatment – AMI* (2022),  https://www.nimh.nih.gov/health/statistics/mental-illness.

15.     EmblemHealth's "ghost network" has obstructed its plan members' access to mental health care, and injured both plan members and psychiatrists.  The Plan Member Plaintiffs and Association Plaintiffs bring this lawsuit to dismantle this unlawful barrier to care and increase access to mental health treatment for all EmblemHealth plan members who need it.

## THE PARTIES

**The Association Plaintiffs**

16.    Plaintiff The American Psychiatric Association ("APA") is a membership organization for psychiatrists, whose mission is to champion psychiatrists' medical leadership in advancing mental health and delivering high-quality care to improve patients' lives.  The APA has approximately 39,000 members across the United States.

17.     The APA employs staff who are dedicated to working on the problems of network adequacy and "ghost networks."  Those staff members have engaged in a variety of projects, including: conducting "secret shopper" surveys to determine whether insurance plans accurately represent their provider networks; conducting and publishing studies on "ghost networks" in their Psychiatric Services journal (e.g. *Availability of Network Psychiatrists Among the Largest Health Insurance Carriers in Washington, D.C.*, https://psychiatryonline.org/ doi/10.1176/appi.ps.201600454); educating Attorneys General offices on issues relating to "ghost networks"; working with media to bring attention to these issues; and the testimony of Dr. Robert Trestman of the APA at the U.S. Senate Finance Committee's hearing on "ghost networks."  The APA has worked across the country to ensure that insurance plans do not misrepresent its psychiatrist members' participation and make it more difficult for those in need to access quality mental health care.

18.     Plaintiff The New York State Psychiatric Association ("NYSPA") is a membership association for psychiatrists who live or work in New York State.  NYSPA's mission is to promote quality mental health care in the State.  NYSPA has approximately 3,700 active members.

19.    NYSPA dedicates significant resources to the enactment of legislation aimed at curtailing insurance practices that inhibit access to care, including "ghost networks," and ensuring

that networks accurately represent psychiatrist participants. These efforts include: NYSPA's Mental Health and Substance Use Disorder Parity Report Act, which requires the inclusion of measures to ascertain network adequacy and "ghost networks"; the promulgation of NYS Department of Financial Services and NYS Department of Health's recently-implemented network adequacy regulations, which require plans to keep their provider directories up-to-date and ensure that patients are seen by a provider within a certain number of days; and participation in the NYAG's mental health hearings and "ghost network" report.

20.     The Association Plaintiffs assert claims on behalf of themselves and their members for appropriate equitable and injunctive relief.  The Association Plaintiffs are not seeking any legal or equitable monetary relief for themselves or their members.

**The Plan Member Plaintiffs**

21.     Plan Member Plaintiff Milen Beyene lives in Brooklyn, New York.  Since 2016, Ms. Beyene has been employed by the City of New York as a Senior Housing Quality Management Specialist at the Department of Health and Mental Hygiene.  At all relevant times, Ms. Beyene has been a participant in a self-funded health benefits plan sponsored by the City of New York: EmblemHealth's GHI Comprehensive Benefits Plan ("GHI CBP").  Since the Fall of 2024, Ms. Beyene has repeatedly used EmblemHealth's provider directory to search for a mental health provider in the GHI CBP network, but has been unable to find such care.  As a result, Ms. Beyene is not, and has not been, able to access the mental health care she needs.

22.     Plan Member Plaintiff Valeria Calderon is a resident of Queens, New York.  She is a special education teacher of students with blindness and visual impairments, and has been employed by the New York City Department of Education since September 2019.  At all relevant times, Ms. Calderon has been a participant in GHI CBP.  Since her previous mental health provider

left the GHI CBP network in 2022, Ms. Calderon has repeatedly used EmblemHealth's provider directory to search for a mental health provider in the GHI CBP network, but has been unable to find such care.  In 2025, Ms. Calderon began seeing an out-of-network therapist, at a substantially higher cost to her than if she had been able to access in-network care.

23.    Plan Member Plaintiff Elizabeth Canty is a resident of Brooklyn, New York.  She has been employed by the New York City Department of Education as a counselor since 2008.  At all relevant times, Ms. Canty and her three children have been members of GHI CBP.  Between 2022 and 2024, Ms. Canty repeatedly used EmblemHealth's provider directory to search for a mental health provider in the GHI CBP network for herself and for her children, but was unable to find such care.  Between 2024 and 2025, after a lengthy delay without in-network mental health care for herself or her family, Ms. Canty finally found an in-network provider through a referral for herself and her children.

24.    Plan Member Plaintiff Bonnie Doris Elliott lives in Queens, New York.  Since 2006, Ms. Elliott has been employed by the New York City Department of Education; first as a special education teacher and then as a teacher assigned to the Committee on Special Education. At all relevant times, Ms. Elliott has been a participant in GHI CBP.  Since at least 2015, Ms. Elliott repeatedly used EmblemHealth's provider directory to search for a mental health provider in the GHI CBP network, but was unable to find such care.  For a period of time, Ms. Elliott obtained care from an out-of-network provider, at a substantially higher cost to her than if she had been able to access in-network care, but otherwise, was not able to obtain any mental health treatment at all.  In 2025, unable to find in-network in-person care, Ms. Elliott began to see an in-network telehealth provider.

25.     Plan Member Plaintiff Daniel Riccobono lives in Rockland County, New York. Since 2001, Mr. Riccobono has been employed by the City of New York as an Emergency Medical Technician, and then as a Paramedic providing advanced life support care.  At all relevant times, Mr. Riccobono has been a participant in GHI CBP.  Since November 2024, Mr. Riccobono has repeatedly used EmblemHealth's provider directory to search for a mental health provider in the GHI CBP network, but has been unable to find such care.  As a result, Mr. Riccobono is not, and has not been, able to access the mental health care he needs.

26.     Plan Member Plaintiff Nimrod Shimrony lives in Hackensack, New Jersey.  Since 2015, Mr. Shimrony has been employed by the City of New York as an Emergency Medical Technician.  At all relevant times, Mr. Shimrony has been a participant in GHI CBP.  Following discharge from an intensive outpatient program in March 2025, Mr. Shimrony has repeatedly used EmblemHealth's provider directory to search for a mental health provider in the GHI CBP network, but has been unable to find such care, despite being assigned a caseworker to assist him with finding in-network mental health treatment.  As a result, Mr. Shimrony is not, and has not been, able to access the mental health care he needs.

**Defendants**

27.     Defendant EmblemHealth, Inc. is a not-for-profit corporation registered with the New York Department of State and headquartered in New York, NY.  It is New York State's largest health insurance company.  EmblemHealth, Inc. provides health insurance plans which purport to cover "behavioral health" services, which is a term that is used in the health care industry to refer to services relating to mental illness and substance use disorders.

28.    Defendant EmblemHealth Plan, Inc. (formerly Group Health Incorporated, or "GHI") is a not-for-profit corporation and a wholly-owned subsidiary of EmblemHealth, Inc.  It is registered with the New York Department of State and headquartered in New York, NY.

29.    EmblemHealth, Inc. and EmblemHealth Plan, Inc. hold themselves out publicly as one company, "EmblemHealth."

30.    Collectively, EmblemHealth, Inc. and EmblemHealth Plan, Inc. are referred to herein as "EmblemHealth" or the "Defendants."

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because various claims in this action arise under the laws of the United States.

32.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

33.    This Court has personal jurisdiction over Defendants because EmblemHealth, Inc. and EmblemHealth Plan, Inc. are headquartered in the State of New York, and both Defendants regularly conduct business in New York County.

34.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions that give rise to the claims alleged herein occurred in New York County, the principal injuries stemming from the violations alleged herein occurred in the State of New York, and this Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

**I.    The Catastrophic Consequences of "Ghost Networks"**

35.    Most people are unaware of the prevalence of "ghost networks."  But the problem has recently begun to receive much-needed attention, and was the subject of a U.S. Senate Finance

Committee Report and Hearing.  "*Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*" Hearing (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/Robert%20Trestman%20APA%20testimony%20050123%20FINAL.pdf ("Senate Finance Hearing").

36.     For example, the U.S. Government Accountability Office described the problems arising from "ghost networks" in a 2022 report, concluding that "consumers with coverage for mental health care experience challenges finding in-network providers," and that "[i]naccurate or out-of-date information on which mental health providers are in a health plan's network contributes to ongoing access issues for consumers and may lead consumers to obtain out-of-network care at higher costs to find a provider."  *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts* (2022), https://www.gao.gov/products/gao-22-104597.

37.     A 2023 study conducted by Senate Finance Committee majority staff reviewed 12 different directories across 6 states, and were only able to make appointments with *18 percent* of the mental health providers contacted—i.e., *over 80 percent* of the listed in-network providers were in reality "either unreachable, not accepting new patients, or not in-network."  For one state, *no* successful appointments could be made.  *See Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, https://www.finance.senate.gov/imo/media/doc/050323 Ghost Network Hearing - Secret Shopper Study Report.pdf ("*Senate Finance Majority Study Findings*").

38.     As these reports reflect, "ghost networks" impose substantial barriers to mental health care, which can have devastating effects.  When people in need are unable to find a mental health provider covered by their insurance on their plan's provider directory, urgent mental health

treatment is often delayed or, at worst, abandoned completely. Others seeking care rely on the directory to find a provider, only to find out later that the provider is not covered by their plan. In still other cases, people seeking care knowingly see an out-of-network provider, because they desperately need help and it is their only option, and they are left to figure out how to shoulder the much steeper costs that follow from going out-of-network. Even people who succeed in finding a mental health provider within a "ghost network," spend countless, difficult hours searching for needed care. *Senate Finance Majority Study Findings*, at 4 ("Call times ranged from 1-3 hours to contact 10 listings per plan.").

39.    "Ghost networks" also harm the psychiatrists who are falsely affiliated and falsely advertised. Psychiatrists care deeply about their patients and their ability to provide care for them, and work hard to develop their reputations, trust, and goodwill amongst patient populations. When insurance companies falsely affiliate or advertise psychiatrists in "ghost networks," they are injured due to a loss of control of their identities, harm to their reputations, and erosion of trust in the patient populations that they serve. Moreover, inaccurate directories impose significant administrative burdens on psychiatrists, who must take action to remedy the false listings and to respond to patients, who are sometimes in urgent need, who contact them after having been led to believe that they participate in the plan's network.

40.    The wrongful conduct at issue here is simple: insurance companies' "ghost networks" mislead consumers by falsely representing health plans as offering a network of mental health providers that they do not. As Senator and Chairman of the Senate Finance Committee Ron Wyden stated in his opening remarks at the Senate Finance Hearing, insurance companies are at fault and their wrongdoing is clear:

> [W]hen insurance companies host ghost networks, they are selling health
> coverage under false pretenses, because the mental health providers

advertised in their plan directories aren't picking up the phone or taking new patients. In any other business, if a product or service doesn't meet expectations, consumers can ask for a refund.

In a moment of national crisis about mental health, with the problem growing exponentially during the pandemic, the widespread existence of ghost networks is unacceptable. When someone who's worried about their mental health or the mental health of a loved one finally works up the courage to pick up the phone and try and get help, the last thing they need is a symphony of "please hold" music, non-working numbers, and rejection.

Just take a moment and think about the impact that might have on an individual who's already in a challenging situation. It's not hard to imagine how many Americans simply give up and go on struggling without the help they need….

I want to conclude by talking about accountability. My view is that insurance companies have gotten a free pass for too long letting ghost networks run rampant. If a student were writing an essay and 80 percent of their citations were incorrect or made up, they'd receive an "F." If a business gave the SEC false or incorrect information, it would face extremely severe consequences. So in my view insurance companies should face strict consequences if their products don't live up to the billing. That's the least that should be done….

Senate Finance Hearing, *Wyden Calls for Action to Get Rid of Ghost Networks, Releases Secret Shopper Study*, https://www.finance.senate.gov/chairmans-news/wyden-calls-for-action-to-get-rid-of-ghost-networks-releases-secret-shopper-study.

41.    For the reasons detailed herein, Plaintiffs bring this action to finally hold EmblemHealth accountable for its "ghost network" of mental health providers, which egregiously violates the law, and causes grievous harm both to the Plan Member Plaintiffs and all similarly-situated EmblemHealth plan members, and to the psychiatrist members of the Association Plaintiffs falsely affiliated and advertised by EmblemHealth.

## II.    EmblemHealth

42.    EmblemHealth is a not-for-profit health insurance organization that serves over 3 million individuals in New York State and issues or administers approximately 30 health insurance plans in the State.  EmblemHealth claims to be one of the largest not-for-profit health insurers in the nation.  *See* EmblemHealth, *Why EmblemHealth*, https://www.emblemhealth.com/about.

43.    EmblemHealth offers both "fully-insured" and "self funded" insurance plans. When a plan is "fully-insured," EmblemHealth charges premiums in exchange for coverage, and it both administers the plan and pays benefits for health care expenses.  When a plan is "self-funded," the employer sponsoring the plan pays the benefits for health care costs out of its own assets, and hires EmblemHealth as the "third-party administrator" ("TPA") to administer the plan in exchange for an administrative fee.  Premiums for a "self-funded" plan are paid to the plan itself, rather than the TPA.

44.    The City of New York offers its 1.25 million employees and retired employees (and their dependents) a choice among ten health insurance plans, which are administered by various TPAs.  Among those choices, for many years, the City has hired EmblemHealth to administer health insurance benefits and provide access to EmblemHealth's network of participating mental health care providers through the GHI Comprehensive Benefits Plan ("GHI CBP").

45.    GHI CBP has the highest enrollment of any health plan offered to City employees, with approximately 60 percent of the City's workforce selecting GHI CBP to provide insurance coverage for themselves and their families.  As of 2025, GHI CBP had approximately 750,000 members, inclusive of dependents.

46.    New York City employees (and their families) are eligible for City-sponsored health insurance as part of their employment package offered by the City.  As part of a City employee's compensation, the City either pays the entire premium or a portion of the premium

(depending on the plan chosen) on the employee's behalf, or it pays the employee an annual payment if the employee waives their City health insurance (e.g. because the employee is covered by another health plan).  For plan year 2025, the City paid an employee who waived their health benefits $1,000 for family coverage and $500 for individual coverage.  *See* NYC Office of Payroll Administration, *Health Benefits Buy-Out Waiver*, Health Benefits Buy-Out Waiver - OPA.

47.    For those who choose to enroll in GHI CBP, the City pays the entire premium on the employee's behalf.  In 2025, the monthly premium payment for GHI CBP was $1,114.91 for individuals and $2,931.44 for families.

48.    GHI CBP is a preferred provider organization ("PPO") plan.  EmblemHealth contracts with providers and sets rates for its health care services, and in turn, these providers qualify as "in-network" providers under the GHI CBP plan.  Members of GHI CBP are encouraged to seek care from in-network providers.  For example, plan members treated by an in-network mental health provider on an outpatient basis pay only a $15 co-pay per visit, and, for inpatient mental health services, pay a $300 co-pay per admission, with a maximum payment of $750 per calendar year.  There is no deductible for in-network providers.

49.    Members who see providers who are not within EmblemHealth's network—i.e. "out-of-network" providers—are subjected to a variety of additional costs.  First, while no deductibles apply to in-network care, a member who receives out-of-network care must meet a $200 deductible for an individual plan, and a $500 deductible for a family plan, before receiving any benefits.

50.    After the member satisfies that deductible, EmblemHealth will authorize payment for the covered service pursuant to the plan's NYC Non-Participating Provider Schedule of Allowable Charges.  Shockingly, this payment schedule uses *GHI's **1983** reimbursement rates,*

most of which have not increased since that time, and are likely to be far less than what the out-of-network provider charges for the service. This is highly significant to plan members, since they are responsible for paying the difference between the provider's fee and EmblemHealth's "allowed amount." *See* EmblemHealth, *GHI CBP*, https://www.emblemhealth.com/resources/government-labor/city-of-new-york-employees/ghi-cbp.

## III. EmblemHealth's Mental Health Provider Directory Has Been Inaccurate for Many Years

51.  EmblemHealth's misrepresentations about its mental health provider network are not new, nor are they unknown to Defendants. For years, EmblemHealth has been the subject of multiple Assurances of Discontinuance ("AOD") entered into with the NYAG regarding their inaccurate provider directory. Yet, their misconduct continues.

52.  In 2010, the NYAG entered into an AOD with GHI, EmblemHealth's subsidiary since 2006, "relating to the accuracy of their participating provider directories." The NYAG's investigation concluded "that GHI failed to maintain an accurate Online Provider Directory in compliance with New York law" and in violation of the New York's General Business Law, Executive Law, and Public Health Law. *See In the Matter of Group Health Incorporated and GHI HMO Select, Inc. D/B/A GHI-HMO*, AOD No. 10-085, *Assurance of Discontinuance Pursuant to Executive Law Section 63, Subdivision 15* (2010), https://ur.ag.ny.gov/sites/default/files/settlements-agreements/Group_Health_Incorporated_10-085.pdf.

53.  Under the 2010 AOD, GHI was required to, *inter alia*:

- "[C]orrect or remove inaccurate listings . . . within 12 months;"

- "[C]onfirm, at least once annually, that every provider listed . . . has a direct or indirect contractual relationship with GHI;"

- Contain a fifteen-pixel notice at the top of every page of GHI's online provider directory that leads to this further notice: "Provider information contained in this

Directory is updated on a weekly basis and may have changed. Therefore, please check with your provider before receiving services to confirm whether he or she is participating before scheduling your appointment;" and

- "[D]evelop and implement an appropriate remedial strategy" when the participating providers fall below a 95 percent accuracy rate.

54.    In addition, a 2014 AOD with EmblemHealth resulted from an NYAG investigation into improperly denied coverage of mental health and substance use disorder services, which concluded that, "[a]ccess to adequate behavioral health care appears to be an issue for Emblem members." *See In the Matter of EmblemHealth, Inc.*, AOD No. 14-031, *Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15* (2014), https://ag.ny.gov/sites/default/files/settlements-agreements/2014-07-03-EmblemParity_MR.pdf. The NYAG's investigation determined that EmblemHealth had violated New York Executive Law Section 63(12), the Federal Mental Health Parity Act, the New York Parity Act, and the Affordable Care Act.

55.    Furthermore, in a study published in 2012, which analyzed the accuracy of the mental health provider networks of 10 large insurance plans in Monmouth and Ocean Counties, New Jersey, GHI was identified as the *only plan* that did not present its network of providers "reasonably accurately":

- GHI was the *only* plan of 10 plans analyzed that had an accuracy rate of less than 85 percent, with 67 percent of the providers on GHI's directory confirmed to be in-network in Monmouth County, and 50 percent of psychiatrists and 64 percent of psychologists determined to be in-network in Ocean County.

- Moreover, when taking into account the in-network providers that were available to see new patients, only 11 percent of psychiatrists and 29 percent of psychologists listed on GHI's directory in Monmouth County were "actually available"; and *0 percent of psychiatrists* and 45 percent of psychologists in Ocean County were actually available of the providers listed.

- For adolescent providers in particular, there were 0 psychiatrists and 5 psychologists available in GHI's network in Monmouth Country, and just 1 child psychologist available in Ocean County.

- The study concluded that "the GHI plan in Monmouth County was definitely a phantom network with respect to children, as it had no participating child psychiatrist" and "in Ocean County, GHI was definitely again deemed to be a phantom network."

Russell Holstein & David P. Paul III, *'Phantom networks' of managed behavioral health providers: an empirical study of their existence and effect on patients in two New Jersey counties*, Hospital Topics 90(3), 68 (2012), https://pubmed.ncbi.nlm.nih.gov/22989224/.

## IV. EmblemHealth's Network of Mental Health Providers Remains a "Ghost Network"

### A. False Affiliation with Mental Health Providers

56. The NYAG report identified significant inaccuracies in EmblemHealth's directory of mental health providers. The NYAG Report summarized the results of "secret shopper" calls it made to mental health providers who were listed in the EmblemHealth directory, reporting that it had success in finding providers where an appointment or screening was available just *18% of the time*, with a "ghost listing" identified for *82% of the calls*.

| Location, scenario | Total calls | In-network | Any appointment offered | In-person appointment offered | Success percentage | Ghost listing percentage |
|---|---|---|---|---|---|---|
| Scenario A (adult) | 28 | 9 | 3 | 3 | 11% | 89% |
| Scenario B (child) | 16 | 9 | 5 | 2 | 31% | 69% |
| **EmblemHealth totals** | **44** | **18** | **8** | **5** | **18%** | **82%** |

57. The NYAG Report also described the substantial difficulties in finding an in-network mental health provider, especially for children, through EmblemHealth:

> EmblemHealth has approximately 530,000 members in its commercial insurance and Medicaid plans in New York. We called psychiatrists, nurse practitioners, doctoral-level psychologists, and social workers in New York City listed in EmblemHealth's provider directory. For children, the treatment options were quite limited. The two psychiatric nurse practitioners who were accepting new child patients only offered

medication management. Two providers were incorrectly listed as treating children; in fact they only worked with adults (one treated only nursing home patients). For adults, treatment options were not much better. One psychologist worked at a nursing home and did not provide any outpatient treatment. Three providers stated that even though they were in-network, they were not taking any more Emblem patients — in one case a psychologist said, "all of her Emblem slots are full." For one call that we counted as a success, the listed provider did not treat patients themselves but only did client intakes. For the few providers that offered appointments, the wait time was up to eight weeks.  NYAG Report, at 23.

58.    In investigating the claims alleged herein, Plaintiffs' counsel retained an expert in data mining and analytics, who determined that approximately *70 percent* of the mental health providers in New York State listed in EmblemHealth's provider directory that could be matched with a provider profile on Psychology Today did not actually participate in Defendants' network. Specifically, an analysis of these mental health providers listed in EmblemHealth's directory in six cities across New York State in December 2024 revealed that between 58 and 89 percent of the providers listed do not appear to accept an EmblemHealth plan:



**B. False Advertising of Mental Health Providers**

59.    EmblemHealth's false advertising of its provider network is similarly staggering. A majority of the mental health providers listed in EmblemHealth's directory are listed multiple times, making it appear that EmblemHealth's mental health provider network is far larger than it is.  EmblemHealth also makes it appear as if its network has many more psychiatrists than it does by including non-psychiatrists in search results.  EmblemHealth's "ghost network" is also replete with other inaccuracies, including:

- Listing providers affiliated with large private entities that members are unable to contact directly;

- Almost half of providers are telehealth-only providers;

- Including hospital-based providers who only see hospitalized patients; and

- Providing incorrect contact information

60.    First, a *majority* of provider listings in EmblemHealth's directory are duplicate entries for the same providers, not only falsely advertising those providers' information, but making it appear that EmblemHealth has significantly more mental health providers than it does.

61.    For example, of the approximately 154,700 search results generated when searching for an in-network mental health provider in six New York cities, there were only 12,550 actual providers.  That is, *approximately 90 percent of the search results were duplicate entries, or, approximately only 10 percent were unique providers.*

62.    In a search for a mental health provider on the directory with "New York, NY" as the location and a 200-mile radius, *there are over 1,000 listings which together reference only 50 actual providers*—an average of more than 20 listings per provider.

63.     One example of a repeatedly duplicated entry is as follows, where the same psychiatrist is listed *twenty-nine times*:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | New York | 10011 | 30 7th Ave | 1.7 |
| 👤 FRANCESC O FERRA… | (212) 434-3365 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | New York | 10065 | 210 E 64th St | 4.2 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | New York | 10075 | 100 E 77th St | 4.9 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Forest Hills | 11375 | 10201 66th Rd | 8.2 |
| 👤 FRANCESC O FERRA… | (718) 226-2824 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Staten Island | 10305 | 450 Seaview Ave | 9.9 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Staten Island | 10305 | 475 Seaview Ave | 9.9 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Glen Oaks | 11004 | 7559 263rd St | 15.6 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | New Hyde Park | 11040 | 26901 76th Ave | 15.8 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | New Hyde Park | 11040 | 27005 76th Ave | 16 |
| 👤 FRANCESC O FERRA… | (516) 600-1118 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Manhasset | 11030 | 600 Community Dr | 16.4 |
| 👤 FRANCESC O FERRA… | (516) 814-6404 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Great Neck | 11021 | 145 Community Dr | 16.4 |
| 👤 FRANCESC O FERRA… | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Manhasset | 11030 | 300 Community Dr | 16.5 |

21

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Staten Island | 10309 | 375 Seguine Ave | 16.8 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Valley Stream | 11580 | 900 Franklin Ave | 16.9 |
| 👤 FRANCESC O FERRA... | (516) 593-1380 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Rockville Centre | 11570 | 100 Merrick Rd | 18.8 |
| 👤 FRANCESC O FERRA... | (516) 321-5770 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Mineola | 11501 | 156 1st St Lowr | 19.3 |
| 👤 FRANCESC O FERRA... | (516) 321-5770 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Mineola | 11501 | 156 1st St Lowr Level | 19.3 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Glen Cove | 11542 | 101 Saint Andrews Ln | 22.9 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Syosset | 11791 | 221 Jericho Tpke | 26.9 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Plainview | 11803 | 888 Old Country Rd | 27.7 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Tarrytown | 10591 | 701 N Broadway | 28.1 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Huntington | 11743 | 270 Park Ave | 32.9 |
| 👤 FRANCESC O FERRA... | (914) 561-3740 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Mount Kisco | 10549 | 657 E Main St | 36 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Mount Kisco | 10549 | 400 E Main St | 36.5 |
| 👤 FRANCESC O FERRA... | (631) 775-3280 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Commack | 11725 | 2171 Jericho Tpke Ste 345 | 38.7 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Bay Shore | 11706 | 301 E Main St | 40.2 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Port Jefferson | 11777 | 75 N Country Rd | 52.1 |
| 👤 FRANCESC O FERRA... | (888) 321-3627 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Riverhead | 11901 | 1 Heroes Way | 70.9 |
| 👤 FRANCESC O FERRA... | (631) 803-3104 | Not Available | NORTH SHORE LIJ MEDICAL PC | NY | Riverhead | 11901 | 877 E Main St | 72.4 |

64.    Simply put, this one psychiatrist generates twenty-nine results, instead of one.  The same is true of thousands of providers in the directory, making it appear that EmblemHealth's network of mental health providers is *vastly larger* than it actually is.

65.    Second, EmblemHealth's directory lists non-physician providers as if they are physicians.  In a search for "psychiatrist" in "New York, NY" on the directory, of the first 300 search results, approximately 110 were in fact psychiatrists, and the remaining 190 were providers other than psychiatrists (nurse practitioners, social workers, psychologists and counselors).

66.    Psychiatrists are medical doctors who complete 4 years of medical school, 4 years of residency, and often 2 more years thereafter to specialize in child and adolescent, geriatric, addiction, and other areas of psychiatry, plus 12,000-16,000 hours of clinical training.  Most Psychiatric Mental Health Nurse Practitioners have a 2-year master's degree in nursing and 500 hours of clinical training.  Their training is substantially different from psychiatrists.  Yet, when plan members search for a "psychiatrist" on the EmblemHealth directory, *more than half of the results* are for Psychiatric Mental Health Nurse Practitioners.  This both misrepresents the number of psychiatrists participating in EmblemHealth's network, and artificially inflates the credentials of the network as a whole.

67.    Third, EmblemHealth's "ghost network" lists thousands of providers who are affiliated with a handful of private entities.  Members are unable to contact these providers directly and instead must go through the entities for access to care.

68.    Out of the 3,947 provider entries on the directory with addresses in "New York, NY," 2,397 of those providers—approximately 60%—are associated with *one of twelve private entities*, whose providers cannot be contacted directly by plan members, despite their significant presence in the directory.

69.    Moreover, of the 3,947 provider entries with a "New York, NY" address, 1,570—approximately 40%—are associated with *only four companies*, all of which provide only telehealth

mental health care.[1]  Providers associated with these entities are not listed with their own phone number and email.  Instead, the phone number and email associated with the entity is listed (e.g., support@vitahealth.care), making it impossible for members to directly contact any of these providers.  *See also Happier Living FAQs: Why can't I select a provider upfront?*, https://www.happierliving.com/faqs (as stated on the Happier Living website, the entity in the directory with the most providers by a wide margin, it is impossible for customers to select a provider upfront).

70.    Fourth, almost half of the mental health providers listed in EmblemHealth's directory provide only telehealth services and cannot be seen in person.

71.    This is despite the fact that EmblemHealth's provider directory generally, and its search functions specifically, make it appear that providers can be seen in person.  Specifically, in order to search for a provider in the EmblemHealth directory, a plan member *must* include a location (a city or zip code).  There is also a filter for "distance" (between 2 and 200 miles) that members can use to further target the results.  Therefore, a member would reasonably believe that the providers generated in the search results would include those within the chosen distance of their location.

72.    Instead, a significant number of search results include only telehealth providers.  For example, of those providers that have an address in "New York, NY," *at least 40%* are telehealth-only providers (who also, as described above, cannot be contacted directly).

73.    Fifth, a number of providers included in EmblemHealth's directory are hospital-based practitioners who only provide inpatient mental health care, thereby artificially inflating the

---

[1] These four companies are: Lawrence Genen MD, Inc. (also known as Happier Living), Valera Medical PC, Vita Health Services PLLC, and Wellnite Medical Group.

network of providers that members believe they have access to for outpatient mental health treatment.

74.    Those who use plans' provider directories are overwhelmingly seeking outpatient mental health services, not inpatient psychiatric services, as reflected by publicly-available data on patients' utilization of mental health care. *See* SAMHSA, *SAMHSA's National Mental Health Services Survey for 2020*, *National and State Profiles*, https://www.samhsa.gov/ data/sites/default/files/reports/rpt35984/2020%20N-MHSS%20State%20Profiles_FINAL. pdf (roughly 97 percent of mental health needs are served in non-24-hour settings); *Id.* at *New York State Profile* (97-98 percent of mental health services in New York are provided in non-24-hour settings, with only 2-3 percent in hospital inpatient or residential care). Inpatient mental health care is typically arranged through an emergency department evaluation or direct physician referral, and not through self-initiated scheduling based on an insurer's directory. *See, e.g.,* Johns Hopkins Medicine, Psychiatry Admissions, https://www.hopkinsmedicine.org/psychiatry/patient-information/admissions.

75.    Despite the fact that the primary use of provider directories is to enable members to find outpatient mental health care, many providers listed in EmblemHealth's directory only see patients on an inpatient basis. As such, the directory's inclusion of these inpatient-only providers misleads members into believing that they have access to a much broader network of outpatient mental health providers than they do.

76.    Of the 3,947 provider entries in the directory with addresses in "New York, NY," 456 are associated with hospitals and research institutions (e.g., New York University/NYU Langone, Weill Cornell, the Icahn School of Medicine, Lenox Hill Hospital, Huntington Hospital).

Upon information and belief, many of these providers provide care in an inpatient capacity only and do not treat patients on an outpatient basis.

77.    Sixth, many of the listings for mental health providers in EmblemHealth's directory have incorrect contact information, making it difficult, if not impossible, to reach them.

78.    "Secret shopper" studies of EmblemHealth's provider directory, performed at the direction of Plaintiffs' counsel, align with the NYAG Report, and found that out of 139 providers in EmblemHealth's directory that the shoppers attempted to contact (by calling multiple times, leaving voicemails, and texting), they were able to get in touch with someone at the listed phone number in 88 of their attempts, or 62% of the time.  Of these 88 successful contacts, provider contact information was incorrect in 23 cases.  Consequently, of the total providers where contact was attempted, *53% were inaccurate, non-working numbers, or unreturned calls.*

79.    One final example from the "secret shopper" study conducted at the direction of Plaintiffs' counsel demonstrates the magnitude of the particular struggle faced by parents seeking to find mental health treatment for their children.  Shoppers attempted to contact listed providers for a search for "child psychiatrist" located within 10 miles of "New York, NY."  Of the results, approximately *80 of the first 100 entries* had incorrect or incomplete contact information, or were otherwise inaccurate.  Of the approximately 20 results that had accurate information, only *three providers, or three percent*, actually accepted children, new patients, and GHI CBP.

## V.    EmblemHealth's Deceptive Representations and Omissions about its Mental Health Provider Network

### A.    EmblemHealth's Provider Directory

80.    At all relevant times, EmblemHealth provided the members of all plans issued or administered by EmblemHealth, including the Plan Member Plaintiffs, with an online directory

purporting to list all the mental health providers that accept EmblemHealth insurance plans.  *See* EmblemHealth, *Find Care*, https://my.emblem health.com/member/s/find-care-services.

81.    The provider directory purportedly allows plan members and potential members to identify how many, and which, mental health providers are in EmblemHealth's network; where providers are located (and the distance from the chosen location); how to contact providers (their phone number, email address, and office address); whether they accept new patients; whether they provide telehealth services; and whether they have access for wheelchairs and public transportation.  There are also filters that members can use to target their searches, which include: ages treated; practitioner type; facility type; specialties and services; languages offered; provider gender, race and ethnicity; hospital privileges; and various trainings and certifications.

82.    Plan members can search the provider directory for their plan, but potential members are also able to utilize the provider directory by choosing the plan they are interested in enrolling in and then searching the directory to find providers that supposedly participate in that plan's network.

83.    EmblemHealth repeatedly directs members to use the provider directory to determine which providers are in-network, telling them that "[u]sing a health care professional in our network is a cost-effective way to use this plan[,]" and emphasizing that in-network mental health visit co-pays are up to $15.  *See* EmblemHealth, *GHI CBP*, https://www.emblemhealth. com/resources/government-labor/city-of-new-york-employees/ghi-cbp.

84.    EmblemHealth states on its website that once a member is signed into their account, provider search "results should include only providers available in your network."  *See* EmblemHealth, *Frequently Asked Questions*, https://www.emblemhealth.com/resources/ member-support/faq.

85.    During at least a portion of the time covered by this case, EmblemHealth offered plan members its own network of mental health providers, i.e. those with whom it directly contracted to provide in-network mental health services for EmblemHealth members.  At some point in or after 2023, EmblemHealth appears to have begun offering access to a mental health provider network offered by Carelon Behavioral Health, Inc. ("Carelon"), alongside EmblemHealth's own provider network.  When referring to the EmblemHealth network herein, the Complaint is referring to the mental health provider network offered to its members by EmblemHealth, whether based on direct contracts with providers or through a Carelon network.

86.    In order to search the EmblemHealth directory, an individual first clicks on "Find A Doctor," and then can search by "Service Type," which includes a specific category for "Mental Health and Substance Use:"



87.    When an individual selects "Mental Health and Substance Use," they are directed to a separate "Find a provider" webpage, apparently operated by Carelon, but prominently displaying EmblemHealth branding.  This "Find a provider" tool is the only way an EmblemHealth plan member can search for a mental health provider in EmblemHealth's network.



88.     In a disclaimer—which only appears on the initial "Find a provider" page, and can only be viewed by clicking on a "drop down" arrow button—the following language can be found:

> Provider Search is a Carelon Behavioral Health (Carelon) online directory for locating providers. Provider Search offers you the ability to locate Carelon network providers and facilities throughout the country. The use of this provider directory does not provide authorization for benefits or services. Prior to beginning any care or program with a provider, you should contact Carelon Behavioral Health to obtain benefits and be notified of any requirements specific to your benefit plan where applicable. If you are unable to locate a network provider through our directory, please call the number on the back of your health insurance card for assistance in locating a network provider.
>
> ….
>
> Carelon makes every effort to maintain accurate and up-to-date information. However, changes can occur at any time. The practice locations at which the provider/facility will see members is self-reported and verified during the initial credentialing process and every three years, as required by applicable state law. Self-reported practice location changes are updated on the website at least weekly. Providers offering telemedicine services and descriptions of telemedicine available (i.e.: audio-only; audio-video; text messaging; etc.) can be found within the directory. Please work with the provider for details how to access the various services they offer.

89.     This statement is attributable to Defendants because EmblemHealth refers its members to the Carelon webpage to find an in-network mental health provider in EmblemHealth's network.

90. This statement fails to satisfy EmblemHealth's obligations to lawfully maintain an accurate provider directory, and to refrain from deceptive acts and practices regarding the same.

91. This statement also does not comply with what GHI had agreed to do in the 2010 NYAG AOD, which required it to correct or remove inaccurate listings every 12 months, have a specific fifteen-pixel disclaimer at the top of every page of GHI's online directory, and to implement a plan to ensure 95 percent accuracy in the provider directory.

92. EmblemHealth's website assures consumers that "finding the right care is [] easy":

## Finding the right care

If you're already a member, finding the right care is as easy as signing in to your myEmblemHealth account. You can search for doctors and facilities in your network and select and save a Primary Care Physician to your account for easy access in the future.

93. In reality, it is nearly impossible for many EmblemHealth members to find in-network mental health care using EmblemHealth's inaccurate directory.

### B. Omissions

94. In addition to the affirmative misrepresentations made by EmblemHealth on its provider directory, Defendants also make material omissions, including but not limited to: failing to disclose the extent of provider directory inaccuracies; that a substantial number of mental health providers on the directory are affiliated with large private entities, are telehealth only, only see hospital patients, or otherwise cannot be contacted or seen by members; and that members will likely face significant difficulty finding an in-network mental health provider in the directory.

95. Any disclaimers, such as those that direct plan members to "[c]heck with your provider before you get services," are woefully insufficient. EmblemHealth cannot shift its obligations to plan members in an effort to evade its legal duties. It is not a consumer's responsibility to verify if they are being misled or not; it is Defendants' obligation not to mislead.

96.     In addition, any disclaimers that do appear are difficult to understand and even to find, and do not accompany every webpage nor appear at the top of webpages as required by the NYAG AOD.

97.     Even if these disclaimers were readily visible, no reasonable consumer viewing them would understand that many of the mental health providers listed in the directory do not take EmblemHealth insurance, are not accessible to members, or cannot even be contacted.  Indeed, there is no disclaimer broad enough to absolve the breadth of the inaccuracies on EmblemHealth's provider directory.

98.     Significantly, there is also complete information asymmetry between EmblemHealth and plan members: EmblemHealth has every ability to access the relevant information to determine whether a provider is inaccurately listed, including through its contracts and communications with providers, as well as claims information.  On the other hand, only after great difficulty—through hours of calls and extensive research—could a plan member become aware of the extent of the directory's inaccuracies.  The information is simply not readily available to the average consumer.

99.     Because of Defendants' misrepresentations and omissions, a reasonable consumer would understandably believe that EmblemHealth's network of mental health providers was broad and accessible.

## VI.     EmblemHealth's Deceptive Representations and Omissions Are Material

100.     As countless studies have shown, the size and quality of a provider network is important to an individual's choice of health care plan.  Over half of consumers in one study identified provider choice as the most important nonfinancial consideration they take into account when selecting a health plan.  *See* Linda J. Blumberg et al., *Factors Influencing Health*

*Plan Choice among the Marketplace Target Population on the Eve of the Health Reform*, Urban Inst. (2014), https://www.urban.org/research/publication/factors-influencing-health-plan-choice-among-marketplace-target-population-eve-health-reform.

101.    Similarly, in a Kaiser Family Foundation survey, "60 percent of [non-group health insurance] enrollees reported that having a choice of providers was either 'very important' or 'extremely important' to them."  Liz Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family Foundation (2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (60 percent is the combined statistic of those who reported choice of providers as "extremely important" (25 percent) or "very important" (38 percent)).

102.    Indeed, members are willing to pay increased premiums for a broad provider network.  *See, e.g.,* Kaiser Family Foundation, *How Narrow or Broad Are ACA Marketplace Physician Networks?* (2024), How Narrow or Broad Are ACA Marketplace Physician Networks? | KFF (Silver ACA Marketplace plans with broader physician networks had higher premiums than those with narrower networks); Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment (participants "were willing to pay $72 more for a plan that covered 30% more doctors in their area.").

103.    In order to assess this material network information, consumers rely on a plan's provider directory.  As stated by the American Medical Association and the Council for Affordable Quality Healthcare:

> Health plans are expected by their members… to display a provider
> directory to the public that represents an accurate reflection of their

networks.  It is the most public-facing data that health plans provide, and patients are dependent on accurate directories to access care….

*See Improving Health Plan Provider Directories*, 3 (2021), https://www.caqh.org/ hubfs/43908627/drupal/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20 Directories%20Whitepaper.pdf.

104.    The materiality of online provider directories in particular reflects the broader reality of how people source information and make consumer decisions in modern-day society. "[C]onsumers have become accustomed to convenient online search and booking experiences outside of healthcare, and they rely on the information to be correct." *Improving Health Plan Provider Directories*, at 3.

105.    As the then-President of the American Medical Association stated during the Senate Finance Committee Hearing:

> I am acutely aware that provider directories are critically important tools to help patients find a physician when they need one.  Directories allow patients to search and view information about in-network providers, including the practice location, phone number, specialty, hospital affiliations, whether they are accepting new patients, and other details. Some directories also provide information on health equity and accessibility issues, such as public transportation options, languages spoken, experience with specific patient populations, and the ability to provide specific services.

*Statement of Jack Resneck, Jr., MD*, Senate Finance Hearing, at 2, https://www.finance.senate. gov/imo/ media/doc/Jack%20Resneck%20MD%20Statement %20to%20Finance% 20Cmt%20on%20Behalf%20of%20AMA%20Re%20Provider%20Directories%202023-5-3.pdf ("Resneck Testimony").

106.    Moreover, since the provider directory is disseminated by the insurance company, it is logically viewed as the authoritative source of information about the provider network offered by that insurance company to the members of its plans.

107.    As such, provider directories are material to whether a potential member chooses a health plan in the first place.  *See, e.g.*, *Senate Finance Majority Study Findings*, at 5 ("Information about participating clinicians and in/out of network status are also used by patients to choose a health plan and seek care that is covered by their plan.").

108.    Moreover, members may select a plan on the belief that because their doctors are listed in the provider directory, they participate in the network.  *See, e.g.*, Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, 39(6) Health Affairs (2020), https://www.health affairs.org/doi/10.1377/hlthaff.2019.01501.

109.    For these reasons, it is unsurprising that providers have clearly stated the importance of being properly listed on health plan directories: "89 percent of physicians surveyed by the AMA indicated it is important to be reflected accurately in plan directories." CAQH, *The Hidden Causes of Inaccurate Provider Directories,* 1, (2019) https://www.caqh.org/ hubfs/43908627/drupal/explorations/CAQH-hidden-causes-provider-directories-whitepaper.pdf.

110.    In addition, EmblemHealth's own repeated direction to its members to use the provider directory demonstrates its materiality.  EmblemHealth's marketing and plan materials specifically direct members to use the provider directory:

- "Please consult your health plan directory to search for Participating Providers." *Summary Program Description ("SPD")*.

- "Visit the website www.emblemhealth.com/city or call 1-800-624-2414 for a list of participating medical providers." *SPD.*

- "Consult your Directory of Participating Physicians and other Providers for the names of Participating Providers. You may also call or write GHI for this information." *Certificate of Insurance ("COI").*

- "The use of Participating Providers controls your out-of-pocket expenses. Consult your Directory of Participating Physicians and other Providers or phone GHI to obtain the names of Participating Providers in your area." *COI.*

111.    Given the materiality of provider directories and network breadth to consumers, and EmblemHealth's own repeated direction to rely on the provider directory, the misrepresentations and omissions made by EmblemHealth constitute precisely the type of information upon which reasonable consumers would rely.

112.    Finally, New York State laws and regulations highlight the materiality of provider directory accuracy and the importance of detailed and accurate information for mental health providers in particular.  N.Y. Ins. Law. Section 3217-A(a)(17) (directories must include providers' direct contact information; whether the provider is accepting new patients; affiliations with facilities certified in New York State; any restrictions regarding the availability of services; and for physicians, board certifications, languages spoken and any affiliations with participating hospitals); *Id.* (the insurer must update provider information within fifteen days of a change); N.Y. Comp. Codes R. & Regs. Tit. 11 § 38.6(b) (directory must be filterable by conditions treated and services provided); *Id.* at § 38.6(e) (plans must review claims information twice a year, and if there are no claims from a provider within that period, plan must confirm provider status directly with provider); D.F.S. Circular Letter 2021-12, 2021 WL 6135547 (directories must include any restrictions on provider's services, including whether they do not serve adults or children, or individuals with particular conditions, and whether the provider provides services at a particular location).  Defendants do not provide a majority of this required, material information.

## VII.    The Plan Member Plaintiffs Have Been Injured by EmblemHealth's Misrepresentations about its Mental Health Provider Network

113.    EmblemHealth plan members, including the Plan Member Plaintiffs, have been, and continue to be, injured by EmblemHealth's "ghost network."

114.    EmblemHealth plan members and potential members seeking a broad and accessible network of mental health providers are attracted to EmblemHealth's seemingly robust provider network.  These plan members' premiums and/or administrative fees are then paid to EmblemHealth.  And so every provider who is not actually in-network, is repeatedly listed, unavailable, or unable to be contacted, represents coverage that EmblemHealth has been paid for and that plan members, including the Plan Member Plaintiffs, never receive.

115.    Relatedly, EmblemHealth is able to charge higher premiums and/or administrative fees because of its illusory broad network; higher than it would have received for its actual narrower network.  *See* Kaiser Family Foundation, *How Narrow or Broad Are ACA Marketplace Physician Networks?* (2024), How Narrow or Broad Are ACA Marketplace Physician Networks? | KFF (Silver ACA Marketplace plans with broader physician networks had higher premiums than those with narrower networks); Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment (participants "were willing to pay $72 more for a plan that covered 30% more doctors in their area.").

116.    In addition, EmblemHealth members, including the Plan Member Plaintiffs, seeking mental health care that are unable to find a provider in EmblemHealth's network, are, as a result, more likely to have to pay higher costs for out-of-network treatment, or to delay needed

mental health treatment, or to forego mental health care altogether, despite ostensibly having coverage for such care.

117.    EmblemHealth's directory errors may have also resulted in plan members having selected an EmblemHealth plan based on inaccurate information about a specific provider, including where the member had identified in the directory a mental health provider with whom they had an existing relationship.  Simon F. Haeder et al., *Surprise Billing: No Surprise in View of Network Complexity* (2019), https://www.healthaffairs.org/content/forefront/surprise-billing-no-surprise-view-network-complexity.

118.    Using EmblemHealth's inaccurate provider directory, plan members may also mistakenly use an out-of-network provider that is falsely listed on the directory as in-network.  *See* Kelly A. Kyanko & Susan H. Busch, *Surprise Bills from Outpatient Providers:* A National Survey, 36 J. of General Internal Medicine (2021), https://link.springer.com/article/10.1007/s11606-020-06024-5 (A 2020 study which found that of patients that received surprise bills, 30 percent "noted that a provider listed in their insurance directory had either incorrect contact information or did not take their insurance.").

119.    Those searching for a mental health provider, especially in a time of need, on EmblemHealth's inaccurate directory are also injured by the administrative and emotional burden of the hours spent searching on a "ghost network."   NYAG Report, at 4 ("[t]he process of navigating a health plan provider directory filled with ghosts is *confusing, time-consuming, and often ends in frustration*." (emphasis added)).

VIII.    **The Association Plaintiffs Have Been Injured by EmblemHealth's False Affiliation and False Advertising of Association Members**

120.    EmblemHealth's false directory causes injury not only to the Plan Member Plaintiffs and other similarly-situated plan members, but to the falsely advertised providers themselves.  By mispresenting that psychiatrists are affiliated with EmblemHealth, listing them multiple times to artificially inflate network size, and otherwise falsely advertising their services, EmblemHealth has caused reputational and financial harm to members of the Association Plaintiffs.

121.    EmblemHealth's false affiliation and advertising harms psychiatrists by causing a loss of control over their reputations and goodwill.  Reputational damage can happen with extraordinary speed in the era of online reviews, which makes the importance of providers' control over their names and practices all the more crucial in the modern age.  Online reviews, star ratings, and social media have significant impact on consumer decisions in general.  This is especially true in the realm of health care providers, as "online reviews are gaining popularity for patient decision-making processes," and "negative reviews [about providers] have a stronger impact than positive ones."  *See* Pauli et al., *The current state of research of word-of-mouth in the health care sector*, 20 Int'l Rev. on Public and Nonprofit Marketing (2022), https://link. springer.com/article/10.1007/s12208-022-00334-6.  Given this modern reality, the loss of control over one's name, likeness, and reputation can be devastating.

122.    Reputational damage is also caused when psychiatrists are called by confused consumers to make an appointment, as it is often the provider's reputation that is damaged when they are forced to tell the person in need that they do not, in fact, accept EmblemHealth insurance, or are unable to provide the care that EmblemHealth advertised that they would.

123.    EmblemHealth's false affiliation and advertising of members of the Association Plaintiffs have also imposed significant administrative burdens on psychiatrists.

124.    Indeed, mental health providers are deterred from joining or staying in an insurer's network by the labyrinth of administrative burdens imposed by insurance companies. *See, e.g.*, *Why I Left the Network*, ProPublica (Aug. 25, 2024), Why I Left the Network — ProPublica; NYAG Report, at 61 ("Health plans can incentivize greater mental health provider participation in networks by reducing administrative burdens that deter many providers from joining networks.").

125.    Nationwide, the economic administrative burden for provider offices to maintain directory information "costs physician practices *$2.76 billion annually*." CAQH, *The Hidden Causes of Inaccurate Provider Directories,* 1 (2019), https://www.caqh.org/hubfs/43908627/drupal/explorations/CAQH-hidden-causes-provider-directories-whitepaper.pdf. (emphasis added).

126.    Even where providers contact a plan to inform them of the inaccurate listing, there is evidence that plans do not make the required updates. NYAG Report, at 19 ("[P]roviders told callers that they had notified the health plan on multiple occasions that they are not in-network"); *see also Senate Finance Majority Study Findings,* at 3 ("[T]he providers ha[d] notified the health plan on multiple occasions that they [we]re not located in the health plan's contracted state and d[id] not have licensed providers there."); Resneck Testimony, at 5 ("[P]ractices report that the updates do not always appear in the directories.").

127.    The administrative burdens imposed by false listings can last for years, and present a repeat obstacle for psychiatrists and their staff. As Dr. Trestman of the APA testified: "I was a ghost physician in Connecticut after I moved to Virginia Tech six years ago… patients were calling

for *two years* after my departure to request appointments with me because I was still listed in multiple commercial insurance plans." Trestman Testimony, at 3 (emphasis added).

128.    Rather than treating patients, members of the Association Plaintiffs, many of whom are in solo or small practices, are forced to spend their time and resources attempting to reach EmblemHealth to be removed from its directory or otherwise maintain the accuracy of their information, or speaking with plan members seeking care from them, as Defendants advertised they would provide.

129.    Finally, because EmblemHealth falsely appears to have an adequate network, it can avoid paying competitive rates to psychiatrists to participate in its network. Put another way, if EmblemHealth had to offer a real network of mental health providers, they would have to pay providers market rates to participate. NYAG Report, at 9 ("Mental health providers presented testimony about the obstacles they face in participating in health plan networks, in particular low reimbursement rates.").

130.    Dr. Trestman of the APA highlighted the longstanding and consequential problem of inadequate provider reimbursement rates:

> Plans' reimbursement rates for psychiatric care have not been raised in decades. Meanwhile, unreimbursed time spent on administrative tasks has risen dramatically. When psychiatrists attempt to negotiate contract provisions, including their rates, plans respond "take it or leave it" even when there is a known and obvious shortage of mental health providers in the network. This is not how insurers behave when they face shortages of other physicians. They raise rates and loosen credentialing standards to ensure that they don't have a dire shortage of important specialists. . . . Demand for care is skyrocketing. In-network provider availability is scarce, yet public and private plans do not provide adequate reimbursement rates for psychiatrists or other mental health clinicians. The basic economics of supply and demand suggest the predictable result that is desired by the plans - lack of access to care and violation of the law. Trestman Testimony, at 6.

131.    The effects are significant and have contributed to an in-network mental health provider crisis in this country, which is predicted to face a shortage of between 14,280 and 31,091 psychiatrists through 2024.  *See, e.g.*, ProPublica, *Why I Left the Network*.

## IX.    EmblemHealth Falsely Affiliates and Falsely Advertises Members of the Association Plaintiffs

### A.  EmblemHealth's "Ghost Network" is Replete with Inaccurate Provider Listings

132.    As discussed at length above, EmblemHealth falsely affiliates and advertises Association Plaintiffs' members, thereby misrepresenting psychiatrists and their services, and EmblemHealth's provider network's size and quality.  Defendants do so in a number of ways, including:

- Listing providers as being in-network, when they are not;

- Repeating provider entries multiple times, providing false information, and making it appear that the network is robust and treatment readily accessible, when that is untrue;

- Misleading members to believe there are many more psychiatrists in their network than there are, by including non-psychiatrists in search results;

- Including providers affiliated with large private entities that members are unable to contact directly;

- Including a significant percentage of telehealth-only providers and misrepresenting members' access to in-person mental health care;

- Including hospital-based providers who only see hospitalized patients; and

- Including incorrect contact information, obstructing members' ability to reach providers.

133.    EmblemHealth's provider directory is also teeming with other inaccuracies, including wrong information about access (e.g., accessibility for wheelchairs and to public

transportation) and about availability, and wrong specialization and patient information (e.g., child versus adult).

### B. EmblemHealth's False Affiliation and False Advertising Result in Immense Consumer Confusion

134.    In the words of the then-AMA President, "[i]magine selecting a health plan and paying health insurance premiums only to find out that you relied on erroneous information. Imagine the sense of helplessness and frustration amongst patients when they cannot access the care on which they were counting."  Resneck Testimony, at 4.

135.    The Plan Member Plaintiffs' experiences demonstrate the immense confusion and frustration caused by EmblemHealth's provider directory[2]:

- I started calling providers from the EmblemHealth provider directory... I took a couple long chunks of days to try and find available providers, and I would also call at work when I had a free moment. But, I wasn't getting anywhere. I would run into any variety of dead ends with each provider. Ultimately, after sending many emails, only two people got back to me. One person wasn't in-network, other didn't have any availability… I thought to myself, I have to solve this problem. So I took a day off of work, and just called straight down the provider directory. I made over 50 calls. I sent emails to anyone with an email address listed. Everyone I talked to, the number was disconnected, or they didn't participate with Emblem, or they don't see children.

- It only hinders my efforts and motivation to keep looking…the directory is so inaccurate... And even after searching via location and limiting the search to within 10 miles, providers from Florida or California will still show up. There are also huge and confusing discrepancies depending on the central location you choose to search around that don't make sense…. Out of the 6 or 7 people I've contacted most recently, I've heard back from one… She told me that she is fully remote telehealth and no longer accepting new patients.

- I was trying to find providers that were local. And they do advertise that they are within the network. And then, as you dig a little deeper, you find out that they don't actually take your coverage. They don't actually take GHI.

---

[2] These quotes are not here attributed to specific Plan Member Plaintiffs in this publicly-filed Complaint, but will be provided to the Court and to Defendants upon request.

136.    There are also countless public accounts illustrating the confusion and frustration caused by EmblemHealth's provider directory.  These online complaints indicate not only the scope of the problem, but also EmblemHealth's knowledge of the same.

137.    The complaints use descriptors such as "misleading," "shady," and "fraudulent marketing" to refer to EmblemHealth's directory.

138.    Below are just some examples of these online complaints, from a variety of online sources[3]:



**Mulysa**    ⋯
7 December, 2023
I had no idea those lists were supposed to be accurate. I tried finding somebody through them once, and it was awful. I have not been able to find a psychiatrist for my kids who takes GHI, and pay out-of-pocket for now. It doesn't help that very few take insurance at all.



Francis K
                    11/13/2023

Worst insurance company ever and doctors are dropping them like flies because their pay scale is stuck in the ****s. Do Not believe their website because they do not remove providers when they leave. Call the providers first before going most do not take emblem anymore, some phone numbers are even out of service.

---

[3] These online complaints can be found at the following websites: Gothamist, *NY attorney general says insurers posting inaccurate 'ghost networks' of mental health providers*, https://gothamist.com/news/ny-attorney-general-says-insurers-posting-inaccurate-ghost-networks-of-mental-health-providers; Better Bus. Bureau, *EmblemHealth*, https://www.bbb.org/us/ny/new-york/profile/health-insurance/emblemhealth-0121-1768/complaints; Yelp, *EmblemHealth*, https://www.yelp.com/biz/emblemhealth-corporate-office-new-york.



**Nikki L.**
New York, NY
⊡ 0  ⊡ 9

 2/18/2020

nobody and I mean nobody takes this insurance. I work for the DOE and I am new to this insurance.
I have been back and forth between finding doctors on the website and then going to their office
only to tell me that they do not accept my insurance or are no longer taking my insurance. THEN
WHY ARE THEY LISTED ON THE EMBLEM WEBSITE!?

You also need referrals to see specialists, such as a dermatologist. I want to see a derm to ask two
questions..just two questions! and I cannot because I cannot find a PCP that takes this insurance
that can input a referral in the system.

ridiculous.



**Suzanne A.**
Jackson Heights, NY
⊡ 0  ⊡ 3  ⊡ 0

 Sep 14, 2024

The website is a recipe for fury. Finding care: God forbid one has to step away for a few minutes
because they'll be signed out and any search results will be gone and need to be restarted. The
results will include the same provider name repeatedly. The only filters for finding care are specialty,
hospital affiliation, accepting new patients and location. One may ONLY search by location. On
location: Results will all be from one's immediate area, even if selecting the furthest distance (50
miles). I would like to see a doctor in a major metropolitan area, not the outskirts area where I live
but ALL results are in my actual neighborhood. And again - search by location is the ONLY option.
On hospital affiliation: They list 100s of hospital affiliations and one must select ALL other hospitals
in order to avoid one particular hospital. On accepting new patients: The results include doctors who
are NOT taking new patients, wasting considerable time calling to make appointments with
providers who in fact are not taking new patients. On specialty: specialists who only provide for
pediatrics when adult care is selected, providers who work in clinics that do not treat the specialty
requested, doctors listed when CNP are requested and vise versa. And finally, physicians listed end
up NOT taking Emblem Health. Avoid if you can.

                        
Helpful **0**      Thanks **0**      Love this **0**      Oh no **0**



**Elisa T.**
Bronx, NY
⊡ 343  ⊡ 17  ⊡ 0

 Nov 12, 2022

EmblemHealth is a terrible insurance company. Many doctors don't want to know about it because
they don't reimburse the doctors much. The same applies if a person submits a claim on their own.
NYC employers continue to sadly offer this insurance. If you retire and leave NY, you will have the
most difficult experience trying to find a participating physician that accepts EmblemHealth.
Shameful. What is the point of having insurance if you can't even use it. So disappointing.
If I could give no stars, I would.

                        
Helpful **0**      Thanks **0**      Love this **0**      Oh no **0**

139.    EmblemHealth currently has a 1.1 out of 5 stars rating on Yelp.  *See* Yelp,

*EmblemHealth Corporate Office*, https://www.yelp.com/biz/emblemhealth-corporate-office-

new-york.

140.    As of the date of the filing of this action, EmblemHealth is *no longer accredited*

by the Better Business Bureau.  *See* Better Bus. Bureau, *EmblemHealth*, https://www.bbb.org/

us/ny/new-york /profile/health-insurance/emblemhealth-0121-1768.  Previously, EmblemHealth

had an almost failing "D" rating.

141.    As is made abundantly clear from the complaints above, the inaccuracies of

EmblemHealth's provider directory have left consumers confused, frustrated, and in need.

## X.  EmblemHealth Knows That its Representations and Omissions Regarding its Mental Health Provider Network Are Deceptive

142.    At all relevant times, EmblemHealth knew, or should have known, that its

representations and omissions regarding its directory of mental health providers were grossly

inaccurate, deceptive and misleading.

143.    Amongst the insurance industry, it is *well known that provider directories are*

*notoriously inaccurate*.  *See, e.g.*, Neel M. Butala et al., *Research Letter: Consistency of Physician*

*Data    Across    Health    Insurer    Directories*,    JAMA    329(10),    842    (2023),

https://jamanetwork.com/journals/jama/article-abstract/2802329 ("In examining  directory entries

for more than 40% of US physicians, inconsistencies were found in 81% of entries across 5 large

national health insurers.").  This is particularly true for directories of mental health providers.  *See,*

*e.g.,* Jane M. Zhu et al., *Phantom Networks: Discrepancies Between Reported And Realized Mental*

*Health    Care    Access    in    Oregon    Medicaid*,    Health    Affairs    41(7)    (2022),

https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052 ("Overall, 58.2 percent of network

directory listings were "phantom" providers who did not see Medicaid patients, including

67.4 percent of mental health prescribers, 59.0 percent of mental health nonprescribers, and 54.0 percent of primary care providers.").

144.    Also, as discussed above, the industry is currently the subject of a bipartisan congressional inquiry into "ghost networks" and the Senate Finance Committee recently held a hearing on the issue specifically.

145.    There are also numerous federal and state laws and regulations aimed at rectifying the problem of inaccurate provider directories, and of which EmblemHealth is well aware.

146.    Put simply by a state legislative senator: "[Insurance companies] have known about this for a long time and they haven't done anything about it.  It's difficult not to assume that this kind of barrier is intentional."  Jack Turban, *Ghost networks of psychiatrists make money for insurance companies but hinder patients' access to care*, Stat News (2019), https://www.statnews.com/2019/06/17/ghost-networks-psychiatrists-hinder-patient-care/.

147.    Insurance companies have also been successfully sued and investigated over the issue.  *See, e.g.*, *Attorney General Bonta Secures $40 Million Settlement with Health Net for Misleading Consumers with Inaccurate Provider Directories* (2025), https://oag.ca.gov/news/press-releases/attorney-general-bonta-secures-40-million-settlement-health-net-misleading; *Attorney General James Secures Settlement with MVP Health Plan Over Mental Health Ghost Network* (2025), https://ag.ny.gov/press-release/2025/attorney-general-james-secures-settlement-mvp-health-plan-over-mental-health.

148.    Indeed, "ghost networks" are an issue that the Association Plaintiffs have been concerned about for many years.

> Our ["secret shopper"] study of the DC market [in 2016] found that almost 25 percent of the phone numbers for the listed psychiatrists were nonresponsive or were nonworking numbers. Only 15 percent of psychiatrists listed in the directory were able to schedule an appointment for callers; under one plan, only four percent

were able to schedule an outpatient appointment. Unfortunately, not much seems to have changed since 2016. Trestman Testimony, at 2.

149.    In addition, EmblemHealth in particular has long been on specific notice, as its misleading provider directory was the exact subject of the 2010 New York Attorney General AOD, which alleged the same violations of New York's consumer protection laws as Plaintiffs allege here.

150.    The 2012 study of mental health provider directories, discussed above, also long ago identified GHI as the *only plan* of the 10 analyzed that did not present its network of mental health providers even "reasonably accurately," and concluded not only that GHI was "definitely a phantom network," but that GHI's network of psychiatrists was "the most inaccurate of all networks [in the study]." Holstein & Paul, *'Phantom networks' of managed behavioral health providers*, https://pubmed.ncbi.nlm.nih.gov/22989224/.

151.    Further, EmblemHealth has every ability to access all of the relevant information to determine whether a provider is inaccurately listed—including, for example, claims information—and so it knows, or reasonably should know, about its directory's inaccuracies. Insurers use claims data to deny payment and to identify provider billing patterns to select candidates for audit. They could also use such data to determine that providers in their directory are not submitting claims, because they do not accept the insurance.

152.    Indeed, even a brief review of the provider directory itself demonstrates knowing wrongdoing by EmblemHealth. Many of the directory's inaccuracies, and especially the multiple entries for the same providers, are immediately and obviously apparent to anyone who utilizes the provider directory. The example described above, where the same psychiatrist is listed twenty-nine different times, all one-after-another on consecutive results pages, would alert EmblemHealth of a serious problem with its directory's accuracy.

153.    For all of these reasons, Defendants' misrepresentations and omissions constitute knowing and willful violations.

**XI.    EmblemHealth Reaps Significant Benefits from the Misrepresentations about its Mental Health Provider Network**

154.    Maintaining an inaccurate mental health provider directory has inured significant financial benefits to EmblemHealth, in a number of ways.

155.    As discussed above, by misrepresenting the size and quality of its network, EmblemHealth attracts more members and increases its share of the market.  This increased number of members' premiums and/or administrative fees are then paid to EmblemHealth. EmblemHealth is thus unjustly enriched from its misrepresentations about its network's breadth.

156.    By misrepresenting the size and quality of its network, EmblemHealth also attracts more employers, including New York City, to retain EmblemHealth to administer health plans offered to their employees.

157.    EmblemHealth's misrepresentations that it has a broad provider network also allows it to charge higher, inflated premiums and/or administrative fees than it would otherwise be able to charge for a narrower network.

158.    In addition, plan members seeking mental health care that are unable to find a provider in EmblemHealth's network, are, as a result, more likely to have to pay high costs for out-of-network treatment, or to delay or abandon their efforts to obtain mental health care altogether.  Either way, where the plan is "fully-insured," this saves EmblemHealth the costs associated with paying benefits for their care.

159.    The barriers to accessing mental health treatment imposed by Defendants' "ghost network" may even cause members to leave EmblemHealth plans, thus "saving" EmblemHealth

the costs of members who are more expensive to insure, and disproportionately harming those with mental health care needs.

160.    Simply put, its inaccurate directory serves to both increase EmblemHealth's revenue, and at the same time, evade the costs of covering their members' care.

161.    Moreover, by falsely listing mental health providers, EmblemHealth is falsely portraying themselves as having an adequate network.  As a result, Defendants are not only saving the costs of paying reasonable rates to in-network providers, they are avoiding the costs of increasing reimbursement rates or decreasing administrative burdens in order to attract more mental health providers to their network.

162.    As explained by Dr. Robert Trestman of the APA at the Senate Finance Hearing, "[i]nsurers intentionally make it difficult for psychiatrists and other mental health professionals to participate in their networks, which frequently enables them to avoid paying for mental health care."  Trestman Testimony, at 4.

163.    These financial incentives of intentionally inaccurate directories were openly discussed during the Senate Finance Hearing.  In an exchange between Senator Elizabeth Warren and testifying witness Mary Giliberti (the Chief Public Policy Officer of Mental Health America), Senator Warren inquired whether the plans were "inaccurate by design," to which Ms. Giliberti responded affirmatively:

> SENATOR WARREN: Okay so it's a way to defraud consumers. To say I have this really big list of people you could go to if you had a problem, and it turns out that really big list . . . is actually this little tiny list.

> MS. GILIBERTI: Right.

> SENATOR WARREN: Okay so that's one way it's to their advantage . . . . They get paid in effect or they make more money by being inaccurate. Did you have another one?

MS. GILIBERTI: Well just that I think it's about 60 percent of the plans [being discussed] don't have out of network coverage so if you get really frustrated and you pay on your own then they're not paying anything.

SENATOR WARREN: So the more I can frustrate you . . . the more you'll just go somewhere else. And that means it's not money out of their pockets.
 . . . .

So what we are really saying here is that it is in the financial interests of these . . . plans to discourage beneficiaries from accessing care . . . . Because here's the key that underlines this. *Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep*.

164.    Finally, a significant consequence of an inaccurate, inflated provider directory is that EmblemHealth appears to meet federal and state network adequacy requirements, when it does not.   Defendants are thereby unjustly enriched by avoiding the compliance costs and other expenditures associated with maintaining an adequate network of mental health providers, as required by federal and state law.

165.    This too was highlighted during the Senate Finance Hearing:

SENATOR WARREN: Do these . . . plans stand to gain anything from having inaccurate information? In other words, is it inaccurate because you just haven't spent enough money to make it accurate, or is it inaccurate by design?

MS. GILIBERTI: Well I think there are advantages they have when their directories are unfortunately inaccurate. They use those directories for network adequacy standards.

166.    Upon information and belief, EmblemHealth knowingly maintains an inaccurate and inflated provider directory in order to hide its non-compliance with network adequacy standards, thereby evading the costs of compliance and unjustly enriching them.

167.    As stated by Dr. Resneck of the American Medical Association, "continuing to allow inaccuracies makes it easier for plans to *fail to build networks that are adequate* and responsive to enrollees' needs."  Resneck Testimony, at 3 (emphasis added).

## ALLEGATIONS OF THE ASSOCIATION PLAINTIFFS

168.    Members of the Association Plaintiffs are falsely affiliated and falsely advertised in EmblemHealth's provider directory, thereby deceiving and confusing plan members, and allowing EmblemHealth to artificially inflate its provider network at psychiatrists' expense. Defendants do so in the following ways:

- Listing Association Plaintiffs' members as being in-network, when they are not;

- Repeating Association Plaintiff members' entries multiple times, making it appear that these providers can be seen at multiple locations and are readily accessible, when they are not;

- Misleading plan members to believe there are many more psychiatrists in their network than there are by including non-psychiatrists in search results;

- Listing Association Plaintiffs' members that are affiliated with large private entities who members are unable to contact directly;

- Listing Association Plaintiffs' members who only see hospitalized patients and do not provide outpatient mental health services; and

- Providing incorrect contact information for Association Plaintiffs' members, obstructing plan members' ability to reach them.

169.    EmblemHealth's provider directory also includes other inaccuracies, including wrong information about access (e.g., accessibility for wheelchairs and to public transportation) and availability, and wrong specialization and patient information (e.g., child versus adult).

170.    By falsely advertising and misusing the names and reputations of mental health providers, including members of the Association Plaintiffs, EmblemHealth has caused, and continues to cause, reputational and financial harm to members of the Association Plaintiffs.

171.    EmblemHealth has also been, and continues to be, unjustly enriched from its "ghost network" at the expense of the Association Plaintiffs' members.  This has occurred in a number of ways, including by inaccurately using psychiatrists' names and reputations to broaden its network,

thereby increasing its membership and employer client base, including New York City, and evading the costs of increasing reimbursement rates to psychiatrists in order to attract an adequate provider network.

172.    Through their misconduct detailed herein, Defendants have violated, and continue to violate, the Lanham Act.

## CLASS ACTION ALLEGATIONS

173.    This action is brought by the Plan Member Plaintiffs individually and on behalf of a class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

174.    Plan Member Plaintiffs seek certification of the following Class:

*All individuals who are currently, or were previously, enrolled in a health benefit plan issued and/or administered by EmblemHealth between 2023 and 2025.*

175.    The Plan Member Plaintiffs reserve the right to amend or modify the class definition.

176.    **Numerosity.** Fed. R. Civ. P. 23(a)(1). The Class consists of all individuals that are or have been members of any EmblemHealth benefit plan, including but not limited to GHI CBP, which itself covers hundreds of thousands of City of New York employees, retired employees under 65, and their dependents, and the Class is thus so numerous that joinder of all members is impracticable.  The exact number and identity of Class Members is unknown to the Plan Member Plaintiffs at this time but can be ascertained through appropriate discovery.

177.    **Typicality.** Fed. R. Civ. P. 23(a)(3). The claims asserted by the Plan Member Plaintiffs are typical of the claims of the Class. At all relevant times, Defendants' provider directory was inaccurate and misleading, and all Class Members' claims arise out of this common source of misrepresentations and omissions. The Plan Member Plaintiffs, like all Class Members, were subject to deceptive and misleading representations and omissions found in Defendants'

provider directory. The Plan Member Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class Members, and the Plan Member Plaintiffs have been damaged by the same wrongdoing set forth in this Complaint.

178. **Adequacy of representation.** Fed. R. Civ. P. 23(a)(4). The Plan Member Plaintiffs will fairly and adequately protect the interests of the Class and do not have any interests antagonistic to those of the Class Members. The Plan Member Plaintiffs have retained counsel competent and experienced in class actions and health insurance and consumer protection litigation, who are competent to serve as the Plan Member Plaintiffs' Class counsel. The Plan Member Plaintiffs and their counsel will fairly and adequately protect the interest of the Class Members.

179. **Ascertainability.** The identities and addresses of Class Members can be readily ascertained from business records maintained by the Defendants, and/or by self-authentication. The precise number of Class Members, and their addresses, can be ascertained from Defendants' records. The Plan Member Plaintiffs anticipate providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

180. **Commonality and predominance.** Fed. R. Civ. P. 23(a)(2); 23(b)(3). This action is appropriate as a class action because common questions of law and fact affecting the Class predominate over those questions affecting only individual members. Those common questions include but are not limited to the following:

- Whether the representations or omissions by Defendants on their provider directory were false or misleading under General Business Law ("GBL") §§ 349 and/or 350, New York Insurance Law § 4226(a), and/or common law;

- Whether Defendants' acts and practices constitute consumer-oriented conduct;

- Whether a reasonable consumer would be misled by Defendants' acts and practices;

- Whether such violations were willful and knowing;

- Whether the Plan Member Plaintiffs and Class Members are entitled to receive specific types of relief available under GBL §§ 349 and/or 350, New York Insurance Law § 4226(a), and/or common law, and the methodology for calculating those damages;

- Whether the Plan Member Plaintiffs and Class Members conferred a benefit on Defendants through enrollment in their plans; payment of premiums and/or administrative fees, and other costs; and/or by not obtaining mental health care;

- Whether equity and good conscience require restitution to the Plan Member Plaintiffs and Class Members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

181.    **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

- Given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class Member, few, if any, Class Members could afford to seek legal redress individually for the wrongs that Defendants have committed against them;

- The prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for Defendants and burden the courts;

- When Defendants' liability has been adjudicated, the claims of all Class Members can be determined by the Court;

- This action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

- Without a class action, many Class Members would continue to suffer injury while Defendants retain the substantial proceeds of their wrongful conduct; and

- This action does not present any undue difficulties that would impede its management by the Court as a class action.

182.    The Plan Member Plaintiffs request that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

**Unfair Competition and False Affiliation in Violation
of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)
(On Behalf of the Association Plaintiffs)**

183.    The Association Plaintiffs incorporate by reference all factual allegations in this Complaint and restate them as if fully set forth herein.

184.    Section 43(a)(1)(A) of the Lanham Act provides liability as to:

> Any person . . . who uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

185.    Defendants' conduct as set forth herein impacts interstate commerce and commerce within this district.

186.    As described more fully herein, Defendants have published and disseminated an inaccurate provider directory that falsely affiliates numerous mental health providers, including members of the Association Plaintiffs.

187.    This conduct has caused, and is likely to cause, mistake and deception as to the affiliation, connection, or association of mental health providers who are improperly listed in the EmblemHealth directory.

188.    Through this conduct, Defendants also misrepresent the nature and characteristics of their mental health provider network.

189.    This course of conduct includes, but is not limited to, the following:

a) confusing, or likely confusing, plan members and potential members about the existence of an affiliation between the falsely listed mental health providers, including members of the Association Plaintiffs, and Defendants;

b) misrepresenting that the falsely listed mental health providers, including members of the Association Plaintiffs, have a consensual business partnership or contract with Defendants and are part of their provider network;

c) misrepresenting that plan members may obtain treatment from any mental health provider listed on the provider directory at in-network rates;

d) misrepresenting the size and quality of Defendants' mental health provider network; and

e) harming the reputations of the falsely listed mental health providers, including members of the Association Plaintiffs, by falsely affiliating them with Defendants.

190.    As a direct and proximate result of Defendants' misconduct, members of the Association Plaintiffs who are falsely listed in Defendants' provider directory have been, or are likely to be, injured.

191.    Based on the violations of the Lanham Act detailed herein, the Association Plaintiffs are entitled to appropriate equitable and injunctive relief to require, among other things, correction of inaccurate directories, issuance of corrective disclosures, and establishment of appropriate practices and procedures to ensure that the directories are accurate and consistent with the disclosures.

192.    Pursuant to 15 U.S.C. § 1117, the Association Plaintiffs are further entitled to recover the costs of this action due to the exceptional nature of the allegations. Defendants' conduct was knowing, and was explicitly designed to deceive the general public, in order to reap profits at the expense of falsely listed mental health providers, including members of the Association Plaintiffs, entitling them to reasonable attorneys' fees and costs. Otherwise, the Association Plaintiffs disclaim any legal or equitable monetary relief.

## SECOND CAUSE OF ACTION

**False Advertising in Violation of Section 43 of the Lanham Act,**
**15 U.S.C. § 1125(a)**
**(On Behalf of the Association Plaintiffs)**

193.    The Association Plaintiffs incorporate by reference all factual allegations in this Complaint and restate them as if fully set forth herein.

194.    Defendants' conduct as set forth herein impacts interstate commerce and commerce within this District.

195.    Section 43(a)(1)(B) of the Lanham Act provides liability as to:

> Any person . . . who uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities. . . .

196.    As described more fully herein, Defendants have published and disseminated an inaccurate provider directory that contains false and/or misleading statements of fact, or omissions of material facts.

197.    These false and/or misleading statements or omissions of material facts, many of which artificially inflate Defendants' network, include, but are not limited to, the following:

   a) Falsely advertising mental health providers, including members of the Association Plaintiffs, as being in-network, when they are not;

   b) Falsely advertising mental health providers, including members of the Association Plaintiffs, by repeating their listings multiple times, making it appear that these providers can be seen at multiple locations and are readily accessible;

   c) Falsely advertising mental health providers, including members of the Association Plaintiffs, by including non-psychiatrists in search results for psychiatrists;

d)  Falsely advertising mental health providers, including members of the Association Plaintiffs, who are affiliated with large private entities that plan members are unable to contact directly;

e)  Falsely advertising mental health providers, including members of the Association Plaintiffs, who only see hospitalized patients and do not provide outpatient mental health services;

f)  Falsely advertising mental health providers, including members of the Association Plaintiffs, by publishing incorrect contact information;

g)  Other misrepresentations and inaccuracies, including wrong information about access (e.g., accessibility for wheelchairs and to public transportation) and about availability, and wrong specialization and patient information (e.g., child versus adult).

198.    The false and misleading statements and omissions described herein are material because consumers rely on provider directories in their evaluation of a health insurance plan and in their choice of providers.  The misrepresentations are intended to have an impact on plan members and potential members.

199.    The false and misleading statements and omissions described herein actually deceive, or have the tendency to deceive, consumers, plan members and potential members of Defendants' plans, including potential patients of the Association Plaintiffs' members.

200.    Defendants' conduct as described herein constitutes a violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a).

201.    As a direct and proximate result of Defendants' misconduct described herein, pursuant to 15 U.S.C. § 1117, mental health providers, including members of the Association Plaintiffs, falsely advertised on Defendants' provider directory have been, or are likely to be, damaged.

202.    Based on the violations of the Lanham Act detailed herein, the Association Plaintiffs are entitled to appropriate equitable and injunctive relief to require, among other things,

correction of inaccurate directories, issuance of corrective disclosures, and establishment of appropriate practices and procedures to ensure that the directories are accurate and consistent with the disclosures.

203.    Pursuant to 15 U.S.C. § 1117, the Association Plaintiffs are further entitled to recover the costs of this action due to the exceptional nature of the allegations.  Defendants' conduct was knowing, and was explicitly designed to deceive the general public, in order to reap profits at the expense of falsely advertised mental health providers, including members of the Association Plaintiffs, entitling them to reasonable attorneys' fees and costs.  Otherwise, the Association Plaintiffs disclaim any legal or equitable monetary relief.

### THIRD CAUSE OF ACTION

### New York Common Law Unfair Competition
### (On Behalf of the Association Plaintiffs)

204.    The Association Plaintiffs incorporate by reference all allegations in this Complaint and restate them as if fully set forth herein.

205.    As described herein, Defendants have engaged in a course of conduct with respect to Defendants' provider directory that falsely affiliate and advertise mental health providers, including members of the Association Plaintiffs.

206.    By misappropriating and exploiting the goodwill and business reputation of the falsely affiliated and falsely advertised mental health providers, including members of the Association Plaintiffs, Defendants have acted in bad faith and have been unjustly enriched, and will continue to do so, unless enjoined by this Court.

207.    Defendants' wrongful conduct constitutes unfair competition under common law against members of the Association Plaintiffs, and the Association Plaintiffs have no adequate remedy at law.

208.    Defendants' conduct has caused, and is causing, immediate and irreparable injury to the falsely affiliated and falsely advertised mental health providers, including members of the Association Plaintiffs, and will continue to damage them and deceive the public unless enjoined by this Court.

209.    Through this Cause of Action, the Association Plaintiffs are only seeking injunctive and equitable relief on behalf of their members, as well as reasonable attorneys' fees and costs, and disclaim any legal or equitable monetary relief.

## FOURTH CAUSE OF ACTION

### Deceptive acts and practices in violation of the
### New York Deceptive Acts & Practices Act, N.Y. Gen. Bus. Law § 349
### (on behalf of the Plan Member Plaintiffs and the putative Class)

210.    The Plan Member Plaintiffs incorporate by reference all factual allegations in this Complaint and restate them as if fully set forth herein.

211.    The Plan Member Plaintiffs bring this claim individually and on behalf of the members of the proposed Class, against Defendants for violations of the New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law ("GBL") § 349.

212.    N.Y. GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

213.    The Plan Member Plaintiffs and the members of the proposed Class are "persons" under N.Y. GBL § 349(h).

214.    Defendants' actions as set forth herein occurred in the conduct of business, trade, or commerce under N.Y. GBL § 349(a).

215.    Defendants have engaged in consumer-oriented conduct that has misled and harmed the Plan Member Plaintiffs and the members of the proposed Class. The acts and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

216.    In the course of business, Defendants made deceptive misrepresentations and omissions to the Plan Member Plaintiffs and the members of the proposed Class by publishing and disseminating an inaccurate and misleading provider directory. The provider directory, which plan members and prospective members are directed to rely on, misleads consumers regarding the size and quality of EmblemHealth's mental health provider network.

217.    False representations include that Defendants' plans have a particular sized network of mental health providers; that all providers listed on the directory are in-network; that there are sufficient, accessible and available mental health care providers in that network; and more.

218.    Omissions include the extent of inaccuracies in the provider directory; the true size of the mental health provider network; the likelihood that a plan member seeking mental health care may be unable to obtain in-network care; and more.

219.    These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, together conveyed that Defendants' provider directory was accurate and broad, and that in-network mental health care would be available and accessible.

220.    These misrepresentations and omissions alleged herein were materially misleading. A reasonable consumer would attach importance to such representations and omissions.

221.    The acts and practices alleged herein are deceptive acts and practices covered under New York GBL § 349 and have caused the Plan Member Plaintiffs and putative Class members concrete monetary and non-monetary injuries. Among other injuries, Defendants' deceptive acts

and practices have caused the Plan Member Plaintiffs and putative Class members to be overcharged for premiums and/or administrative fees for an illusorily broad network of mental health providers.

222.    Defendants willfully and knowingly violated N.Y. GBL § 349.


### FIFTH CAUSE OF ACTION

### False advertising in violation of the
### New York False Advertising Act, N.Y. Gen. Bus. Law § 350
### (on behalf of the Plan Member Plaintiffs and the putative Class)

223.    The Plan Member Plaintiffs incorporate by reference all factual allegations in this Complaint and restate them as if fully set forth herein.

224.    The Plan Member Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendants for violations of the New York False Advertising Act, N.Y. GBL § 350.

225.    N.Y. GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in New York. "False" includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity . . . ." N.Y. GBL § 350(a).

226.    Defendants' actions as set forth herein occurred in the conduct of business, trade, or commerce under N.Y. GBL § 350.

227.    Defendants have engaged in consumer-oriented conduct that has misled and harmed the Plan Member Plaintiffs and the members of the proposed Class. The acts and practices

alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

228.    In the course of business, Defendants made deceptive misrepresentations and omissions to the Plan Member Plaintiffs and the members of the proposed Class by publishing and disseminating an inaccurate and misleading provider directory.  The provider directory, which plan members and prospective members are directed to rely on, misleads consumers regarding the size and quality of EmblemHealth's mental health provider network.

229.    False representations include that Defendants' plans have a particular sized network of mental health providers; that all providers listed on the directory are in-network; that there are sufficient, accessible and available mental health care providers in that network; and more.

230.    Omissions include the extent of inaccuracies in the provider directory; the true size of the mental health provider network; the likelihood that a member seeking mental health care may be unable to obtain in-network care; and more.

231.    These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, together conveyed that Defendants' provider directory was accurate and broad, and that in-network mental health care would be available and accessible.

232.    These misrepresentations and omissions alleged herein were materially misleading. A reasonable consumer would attach importance to such representations and omissions.

233.    The acts and practices alleged herein are deceptive acts and practices covered under New York GBL § 350 and have caused the Plan Member Plaintiffs and putative Class members concrete monetary and non-monetary injuries.  Among other injuries, Defendants' deceptive acts and practices have caused the Plan Member Plaintiffs and putative Class members to be

overcharged for premiums and/or administrative fees for an illusorily broad network of mental health providers.

234.     Defendants willfully and knowingly violated N.Y. GBL § 350.

## SIXTH CAUSE OF ACTION

**Misrepresentations in violation of
New York Insurance Law § 4226
(on behalf of the Plan Member Plaintiffs and the putative Class)**

235.     The Plan Member Plaintiffs incorporate by reference all factual allegations in this Complaint and restate them as if fully set forth herein.

236.     Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans.  Specifically, New York Insurance Law § 4226 states in pertinent part: "No insurer authorized to do in this state the business of . . . health insurance . . . shall . . . issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."

237.     Defendants are liable under Section 4226 because:

a)  they are authorized to provide health insurance in New York;

b)  they misrepresented: the size and quality of their network of mental health providers; that the Plan Member Plaintiffs and putative Class members would have access to in-network care from the mental health providers listed on the directory; that these providers would be accessible and available, and more;

c)  the misrepresentations were material;

d)  Defendants knew that they had misrepresented the terms, benefits, and advantages of their health plans, and have long been on notice of their provider directory's deficiencies;

e)  Defendants knew that their provider directory would be communicated to the Plan Member Plaintiffs and putative Class members, directly and indirectly;

f) the Plan Member Plaintiffs and the members of the proposed Class received the provider directory and learned of the misrepresentations, directly and indirectly;

g) Defendants did not abide by their representations; and

h) the Plan Member Plaintiffs and the members of the proposed Class were thereby injured.

238.    The acts and practices alleged herein are deceptive acts and practices covered under New York Ins. Law § 4226 and have caused the Plan Member Plaintiffs and putative Class members concrete monetary and non-monetary injuries. Among other injuries, Defendants' deceptive acts and practices have caused the Plan Member Plaintiffs and putative Class members to be overcharged premiums and/or administrative fees for an illusorily broad network of mental health providers.

239.    These violations of New York Insurance Law § 4226(a) were knowing, and Defendants knowingly received premiums and/or other compensation as a result of such violations.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment
### (on behalf of the Plan Member Plaintiffs and the putative Class)

240.    The Plan Member Plaintiffs incorporate by reference all factual allegations in this Complaint and restate them as if fully set forth herein.

241.    Defendants have been, and continue to be, unjustly enriched because of their misrepresentations and omissions in their provider directory.

242.    Defendants portrayed their mental health provider network as broad and accessible, and the Plan Member Plaintiffs and putative Class members, and employer clients, including New York City, believed that information to be accurate. Defendants' deceptive representations thus attracted increased membership, and allowed them to enter into more agreements with employers, thereby increasing EmblemHealth's share of the marketplace.

243.    The Plan Member Plaintiffs and putative Class members have conferred a benefit on Defendants by enrolling in Defendants' plans, and thereby paying and/or directing their medical premiums and/or administrative fees to Defendants.

244.    Defendants' deceptive representations about their provider network allowed them to charge higher, inflated premiums and/or administrative fees based on the appearance of a broad mental health provider network.

245.    The members of the proposed Class who are enrolled in EmblemHealth's fully-insured plans have further conferred a benefit on Defendants, because members seeking mental health care that are unable to find a provider in EmblemHealth's network were more likely to obtain out-of-network treatment, or to delay or abandon their efforts to obtain mental health care altogether; in both cases, saving EmblemHealth costs of paying benefits associated with their care.

246.    Defendants have thus enriched themselves by reaping the benefits of increased membership and employer contracts, and by charging higher premiums and/or administrative fees than they otherwise would have been able to, while reducing their own financial duties for mental health care coverage.

247.    These and other benefits were obtained at the expense of the Plan Member Plaintiffs and putative Class members, who did not receive the full value of their health benefits.

248.    In addition, EmblemHealth's inflated mental health provider network makes it appear that Defendants are in compliance with statutory and regulatory requirements that their provider network be sufficient, adequate, and accurate; thereby saving EmblemHealth the costs of actual compliance with these requirements, and shielding EmblemHealth from government investigation and the associated costs.

249.    It is inequitable and unjust for Defendants to continue to be allowed to benefit from their false and misleading provider directory, and to retain the benefits conferred on them by the Plan Member Plaintiffs and the members of the proposed Class, while decreasing their obligations to do what they say they will: provide access to a broad network of mental health providers and adequate coverage for mental health treatment.

250.    These expenses and inconveniences should have been borne by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

251.    Certifying the Class proposed above;

252.    Appointing Mark Health Law PLLC and Zuckerman Spaeder LLP as Class Counsel;

253.    Awarding any and all relief permitted by law or equity to the Plan Member Plaintiffs, the proposed Class, and the Association Plaintiffs.

254.    Awarding damages, including trebled damages and punitive damages, as well as injunctive and equitable relief, to the Plan Member Plaintiffs and the proposed Class.

255.    Awarding the Plan Member Plaintiffs and the proposed Class pre-judgment and post-judgment interest, as well as costs.

256.    Awarding the Plan Member Plaintiffs and the proposed Class reasonable attorneys' fees and costs.

257.    Awarding the Plan Member Plaintiffs and the proposed Class such other relief as this Court may deem just and proper under the circumstances.

258.    Awarding the Association Plaintiffs appropriate equitable and injunctive relief to redress and prevent Defendants' misconduct and the resulting injury to members of the Association Plaintiffs, including but not limited to correction of inaccurate directories, issuance of corrective disclosures, and the establishment of appropriate practices and procedures to ensure that the directories are accurate and consistent with the disclosures.

259.    Awarding the Association Plaintiffs reasonable attorneys' fees and costs.

\* \* \*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: December 30, 2025,

Respectfully submitted,

**Mark Health Law PLLC**
By: */s/ Sara Haviva Mark*

Sara Haviva Mark
Sara@MarkHealthLaw.com
909 Third Avenue, #792
New York, NY 10150
(646) 504-1850

**Zuckerman Spaeder LLP**
By: */s/ Caroline E. Reynolds*

Caroline E. Reynolds (*pro hac vice*
forthcoming)
CReynolds@Zuckerman.com

2100 L Street NW, Suite 400
Washington, DC 20037
(202) 778-1800

Jason S. Cowart
JCowart@Zuckerman.com
485 Madison Ave., 19th flr.
New York, NY 10022
(212) 704-9600


**The Hufford Law Firm PLLC**
By: */s/ D. Brian Hufford*

D. Brian Hufford
dbhufford@huffordlawfirm.org
76 Midland Avenue
Rye, NY 10580
(614) 371-3657


**Janove PLLC**
By: */s/ Raphael Janove*

Raphael Janove
Raphael@janove.law
500 7th Ave., 8th Fl.
New York, NY 10018
(646) 347-3940

*Attorneys for Plaintiffs and the Proposed Class*