# Exhibit B

ATTORNEY GENERAL OF THE STATE OF NEW YORK
HEALTH CARE BUREAU

_____

In the Matter of

**Investigation by LETITIA JAMES,**
**Attorney General of the State of New York,** of

**EmblemHealth, Inc., EmblemHealth Plan, Inc.,**
**Health Insurance Plan of Greater New York, and**
**EmblemHealth Insurance Company,**

Respondents.

_____

Assurance No. 24-009

## <u>ASSURANCE OF DISCONTINUANCE</u>

The Office of the Attorney General of the State of New York ("OAG") commenced an

investigation pursuant to New York Executive Law § 63(12) into the business practices of

EmblemHealth, Inc., EmblemHealth Plan, Inc. f/k/a Group Health Incorporated, Health

Insurance Plan of Greater New York d/b/a HIP Health Maintenance Organization, and

EmblemHealth Insurance Company f/k/a HIP Insurance Company of New York (collectively,

"Respondents" or "Emblem"). OAG's investigation, which is based on its statewide secret

shopper survey of thirteen health plans ("Secret Shopper Study"), concerns the accuracy of

Respondents' participating provider directory (in particular for behavioral health), the adequacy

of their networks of behavioral health providers, and their compliance with behavioral health

parity laws. This Assurance of Discontinuance ("Assurance") contains the findings of OAG's

investigation and the relief agreed to by OAG and Respondents (collectively, the "Parties"),

whether acting through their respective directors, officers, employees, representatives, agents,

delegated entities, affiliates, or subsidiaries.

**FINDINGS**

1.      EmblemHealth, Inc., a New York not-for-profit corporation, was formed in 2006 by the merger of Group Health Incorporated and the Health Insurance Plan of Greater New York d/b/a HIP Health Maintenance Organization ("HIP") and offers health plans to New York consumers. EmblemHealth, Inc.'s principal offices are located at 55 Water Street, New York, New York 10041.

2.      HIP, a subsidiary of EmblemHealth, Inc., is a New York not-for-profit health insurer and health maintenance organization ("HMO") licensed under Article 43 of the New York Insurance Law and Article 44 of the New York Public Health Law. Its principal offices are located at 55 Water Street, New York, New York 10041.

3.      EmblemHealth Plan, Inc., f/k/a Group Health Incorporated ("EHPI"), a subsidiary of HIP, is a New York State not-for-profit health insurer licensed under Article 43 of the New York State Insurance Law. EHPI's principal offices are located at 55 Water Street, New York, New York 10041.

4.      EmblemHealth Insurance Company f/k/a HIP Insurance Company of New York ("EHIC"), a subsidiary of HIP Holdings, Inc. (which is a subsidiary of HIP), is licensed under Article 42 of the New York Insurance Law.

5.      In the regular course of business, Respondents enroll consumers in health plans and contract with health care providers for the delivery of health care services to those consumers.

### THE BEHAVIORAL HEALTH CRISIS IN NEW YORK STATE

6.        Three million adult New Yorkers — one in five across the state — live with behavioral disorders.[1] As used in this Assurance, "behavioral health" includes mental health disorders, substance use disorders, and autism. In February 2023, 31 percent of New Yorkers reported symptoms of anxiety or depression.[2] The COVID-19 pandemic dramatically increased the need for behavioral health services in New York.[3]

7.        Access to behavioral health treatment remains out of reach for many. More than half of insured adults who do not get needed behavioral health treatment cite lack of coverage by their health plans as the reason.[4] In 2022, almost 500,000 New York children aged 3 through 17 had a diagnosed behavioral health condition (depression, anxiety problems, or behavioral or conduct problems).[5] Of those children, 196,000 (40 percent) did not receive treatment or counseling.[6]

8.        Consumers depend on their health insurance to access and afford behavioral health treatment for themselves and their dependents. To find in-network treatment and to shop for insurance, consumers look to provider directories published by health plans. But consumers

---

[1] Kaiser Family Found. (KFF), *New York: Mental Health & Substance Abuse*, https://www.kff.org/state-category/mental- health/?state=NY (2,972,000 (19.5 percent) adults in New York reported mental illness from 2018-19).
[2] Kaiser Family Found. (KFF), *Mental Health in New York*, https://www.kff.org/statedata/mental-health-and-substance- use-state-fact-sheets/new-york.
[3] *See* N.Y. State Health Found., *Mental Health Impact of the Coronavirus Pandemic in New York State* (2021), https://nyshealthfoundation.org/wp-content/uploads/2021/02/mental-health-impact-coronavirus-pandemic-new-york-state.pdf; NYC Dep't of Health and Mental Hygiene, *Impacts of COVID-19 on Mental Health in New York City*, 2021 (2021), https://www1.nyc.gov/assets/doh/downloads/pdf/epi/databrief130.pdf.
[4] Kaiser Family Found. (KFF), *Proposed Mental Health Parity Rule Signals New Focus on Outcome Data as Tool to Assess Compliance* (Sept. 29, 2023), https://www.kff.org/mental-health/issue-brief/proposed-mental-health-parity-rule- signals-new-focus-on-outcome-data-as-tool-to-assess-compliance/.
[5] Child and Adolescent Health Measurement Initiative, *2022 National Survey of Children's Health*, https://www.childhealthdata.org/browse/survey/results?q=10029&r=34.
[6] *Id.*

— in particular those with behavioral health conditions — may experience challenges when using these directories, including providers not accepting new patients, long wait times to see providers, and inaccurate or out-of-date provider information.

9.     Secret shopper surveys, in which callers simulate the experience of consumers calling providers in a plan's network directory, are an effective tool to test directory accuracy and identify gaps in network adequacy. Numerous secret shopper studies conducted during the past eight years have indicated that inaccuracies in health plans' provider directory listings for behavioral health providers exist, including incorrect information about network status, location, and availability to accept new patients.[7] In July 2024, a study published in the Journal of the American Medical Association showed that only 18 percent of mental health clinicians listed as in-network for Medicaid plans were reachable, accepted Medicaid, and could provide a new patient appointment.[8] These are referred to as "ghost networks" — i.e., providers who are listed in a provider directory as being in-network but are not taking new patients or no longer in a plan's network. Other tools serve a similar purpose as secret shopper surveys, including examining claims data to assess whether consumers actually access treatment.

---

[7] In 2017, a survey of BlueCross BlueShield plans in five cities found that mental health appointments for children were obtained with only 40% of the pediatricians and 17% of the child psychiatrists. Shireen Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, 47 Int'l J. Health Servs. 621, 630 (2017), https://pubmed.ncbi.nlm.nih.gov/28474997/. A different study of BlueCross BlueShield plans in three cities found that mental health appointments with psychiatrists were obtained with only 26% of psychiatrists. Monica Malowney et al., *Availability of Outpatient Care from Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, 66 Psychiatr. Serv. 94, 95 (2015), https://pubmed.ncbi.nlm.nih.gov/25322445/. And a study of three health plans' directories in the Washington, D.C. area found that only seven percent of psychiatrists offered an appointment within two weeks. Benzion Blech et al., *Availability of Network Psychiatrists Among the Largest Health Insurance Carriers in Washington, D.C.*, 68 Psychiatr. Serv. 962, 964 (2017), https://ps.psychiatryonline.org/doi/epdf/10.1176/appi.ps.201600454.
[8] Diksha Brahmbhatt & William Schpero, *Access to Psychiatric Appointments for Medicaid Enrollees in 4 Large US Cities*, *JAMA*, 332(8):668–669 (2024), https://jamanetwork.com/journals/jama/fullarticle/2821639.

## OAG'S INVESTIGATION OF RESPONDENTS

### Respondents' Online Participating Provider Directory

10.     Respondents operate as a corporation licensed under Article 43 of the New York Insurance Law and as an HMO licensed under Article 44 of the New York Public Health Law. Respondents offer preferred provider organization, health maintenance organization, Essential Plan, Medicaid Managed Care, and Child Health Plus plans.

11.     Respondents make available networks composed of various types of behavioral health providers and facilities in New York ("Participating Providers") that accept negotiated rates plus the applicable member co-payment, coinsurance, and/or deductible as payment in full for covered services rendered to the members of Respondents' plans ("Members").

12.     As of the Effective Date, Respondents have approximately 1.5 million members in their commercial health plans, New York City employee health plans, Essential Plan products, Qualified Health Plans, Medicaid managed care plans, and Child Health Plus plans.

13.     Respondents are legally responsible for maintaining an accurate directory of behavioral health providers, an adequate network of behavioral health providers, and for compliance with behavioral health parity laws. For approximately twenty years, Respondents have retained Carelon Behavioral Health, Inc. and its subsidiaries and affiliates, including Carelon Behavioral Health IPA, Inc. ("Carelon," f/k/a Beacon Health Options, f/k/a Value Options), as a delegated vendor for behavioral health benefit management services to EmblemHealth.

14.     Respondents make information about Participating Providers available to Members and other consumers through a provider directory on their public website

www.emblemhealth.com ("Online Participating Provider Directory"), either directly or by clicking a link on a web page that redirects to a web page on Carelon's public website, which features Emblem branding.[9]

15.    Respondents encourage Members and other consumers to use their Online Participating Provider Directory. For example, as of the Effective Date, on their public website Respondents inform City of New York employees and their dependents that Respondents have a "robust network of quality doctors" from which Members and other consumers can access care, and instruct them to use Respondents' Online Participating Provider Directory:



16.    Respondents' Online Participating Provider Directory contains listings for Participating Providers (including facilities) that include: name, addresses, telephone number(s), and in the case of physicians and other applicable providers, specialty area, hospital affiliations and any applicable board certification, and whether they are accepting new patients.

17.    Respondents' Online Participating Provider Directory is available to Members and other consumers who seek information about Respondents' Participating Provider network when selecting their health plans.

---

[9] https://www.carelonbh.com/emblemhealth/en/home/find-providers.

**Respondents' Directory Accuracy Policies and Process**

18.    In 2010, OAG executed Assurances of Discontinuance with Respondent EmblemHealth Plan Inc., and in 2011, with Respondent Health Insurance Plan of Greater New York, regarding their inaccurate directory listings, including for behavioral health providers (the "2011 AOD"). Respondents agreed to ensure their provider directory is accurate on an ongoing basis. The 2011 AOD is still in effect.

19.    In June 2020, a consultant informed Respondents that "[t]here is no functional capability for a provider to attest to the accuracy of their data displayed in the [Online Participating Provider Directory on their website] nor to notify the health plan of any changes that may be required." At some point prior to 2025, Carelon's website allowed Members to report inaccuracies in Online Participating Provider Directory listings.

20.    Respondents adopted a policy in January 2021 titled "[Provider Data Validation] Process Overview," which states that, pursuant to the 2011 AOD, Respondents are required to solicit all Participating Providers listed in their Online Participating Provider Directory and in printed provider directories and verify their plan status on at least an annual basis. The policy also states that Respondents use a vendor to validate service locations for providers with whom they contract directly, and "special handling" for other types of providers, and that uncooperative and unresponsive providers may be suppressed (i.e., removed) from the Online Participating Provider Directory.

21.    In March 2023, Respondents told the City of New York that Carelon had a "[o]ne- day turnaround time for provider directory updates upon notification of a change in information."

22.    Other than audits of small samples of providers that showed many inaccuracies (with a two-time exception where a larger pool was audited and also showed many inaccuracies), Respondents' only other method of ensuring the accuracy of Online Participating Provider Directory listings has been to send notices to providers reminding them to verify their information. But Respondents failed to ensure that Carelon sent these notices to every provider on a regular schedule, as was required by Respondents' own policies and federal law. Respondents did not monitor its behavioral health Online Participating Provider Directory processes after 2020, which Respondents' corporate representative testified was "a lost opportunity." In December 2023, one week after OAG published its Secret Shopper Study, an executive of an affiliate of Respondents suggested that Respondents were "out of compliance" with federal directory accuracy requirements.

23.    Respondents' corporate representative also testified that there is "a heavy reluctance to remove a provider from the directory,"—a reluctance which Respondents failed to rectify—and that having accurate listings means removing some providers from the Online Participating Provider Directory and having a less robust network, which is a concern for Respondents.

24.    Since 2019, Respondents have removed from their Online Participating Provider Directory some medical/surgical Participating Providers who did not verify their provider directory information, or who did not treat Members within the prior year. However, Respondents did not systematically remove behavioral health Participating Providers from their Online Participating Provider Directory due to failure to verify their information until 2025, and only if such providers did not verify their information for more than one year.

25.    Respondents' Online Participating Provider Directory (which includes listings for

certain mental health Participating Providers) does not allow Members, other consumers, or providers to report inaccurate provider information directly on pages containing providers' listings. Rather, they must call Respondents and report errors to the service center.

**Respondents' Network Adequacy Policies and Process**

26.    Respondents' "Network Adequacy Standards - Practitioner" policy requires its provider network to meet or exceed the following availability standards for behavioral health appointment waiting times:

a.    Emergencies: member must be seen immediately.

b.    Non-life threatening emergent: member must be offered the opportunity to be seen within six hours of the request.

c.    Urgent: member must be offered the opportunity to be seen within 48 hours of the request.

d.    Initial visit for routine care: member must be offered the opportunity to be seen within ten (10) business days.

e.    Follow-up Routine: member must be offered the opportunity to be seen within ten (10) business days.

Respondents' "standard of performance" is that its network has 95 percent or greater availability across all licensure types.

27.    Respondents' "Monitoring Access & Appointment Availability" policy sets forth requirements for assessing compliance with Respondents' appointment wait time standards for medical/surgical and behavioral health services, as measured through telephone surveys. For practitioners, an appointment must be scheduled within the appointment availability standards. The policy requires at least 75 percent of the practitioners in Respondents' network to meet the

appointment availability standards. The policy deems the following telephone survey results to be "non-compliant" with the appointment availability standards: no answer after three calls, line busy on three attempts, put on hold for more than 10 minutes in three attempts, disconnected phone, telephone number changed but no forwarding number given, practitioner no longer at number, practitioner no longer participating, and practitioner not accepting new patients.

28.    Respondents have not consistently monitored network adequacy for behavioral health services beyond reports that rely on directory listings (which may be inaccurate) and do not measure actual access to providers. In October 2022, a senior compliance executive stated that "[t]here is an open question at [Respondents] attempting to identify who oversees" network adequacy for behavioral health. In late December 2023 (three weeks after OAG published its Secret Shopper Study), another senior compliance executive asked a senior executive, "WHO at EMBLEM monitors the network adequacy assessments that Carelon performs and their results?" Another senior executive responded with a question: "do we get the report so we are responsible?"

### OAG's Secret Shopper Study

29.    Using a methodology commonly used in academic studies published in peer reviewed journals,[10] OAG conducted a "simulated patient" secret shopper study of behavioral health Participating Providers listed in Respondents' Online Participating Provider Directory,

---

[10] *See, e.g.*, Diksha Brahmbhatt & William Schpero, *Access to Psychiatric Appointments for Medicaid Enrollees in 4 Large US Cities*, JAMA, 332(8):668–669 (2024), https://jamanetwork.com/journals/jama/fullarticle/2821639; Shireen Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, 47 Int'l J. Health Servs. 621, 630 (2017), https://pubmed.ncbi.nlm.nih.gov/28474997/; Benzion Blech et al., *Availability of Network Psychiatrists Among the Largest Health Insurance Carriers in Washington, D.C.*, 68 Psychiatr. Serv. 962, 964 (2017), https://ps.psychiatryonline.org/doi/epdf/10.1176/appi.ps.201600454; Monica Malowney et al., *Availability of Outpatient Care from Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, 66 Psychiatr. Serv. 94, 95 (2015), https://pubmed.ncbi.nlm.nih.gov/25322445/.

between March 14 and April 27, 2023, and published the results on December 7, 2023.[11] OAG called 44 Participating Providers in New York City listed in Respondents' Online Participating Provider Directory as accepting new patients, including psychiatrists, nurse practitioners, doctoral-level psychologists, and Licensed Clinical Social Workers.

30.    OAG called providers posing as a family member of a Member with a mental health need, with the goal of securing an appointment. For two-thirds of the calls, staff used Scenario A (a fictional adult patient), stating the family member is depressed and their primary care physician suggested they see a mental health provider. For one-third of the calls, staff used Scenario B (a fictional child patient), stating they are the parent of a 14-year-old who has begun having problems in school. When callers reached a voicemail, they left a message with a request for a call back. When the listed phone number was incorrect but callers reached a person who could direct them to another number, the caller followed those instructions and attempted to reach the listed provider.

31.    Of the 44 Participating Providers listed as accepting new patients in Respondents' Online Participating Provider Directory whom OAG attempted to contact, the Secret Shopper Study found that 16 (36 percent) were not accepting new patients, 11 (25 percent) were not practicing, and five (11 percent) were non-working numbers, incorrect numbers, or unreturned calls. Staff could make appointments with only eight (18 percent) of the listings, either in-person or via telehealth. The Study concluded that 82 percent of the listed providers staff attempted to contact were therefore "ghosts," because, for example, they were unreachable, not accepting new patients, or not in-network — despite being listed in Respondents' directory as in-network and

---

[11] Office of the New York State Attorney General (Dec. 7. 2023), *Inaccurate and inadequate: Health plans' mental health provider network directories*, https://ag.ny.gov/sites/default/files/reports/mental-health-report_0.pdf, at 17-23.

accepting new patients. The following chart shows detailed results of the Study:

**Plan: EmblemHealth | Location: New York City**

| Location, scenario | Total calls | In-network | Any appointment offered | In-person appointment offered | Success percentage | Ghost listing percentage |
|---|---|---|---|---|---|---|
| Scenario A (adult) | 28 | 9 | 3 | 3 | 11% | 89% |
| Scenario B (child) | 16 | 9 | 5 | 2 | 31% | 69% |
| **EmblemHealth totals** | **44** | **18** | **8** | **5** | **18%** | **82%** |

32.    Of the 44 Participating Providers OAG contacted, Respondents' data show that they failed to verify the information of 16 of those 44 providers within at least one quarter of the prior year – more than one-third. Respondents' claims data show that of those 44 providers, seven treated no Members in the prior year, and 20 (almost half) treated four Members or less.

33.    Respondents have not corrected certain listings of providers whom OAG contacted. For example, in 2023, Respondents' Online Participating Provider Directory listed a provider as accepting new patients and practicing child psychiatry. When OAG called the doctor's office to book an appointment for a child, the receptionist said that the provider works in a nursing home, does not accept outpatient clients, and only sees patients over age 18. Yet until late September and October 2025 (when the provider's listings for four locations were removed), he was still listed as accepting new patients and practicing child psychiatry, even though he submitted no claims to Respondents from 2019 through 2024, and his provider verification file indicates that he lives in Florida and sees patients at eight locations in four different states (Florida, New York, Pennsylvania, and California), in practices whose names include the word "senior." Respondents' corporate representative testified that these facts are "of high concern" and require "a deeper understanding."

### Other State Secret Shopper Surveys

34.    In secret shopper surveys, the New York State Department of Health ("DOH")

also found serious deficiencies in Respondents' Online Participating Provider Directory. In 2020, DOH called 60 Medicaid providers in Respondents' network and found a 33 percent participation rate and 67 percent directory inaccuracy rate. In 2023, DOH surveyed primary care providers in Respondents' HIP network, finding that only 45 percent were able to offer timely appointments for routine visits. Also in 2023, a DOH secret shopper survey of Respondents' Essential Plan providers showed that the overall access rate was 49 percent, and that of 30 behavioral health providers surveyed, the access rate was 13 percent.

**Respondents' Directory Accuracy and Network Adequacy Audits**

35.    Respondents' own email audits and secret shopper surveys of behavioral health providers in its Online Participating Provider Directory have produced results similar to OAG's and DOH's findings.

36.    Respondents' audit of provider directory data validation for January through July 2022 showed that 23 percent of medical/surgical Participating Provider offices did not respond to requests for data validation. Of Participating Providers who responded, 71 percent reported incorrect location and other errors in their listings.

37.    Respondents' audit of provider directory data validation for the second quarter of 2024 showed that 15 percent of medical/surgical Participating Provider offices did not respond to requests for data validation. Of Participating Providers who responded, 60 percent reported incorrect location and other errors in their listings.

38.    In January 2025, Respondents called 600 behavioral health Participating Providers seeking to schedule appointments, to "simulate the experience of a member seeking behavioral health services by a practitioner." A secret shopper report issued by Respondents states that only 62 percent of providers surveyed were accepting new patients and only 46

percent had appointment availability within ten days. Respondents' corporate representative testified that the 46 percent figure does not meet Respondents' availability and access standards. Respondents' corporate representative also testified that in calculating these percentages, Respondents excluded providers who could not be reached, but should have included them. Respondents' corporate representative further testified that had Respondents included unsuccessful calls in the result calculations, as required by Respondents' Monitoring Access & Appointment Availability policy (described in Paragraph 27 above), the overall appointment availability would have been 22 percent and the ten-day appointment availability rate would have been 10 percent. These results show Respondents falling far short in meeting the access and availability standards set forth in their own policies.

39.    A report prepared by Carelon regarding Respondents' behavioral health Participating Providers confirms an eight percent success rate in calls attempting to schedule appointments with those providers – and that Respondents have a "Ghost network."

40.    Thousands of behavioral health providers listed in Respondents' Online Participating Provider Directory do not treat Respondents' Members. During a six-year period from 2019 through 2024, 6,475 of Respondents' behavioral health Participating Providers did not file a single behavioral health claim for treatment of a Member; 4,495 filed no claims at all. In 2023, 87 percent of Respondents' Essential Plan behavioral health Participating Providers were unavailable (defined as filing no claims), as reflected in Respondents' own analysis of their claims data:

| Provider Type | Listed | Accessed | Unavailable | Total |
|---|---|---|---|---|
| Psychiatrist | 881 | 160 | 721 | 881 |
| Psychologist | 977 | 114 | 863 | 977 |
| Licensed Social Worker | 2124 | 317 | 1807 | 2124 |
| Mental Health Counselor | 578 | 46 | 532 | 578 |
| Licensed Behavior Analyst | 489 | 0 | 489 | 489 |
| Other Mental Health Provider | 579 | 110 | 469 | 579 |
| All Providers (Total) | 5628 | 747 | 4881 | 5628 |

**Complaints by Respondents' Members Regarding Access to Behavioral Health Treatment**

41. From 2018 through 2024, Members of Respondents' health plans lodged at least 360 complaints with Respondents relating to directory inaccuracy or inability to secure behavioral health treatment with Participating Providers.

42. Respondents oversaw and failed to address Carelon's practice of deeming complaints unsubstantiated, even when members unsuccessfully tried to reach providers whose numbers Respondents had given them. For example, a Member contacted Respondents because they could not locate a Participating Provider for their spouse. The member reported that they called at least eight Participating Providers listed in Respondents' Online Participating Provider Directory seeking an appointment for their spouse to see a psychiatrist, but each call was unsuccessful because the provider did not participate with Respondents, was not accepting new patients, or had an incorrect number or place of business. Carelon then gave the spouse a list of approximately twenty-five (25) Participating Providers listed in Respondents' Online Participating Provider Directory, and the spouse called each of them without any success in securing an appointment for the Member. Carelon then reached out to an additional thirty-eight (38) Participating Providers listed in their Online Participating Provider Directory, but could not secure an appointment for the Member's spouse with any of them. Nevertheless, Carelon sent the Member a complaint determination letter stating the complaint was unsubstantiated because the

Member did not send the names of specific providers they called within ten days of the date of the complaint acknowledgement letter. Respondents' corporate representative testified that this outcome was "highly frustrating" due to the Member's lack of access.

43.    Another Member filed a complaint with OAG after Carelon failed to respond adequately to her complaint to Respondents regarding her difficulty finding an in-network psychiatrist for her 14-year-old son, who suffered from major depression and attention-deficit disorder. As set forth in OAG's Secret Shopper Study, Respondents "gave her a list of eight in-network providers, but none accepted new patients[.]" Respondents sent the same list of providers to OAG, suggesting they were available in-network providers, despite the fact that the member's out-of-network provider had filed a written grievance with Respondents a month earlier, stating that he called *the same providers*, who told him they could not treat the member. After Respondents accepted that no Participating Provider could treat the patient and agreed to enter into a single-case agreement with an out-of-network psychiatrist, Respondents asserted to OAG that the provider had requested an "exorbitant" reimbursement rate, when in fact the provider had requested usual, customary, and reasonable rates.

### The Harms Caused by Inaccurate Provider Directories

44.    Inaccurate provider directories may cause consumers seeking health care to expend additional time and resources combing through website listings and calling providers' offices to secure an appointment with an in-network provider. Ghost networks can exacerbate behavioral health conditions, creating additional anxiety and feelings of hopelessness for patients, who may delay or forego care altogether due to the difficulty of accessing services, the cost, or

both.[12]

45.    Surveys consistently show that lack of adequate insurance coverage is a major

reason why consumers with behavioral health conditions go without treatment.  According to a

2022 survey conducted by The Harris Poll, 43 percent of Americans who needed mental health or

substance use-related care in the past year did not receive it, compared to only 21 percent of

those who needed primary care.[13] Notably, 43 percent of those who did not receive necessary

mental health care in the past year cited insurance-related issues as the barrier and 37 percent

reported that cost-related issues prevented them from accessing care.[14]

46.    Inaccurate provider directories — and the resultant inability to find in-network

providers — lead many consumers to seek out-of-network care.[15] A study analyzing health

insurance claims data showed large disparities in out-of-network provider use between

behavioral health and physical health services.[16] In New York in 2017, outpatient behavioral

health office visits were 10 times more likely than medical/surgical inpatient stays and primary

---

[12] John E. Dicken, Gov't Accountability Off., GAO-22-104597, Mental Health Care; Access Challenges for Covered Consumers and Relevant Federal Efforts 12 (2022) ("2022 GAO Report") at 17, https://www.gao.gov/assets/gao-22-104597.pdf; *Barriers to Mental Health Care: Improving Provider Director Accuracy to Reduce the Prevalence of Ghost Networks¸* U.S. Senate Committee on Finance 2-3 (May 3, 2023) (written testimony of Mary Giliberti, Chief Public Policy Officer, Mental Health America), https://www.finance.senate.gov/imo/media/doc/Mary%20Giliberti-written%20testimony%205-1.pdf; *id.* at 2 (testimony of Robert L. Trestman, PhD, MD On Behalf of the American Psychiatric Association), https://www.finance.senate.gov/imo/media/doc/Robert%20Trestman%20APA%20testimony%20050123%20FINAL.pdf [hereinafter Trestman Testimony]. *See also* Simon F. Haeder et al., *A Knotty Problem: Consumer Access and the Regulation of Provider Networks*, 44 J. Health Pol. Pol'y L. 937, 938-39 (2019) [hereinafter Haeder et al., *A Knotty Problem*], https://read.dukeupress.edu/jhppl/article-abstract/44/6/937/139734/A-Knotty-Problem-Consumer-Access-and-the?redirectedFrom=fulltext; Simon F. Haeder et al., *Going the Extra Mile? How Provider Network Design Increases Consumer Travel Distance, Particularly for Rural Consumers*, J. Health Pol. Pol'y L. 1107, 1127 (2020) [hereinafter Haeder et al., *Going the Extra Mile?*], https://pubmed.ncbi.nlm.nih.gov/32464649/; Jinkyung Kim et al., *Transportation Brokerage Services and Medicaid Beneficiaries' Access to Care*, 44 Health Serv. Rsch. 145, 156-57 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2669622/.
[13] Nat'l Council for Mental Wellbeing, 2022 Access to Care Survey Results, at 4 (May 11, 2022), https://www.thenationalcouncil.org/resources/2022-access-to-care-survey-results/.
[14] *Id.* at 9, 20.
[15] 2022 GAO Report, at 17.
[16] Stoddard Davenport et al., Milliman Research Report, Addiction and Mental Health vs. Physical Health: Widening Disparities in Network Use and Provider Reimbursement 6 (2019), https://www.milliman.com/en/insight/addiction-and- mental-health-vs-physical-health-widening-disparities-in-network-use-and-p.

care visits to be out-of-network.[17]

47.    Many consumers who use out-of-network providers are confronted with surprise bills. In other words, they did not initially know that a provider was out-of-network. In a national survey conducted in 2018, the majority of respondents who had used a mental health provider directory encountered inaccuracies, and as a result of those inaccuracies, were twice as likely as recipients of general medical services to be treated by an out-of-network provider and four times more likely to receive an unexpected outpatient out-of-network bill.[18]

48.    Higher out-of-network utilization results in higher costs for consumers. A study of psychotherapy costs between 2007 and 2017 found that out-of-network prices dramatically increased for both adults (from $123.30 to $148.64) and children (from $119.83 to $139.18), even as in-network prices and cost sharing declined.[19] Consumers who lack out-of-network benefits must pay the entire cost of treatment, which is a strong deterrent to seeking care.

49.    The harms related to the lack of adequate behavioral health service providers in New York State fall disproportionately on populations that are already marginalized in the health care system.

50.    Respondents acknowledge that inaccurate provider directory information impacts their members as follows: (a) "generates confusion and frustration"; (b) "[d]elay in accessing services"; (c) "[r]isk of not obtaining services"; and (d) "[r]isk of unnecessarily utilizing out of network providers."

---

[17] *Id*. at 65.

[18] Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, 39 Health Affs. 975, 978-80 (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501.

[19] Nicole M. Benson & Zirui Song, *Prices and Cost Sharing for Psychotherapy In Network Versus Out Of Network In The United States*, 39 Health Affs. 1210, 1212-1213 (July 2020), https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.2019.01468. The prices are adjusted to 2016 US dollars.

**Disparities between Respondents' Coverage of Behavioral Health Services and Medical/Surgical Services**

51.     In 2014, after uncovering Respondents' violations of behavioral health parity laws, OAG entered into an Assurance of Discontinuance with EmblemHealth, Inc. (the "2014 AOD") that required it to comply with applicable behavioral health parity laws and other obligations including, among other things, reform its behavioral health review processes and to state in its member handbooks that it provides "broad-based coverage for the diagnosis and treatment of behavioral health conditions, at least equal to the coverage provided for other health conditions." The 2014 AOD is still in effect.

52.     Despite the 2014 AOD, Respondents did not have a designated behavioral health parity compliance program until 2020.

53.     Respondents enter into "in-network exceptions" for behavioral health services, which allow members to see out-of-network providers at in-network cost sharing due to difficulties finding Participating Providers, at a far greater rate for behavioral health services than for medical/surgical services. For example, in 2022, Respondents' GHI business had 195 Members with in-network exceptions for mental health services, but only eight for medical/surgical services, despite having many times more members receiving medical/surgical services than mental health services. In the second quarter of 2024, Respondents' HIP business had 442 in-network exceptions for mental health services but only 19 for medical/surgical services, despite having many times more members receiving medical/surgical services than mental health services. Such disparities suggest, as has been shown nationally, that Members have difficulties finding Participating Providers at a far greater rate for behavioral health treatment than for medical/surgical treatment.

54.     In October 2022, a compliance executive of Respondents enumerated

Respondents' potential parity violations, which included no analysis of provider reimbursement or of usual, reasonable, and customary rates. Respondents have not conducted an analysis of provider reimbursement for purposes of assessing compliance with behavioral health parity laws (described below in Paragraphs 62 through 64), even though conducting such analyses is required by such laws. Since at least the first quarter of 2021, Respondents have possessed data showing that Participating Providers believed Respondents' reimbursement rates for mental health services were low.

### LEGAL REQUIREMENTS

### Directory Accuracy Requirements for Health Plans

55. New York law requires health plans to include in their provider directories a listing, by specialty, of the name, address, and telephone number of all participating providers, noting whether each provider is accepting new patients. N.Y. Ins. Law §§ 3217-a(a)(17) and 4324(a)(17); N.Y. Pub. Health Law § 4408(1)(r). For mental health and substance use disorder treatment providers, the directories must include any affiliations with participating facilities certified or authorized by the Office of Mental Health ("OMH") or the Office of Addiction Services and Supports ("OASAS"), and any restrictions regarding the availability of the individual provider's services. Insurers must maintain the provider directory on their website and revise it annually, updating the website within 15 days of the addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliations.

56. New York law requires that if a health plan member receives a bill for out-of-network services resulting from inaccurate network status information provided by their health plan, the plan must pay for the services and can charge the member only their in-network cost sharing, regardless of whether the member's coverage includes out-of-network services. N.Y.

Ins. L. §§ 3217-b(n) and 4325(o); N.Y. Pub. Health L. § 4406-c(12); 11 N.Y.C.R.R. § 52.77(a).

57. New York regulations require that "every MCO [managed care organization] shall maintain and update, on a quarterly basis, a listing by specialty of the names, addresses and telephone numbers of all participating providers, including facilities, and in the case of physicians, board certification. Where the MCO contracts with behavioral health facilities rather than directly with behavioral health providers, the provider types available at the facilities must be included in the listing." 10 N.Y.C.R.R. § 98-1.16(i).

58. The federal No Surprises Act requires all private health plans to maintain accurate online provider directories, verify their directories at least every 90 days, and post any changes within two business days. 42 U.S.C. § 300gg-115(a). Plans must apply in-network cost sharing for covered services provided by providers inaccurately listed as in-network. 42 U.S.C. § 300gg-115(b).

**Network Adequacy Requirements for Health Plans**

59. New York law requires each commercial health insurance plan to "ensure that the[ir] network is adequate to meet the health and mental health needs of insureds and provide an appropriate choice of providers sufficient to render the services covered under the policy or contract." N.Y. Ins. Law § 3241(a)(1).

60. New York health plans must provide referrals to non-participating providers at in-network cost sharing for members who are unable to access an appropriate participating provider. N.Y. Ins L. §§ 4804(a), 4910(b)(4).

61. Each qualified health plan ("QHP") sold on the New York State of Health Marketplace must maintain a network "that is sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure

that all services will be accessible without unreasonable delay." 45 C.F.R. § 156.230(a)(1)(ii).

**Behavioral Health Parity Requirements for Health Plans**

62.     The Mental Health Parity and Addiction Equity Act ("MHPAEA") prohibits covered group health plans from imposing treatment limitations on mental health and substance use disorder benefits that are more restrictive than the treatment limitations they apply to medical/surgical benefits. 42 U.S.C. § 300gg-26. "Treatment limitations" include nonquantitative treatment limitations ("NQTLs"), "which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." NQTLs include "[s]tandards related to network composition, including but not limited to, standards for provider and facility admission to participate in a network or for continued network participation, including methods for determining reimbursement rates, credentialing standards, and procedures for ensuring the network includes an adequate number of each category of provider and facility to provide services under the plan or coverage." 45 C.F.R. § 146.136(c)(4)(ii). A plan may not impose an NQTL on mental health or substance use disorder benefits unless, "as written and in operation," the NQTL is "comparable to" and "applied no more stringently" than to medical/surgical benefits. 45 C.F.R. § 146.136(c)(4)(i)(A). For example, if a health plan takes steps to ensure it has an adequate number of in-network medical/surgical providers, the plan must take comparable steps to ensure an adequate number of in-network mental health and substance use disorder providers. Plans must also "perform and document comparative analyses of the design and application of NQTLs." 42 U.S.C. § 300gg-26(a)(8)(A).

63.     The essential health benefit regulations under the ACA extend MHPAEA's requirements to small and individual plans.

64.     New York's behavioral health parity law (originally enacted as "Timothy's Law")

incorporates the requirements of MHPAEA. N.Y. Ins. L. §§ 3216(i)(31), (i)(35); §§ 3221(l)(5), (7); §§ 4303(g), (l).

<b>Health Plans' Obligations to Provide Accurate, Non-Misleading Information</b>

65.      New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

66.      New York General Business Law § 350 prohibits false advertising "in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

67.      New York Public Health Law § 4405(10) permits health maintenance organizations to advertise their health care services provided that all information disseminated to the public shall be strictly factual in nature and accurate in all respects and shall not in any way be misleading to the public. New York 10 NYCRR § 98-1.16(i) requires "every MCO [to] maintain and update, on a quarterly basis, a listing by specialty of the names, addresses and telephone numbers of all participating providers, including facilities, and in the case of physicians, board certification. Where the MCO contracts with behavioral health facilities rather than directly with behavioral health providers, the provider types available at the facilities must be included in the listing."

68.      New York Insurance Law § 4226 prohibits misrepresentations and misleading statements by insurers.

69.      OAG finds that Respondents' actions and omissions are in violation of: New York Executive Law § 63(12); Insurance Law §§ 3217-a(a)(17), 4324(a)(17), 3241(a)(1), 3216(i)(31) & (35), 3221(l)(5) & (7), 4303(g) & (l), and 4226; Public Health Law §§ 4408(1)(r) and 4405(10); General Business Law §§ 349(a) and 350; 10 N.Y.C.R.R. § 98-1.16(i); 42 U.S.C. §§

Page <b>23</b> of <b>56</b>

300gg-115(a) and 300gg-26; and 45 C.F.R. §§ 146.136(c) and 156.230(a)(1)(ii).

70.    OAG finds that Respondents violated provisions of the 2011 AOD and the 2014 AOD.

71.    Respondents neither admit nor deny OAG's Findings, Paragraphs 10 through 54, 69, and 70 above.

72.    OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest. THEREFORE, OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding for violations of Executive Law § 63(12) based on the conduct described above during the period of January 1, 2020 through present.

**IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:**

**RELIEF**

**Entities Bound By Assurance**

73.    This Assurance binds Emblem Health, Inc., EHPI, HIP, and EHIC, as well as their principals, officers, successors, and assigns.

**Compliance with the Law**

74.    Respondents shall not engage, or attempt to engage, in conduct in violation of any applicable laws and regulations, including but not limited to New York Executive Law § 63(12); Insurance Law §§ 3217-a(a)(17), 4324(a)(17), 3241(a)(1), 3216(i)(31) & (35), 3221(l)(5) & (7), 4303(g) & (l), and 4226; Public Health Law §§ 4408(1)(r) and 4405(10); General Business Law §§ 349(a) and 350; 10 N.Y.C.R.R. 98-1.16(i); 42 U.S.C. § 300gg-115(a) and 300gg-26; and 45 C.F.R. §§ 146.136(c) and 156.230(a)(1)(ii), and expressly agree and acknowledge that any such conduct is a violation of the Assurance, and that OAG thereafter may commence the civil action

or proceeding contemplated in Paragraph 72, in addition to any other appropriate investigation, action, or proceeding.

## PROGRAMMATIC RELIEF

75. Respondents will begin to implement the relief described in Paragraphs 78 through 104 below immediately upon the full execution of this Assurance.

76. For avoidance of any doubt, the relief described in Paragraphs 78 through 104 below apply to all commercial health plans, New York City employee health plans, Essential Plan products, Qualified Health Plans, Medicaid managed care plans, and Child Health Plus plans administered by Respondents, which collectively had a membership as of 1.5 million as of July 1, 2025. The relief described in Paragraphs 78 through 103 below does not apply to Medicare plans regulated by the Centers for Medicare & Medicaid Services ("CMS"), or to three self-funded ERISA medical benefit plans administered by Respondents (National Grid ASO, National Grid/KeySpan ASO, and Local 389, which collectively had 2,289 Members as of July 1, 2025).

77. The requirements set forth in Paragraphs 78 through 104 below apply to Online Provider Directories maintained on Respondents' own websites as well as Online Provider Directories maintained on websites operated by third parties that administer provider networks on behalf of Respondents.

78. Respondents shall maintain an Online Participating Provider Directory that includes an accurate listing for each Participating Provider ("Participating Provider Information") that shall include:

    a. name, address, telephone number, licensure, and digital contact information;

    b. whether the provider or facility is accepting new patients;

c.  for mental health and substance use disorder providers, any affiliations with participating facilities certified or authorized by OMH or OASAS;

d.  any restrictions regarding the availability of the individual provider or facility's services, including but not limited to any limits on the ages of patients that the provider treats or the type of specific behavioral health conditions that the provider treats;

e.  languages other than English spoken by the Participating Provider; and

f.  for physicians, board certification and any affiliations with participating hospitals.

The above-noted information shall also be published at least annually in a Print Directory made available to current and prospective Members, which shall contain a clear and conspicuous disclaimer that the information contained therein was accurate as of the date of publication and that Members should consult the Online Participating Provider Directory to obtain the most current provider directory information.

79.  Respondents shall, on all Online Participating Provider Directories maintained on Respondents' own websites as well as Online Provider Directories maintained on websites operated by third parties that administer networks on behalf of Respondents, include a clear and conspicuous link next to each Participating Provider listing through which Members, Participating Providers, and members of the public can report inaccurate information contained in such directories. Respondents shall monitor reports of inaccurate directory information on a continuous basis.

80.  Respondents shall, as of the Effective Date of this Assurance:

a.  correct their Online Participating Provider Directory within two (2) business days after learning of, or receiving information regarding, the beginning or

termination of network agreements, and/or changes to the Participating Provider Information set forth in Paragraph 78 above.

b. within two (2) business days after Respondents learn that a provider is not accepting new patients, add a notation in the Online Participating Provider Directory that such provider is not accepting new patients, subject to the provisions of Paragraph 82, including but not limited to the claims analysis.

81. Respondents shall create and maintain the "Behavioral Health Participating Provider Directory Deletion/Addition Report," which shall include, for behavioral health providers who are removed from or added to their Online Participating Provider Directory, the following information: name, office address, date of removal or addition, reason for removal or addition, and if applicable, date on which their participation in Respondents' networks ended. As used in this Assurance, a "Behavioral Health Provider" is a New York-licensed or certified individual (psychiatrist, psychiatric nurse practitioner, master social worker, clinical social worker, psychologist, mental health counselor, creative arts therapist, marriage and family therapist, psychoanalyst, or credentialed alcoholism and substance abuse counselor) who treats behavioral health conditions, or a hospital, institution, facility, clinic, program, or agency licensed by OMH or OASAS. Within sixty (60) days after the Effective Date, Respondents shall submit to OAG the first Behavioral Health Participating Provider Directory Deletion/Addition Report, which shall include the results of the review process described in Paragraph 82(a)(ii)(3) below. Respondents shall submit to OAG the next Behavioral Health Participating Provider Directory Deletion/Addition Report six (6) months after the Effective Date, and subsequent reports at six-month intervals.

82. ***Verification Process***. Within thirty (30) days after the Effective Date, Respondents

shall submit to OAG for approval a written policy and procedure containing the provisions set forth in this Paragraph, establishing an Online Participating Provider Directory verification process ("Verification Process"). Respondents shall implement Paragraph 82(a)(ii)(3) within thirty (30) days after the Effective Date. Respondents shall implement the other provisions of the Verification Process within thirty (30) days after OAG approval. The Verification Process shall include the following:

a.   Every ninety (90) days (a "Verification Cycle"), Respondents shall:

   i.   Outreach each credentialed behavioral health Participating Provider by electronic means, fax, or through U.S. mail (for those that opt out of electronic communications) to request they verify the accuracy of information included in their directory listing. Electronic means shall include, but not be limited to, a pop-up message triggered upon login to provider websites maintained by Respondents, which is linked to a directory information accuracy verification form.

   ii.   Stratify Participating Providers into three groups:

      1.   Providers who remain in the directory. These include providers who verified the accuracy of their directory information **and** do not fall within subsections (2) and (3) below.

      2.   Providers who remain in the directory but require further investigation. Regardless of whether a Participating Provider attests to the accuracy of their directory information, Respondents shall investigate the accuracy of the Participating Provider Information, including at least two follow-up contacts with providers—the second of which shall be via telephone—to

confirm their continued participation in Respondents' provider network, in the following situations:

 a. Providers who have not submitted a claim within the last ninety (90) days. If Respondents do not timely confirm such providers' continued participation in Respondents' provider network, Respondents shall remove such providers from the Online Participating Provider Directory.

 b. Providers with deactivated, invalid, missing or HHS OIG Exclusion-listed NPIs.

 c. Providers listed as practicing at five or more unaffiliated locations.

 d. Unlikely specialty combinations. For example, Participating Providers who practice at hospitals but are listed as treating outpatients, including providers under whose NPIs no outpatient claims have been submitted. If a Participating Provider practices at a hospital but does not treat outpatients, their Participating Provider Directory listing shall so indicate in a clear and conspicuous manner.

3. Providers who must be removed from the directory. Within thirty (30) days after the Effective Date, Respondents shall complete a review of their most recent provider verification information and, within fifteen (15) days after such review, remove Participating Providers: (i) who did not respond to Respondents' most recent verification request; and/or (ii) for whom Respondents have information, including but not limited to a response to a verification request or other communication to Respondents,

that they are no longer providing services or no longer participating with Respondents, or not accepting new patients. Thereafter, Respondents shall remove Participating Providers who do not verify their directory information within fifteen (15) days after a verification cycle, or within two (2) business days from when Respondents receive information, including but not limited to a response to a verification request or other communication to Respondents, that they are no longer providing services, or no longer participating with Respondents, regardless of a Verification Cycle. If a Provider does not verify their directory information within fifteen (15) days after a Verification Cycle, but in the past ninety (90) days has submitted to Respondents claims, request for authorization, and/or medical records, such Provider may remain in the directory but with a notation that they are not accepting new patients, and Respondents shall perform diligence to ensure the directory information for the provider is accurate and take all reasonable steps to secure a verification as soon as possible. If Respondents cannot verify such Providers' directory information, they shall remove such providers from its directory.

iii. Conduct rolling outreach such that each Participating Provider verifies the accuracy of their information every ninety (90) days. In other words, the provider's verification resets the 90-day cycle.

iv. Maintain documentation of all efforts undertaken in the Verification Process for each Participating Provider listed in their Online Participating Provider Directory, which shall accurately reflect the dates on which each provider's

Participating Provider status and Participating Provider Information were

verified. If Respondents use telephone communications to verify Participating

Provider status and Participating Provider Information as part of their

Verification Process, they shall record any and all telephone calls.

v.    Conduct educational outreach to professional associations to emphasize the

importance of provider cooperation in Respondents' verification process.

83.    ***Response Protocol***. Within thirty (30) days after the Effective Date, Respondents

shall submit to OAG for approval a written policy and procedure containing the provisions set

forth in this Paragraph, establishing a protocol for processing requests for information,

complaints, grievances, and appeals from Members and others acting on their behalf (including

family members and providers) relating to access to Participating Providers ("Response

Protocol"). Respondents shall implement the Response Protocol within thirty (30) days after

OAG approval. The Response Protocol shall include the following:

a.    For Members who seek assistance finding or making an appointment with a

Participating Provider and/or request information regarding whether a provider is

in-network, Respondents shall reply to the Member to indicate whether the

provider is a Participating Provider as soon as practicable and in no case later than

one (1) business day after such communication is received. Respondents shall

communicate with the Member in the manner (e.g., electronic, print, telephonic)

as requested by the member, or if no such request, via the same means as the

member used in the initial contact. If telephonic means are used and Respondents

are unable to reach the Member by telephone, Respondents shall use a secondary

means to reach the Member. Respondents shall retain such communication in

such Member's file for at least two (2) years following such response.

b.  The Response Protocol shall include, and Respondents shall comply with, the following provisions:

i.  Provide notice to Members in all complaint, grievance, and appeal acknowledgment and determination letters, adverse determination letters, explanations of benefits, and similar types of communications, regarding their rights under the 2025 New York network adequacy and access regulations, 11 NYCRR § 38.0, 10 NYCRR § 98.0, including their rights to file complaints related to inability to access services with a behavioral health provider ("Access Complaints") and receive out-of-network exceptions.  For purposes of this Assurance, in addition to statutory or regulatory meanings, a "Complaint" shall include any communication in which a Member expresses any form of dissatisfaction ("Member Dissatisfaction"), including but not limited to difficulty locating a behavioral health provider, concerns about behavioral health providers, and/or frustration with any Emblem or Carelon process. "Member Dissatisfaction" includes but is not limited to any expression of frustration, anger, or disappointment, in tone or in words to the effect of "unhappy," "discuss with your supervisor," "someone else review," "have been waiting," "keep calling," "disappointed," "violate," "fed up," "too long," "confusing," "awful," "suffering," and "sensitive." For avoidance of doubt, to lodge a Complaint a member need not use the actual word "Complaint" or other specific words or phrases. If an Emblem or Carelon representative is unsure whether a Member wishes to lodge a Complaint, such

representative must treat the Member's communication as a Complaint.

ii.   Consider any Access Complaint related to access to behavioral health services to be presumptively valid.

iii.  Waive the three-day waiting period under 11 NYCRR § 38.0 and 10 NYCRR § 98.0 for Access Complaints in urgent cases. In this AOD, an "urgent case" is defined as an acute condition or a condition that may become an emergency if not treated.

iv.   Before providing referrals or names of providers to Members, Respondents must contact such providers—via telephone or other means that may be approved by the OAG—and confirm in real time that they accept new patients and can treat the Member.

v.    Respondents shall not state or suggest to Members that responsibility for accurate directories rests with providers.

vi.   If a Member lodges a Complaint, grievance, or appeal regarding surprise bills, Respondents must inform the Member about the requirements under New York law (11 NYCRR § 52.77) and federal law (42 U.S.C. § 300gg-115(b)) that members be held harmless (responsible only for in- network cost-sharing) when a plan provides inaccurate network status information.

vii.  If a Member lodges a Complaint, grievance, or appeal stating they called a provider after receiving a provider's information from Respondents and the information given about the provider's in-network status or ability to see new patients was inaccurate, Respondents must hold the member harmless (responsible only for in-network cost-sharing) unless Respondents can prove

with documentary evidence that it did not provide inaccurate information.

viii. If a Member lodges a Complaint, grievance, or appeal about a vendor or telehealth entity that contracts with Respondents (e.g., Valera, TalkSpace, etc.), Respondents must immediately escalate and resolve the Complaint, grievance, or appeal within three (3) business days, except in the case of expedited appeals under New York Insurance Law § 4904, in which case the appeal must be determined within two (2) business days, or twenty-four (24) hours for inpatient substance use disorder treatment.

ix. Respondents shall coordinate with any behavioral health vendor to resolve any Complaint, grievance, or appeal that such vendor believes does not concern behavioral health.

x. Respondents must consider any Complaint, grievance, or appeal relating to access to care under urgent time frames if the Complaint, grievance, or appeal indicates it could be urgent.

xi. Respondents must follow up with a Member who lodges a Complaint, grievance, or appeal about provider availability, to confirm the Member has made an appointment, by sending to the Member at least one communication by email or other means of contact requested by the Member, and making at least one phone call to the Member.

xii. Respondents must comply with the New York Continuity of Care law, N.Y. Ins. L. §§ 3217-d(c), 4306-c(c), 4804(e) & (f), and N.Y. Pub. Health L. § 4403(6)(e) & (f)), with respect to Members who lodge a Complaint, grievance, or appeal about their provider leaving Respondents' network.

84.    ***Incorrect Directory Information Protocol.*** Within thirty (30) days after the

Effective Date, Respondents shall submit to OAG for approval an Incorrect Directory Information

Protocol containing the provisions set forth in this Paragraph. Respondents shall implement the

Incorrect Directory Information Protocol within thirty (30) days after OAG approval. The

Incorrect Directory Information Protocol shall include the following:

a. If Respondents provide inaccurate network status information to a Member, as
   defined below, Respondents must hold the Member harmless (responsible only for
   in-network cost-sharing).

b. Respondents shall be deemed to provide inaccurate network status information if
   Respondents:

   i.    indicate in their Online Participating Provider Directory that a non-participating
         provider is participating in Respondents' networks;

   ii.   indicate, through their Response Protocol, that a non-participating provider is
         participating in Respondents' networks;

   iii.  indicate incorrectly that a provider is accepting new patients;

   iv.   fail to provide information regarding a specific provider's participating status
         within one (1) business day of a request from a member; and/or

   v.    indicate in a print provider directory that a provider is a Participating
         Provider, but the provider was not a Participating Provider as of the date of
         publication.

c. The Incorrect Directory Information Protocol shall include, and Respondents shall
   comply with, the following provisions:

   i.    If a Member lodges a Complaint, grievance, or appeal stating they contacted

providers (including those given by Respondents), but such providers were not available or did not answer or respond, Respondents must deem such Complaint, grievance, or appeal substantiated unless Respondents timely prove otherwise, and hold the Member harmless, as defined above.

ii. If a Member lodges a Complaint, grievance, or appeal stating they called a provider Respondents provided but does not supply the name(s) of such provider(s), Respondents must search their files for all communications with such Member and cannot shift the burden to such Member to supply Respondents with information they already have.

iii. Respondents must remove providers they cannot reach from their Provider Directories, and from databases used to supply information to Members.

iv. Respondents cannot tell Members that Respondents lack jurisdiction over out-of-network providers.

85. ***Appointment Waiting Times.*** Respondents shall ensure that Members are able to obtain appointments with behavioral health providers within the following time frames ("Access Time Frames"):

a. For commercial members:

i. Emergency care: Member must be seen immediately.

ii. Urgent care: Member must be seen within twenty-four (24) hours.

iii. Initial appointment with an outpatient facility or clinic, or a health care professional not employed or contracted with an outpatient facility or clinic: Ten (10) business days.

iv. Appointment following a discharge from a hospital or an emergency room

visit: Seven (7) calendar days.

b. For Medicaid Members:

    i.    Emergency care: immediately upon presentation.

    ii.    Inpatient services: immediately upon presentation.

    iii.    Urgently needed services: twenty-four (24) hours.

    iv.    Non-urgent care: Seven (7) calendar days.

86.    ***In-Network Exceptions.*** Within thirty (30) days of the Effective Date, Respondents shall submit for OAG approval a written policy and procedure that establishes a protocol for Members and others acting on their behalf, including but not limited to family members and providers, to request in-network exceptions when Members cannot obtain an appointment with an appropriate provider within Access Time Frames set forth above in Paragraph 85 (the "In- Network Exception Protocol"). Pursuant to such in-network exceptions, Members shall be held harmless (responsible only for in-network cost-sharing). The In-Network Exception Protocol shall include the following:

a. For Members who say they were unable to secure a timely appointment with a Participating Provider, Respondents shall have three (3) business days—except for emergent and urgent cases—from receipt of the Member communication to locate a Participating Provider that can treat the Member's behavioral health condition and is able to meet the appointment wait times set forth in Paragraph 85.  If no appropriate Participating Provider is identified, Respondents shall allow the Member to see a non- participating provider and hold the Member harmless (responsible only for in- network cost-sharing), regardless of whether Respondents are able to enter into a single-case agreement with a provider.

b.  Respondents shall use FAIRHealth out-of-network rates as the benchmark for negotiation of rates under single-case agreements.

87.  *Audits*. Respondents shall:

a.  At least once per quarter, conduct behavioral health Participating Provider secret shopper surveys using the methodology set forth in OAG's December 2023 report titled "Inaccurate and Inadequate," and make the results publicly available.

b.  For any audit or survey of Participating Provider directory accuracy or provider access and availability, including but not limited to digital audits and secret shopper surveys, include in calculations of rates of directory accuracy and provider access and availability all attempted contacts, including those that: (i) do not result in offers of appointments that satisfy the appointment availability standards set forth in this Assurance; or (ii) result in no response or answer, a wrong number or email, a disconnected number, or an unreturned call or voicemail.

88.  *Complaint Monitoring System*. Within thirty (30) days of the Effective Date, Respondents shall establish a Participating Provider Directory/Network Access Complaint Monitoring System ("Complaint Monitoring System"). Respondents shall:

a.  log and track by date all Complaints, grievances, or appeals relating to the subject matter of this Assurance, including but not limited to inaccurate Online Participating Provider Directory listings, network access issues, and requests for in-network exceptions made to or through Respondents' regulatory affairs group, executive/concierge Complaint process or the like, customer service lines, and Complaint, grievance, and appeal processes.

b.  document how each Complaint, grievance, and appeal was handled and resolved.

c.  provide to OAG every six (6) months following the Effective Date of this Assurance a report listing the information contained in (a) and (b) ("Complaint Report").

89.  ***Behavioral Health Participating Provider Recruitment and Retention Plan***. Within ninety (90) days of the Effective Date, to improve access to behavioral health services, Respondents shall create and submit to OAG a behavioral health provider recruitment and retention plan ("Behavioral Health Provider Recruitment and Retention Plan"), which shall include a detailed description of the mechanisms through which Respondents will work to expand their network of behavioral health providers. The Behavioral Health Provider Recruitment and Retention Plan shall include, at a minimum, specific proposals for: (a) outreach to New York-licensed behavioral health providers who are not currently Participating Providers, including psychiatrists, psychiatric nurse practitioners, master social workers, clinical social workers, psychologists, mental health counselors, creative arts therapists, marriage and family therapists, psychoanalysts, and credentialed alcoholism and substance abuse counselors; (b) periodically reviewing existing provider fee schedules and network needs for Behavioral Health Participating Providers; (c) reducing administrative burdens on providers; (d) estimating expected utilization of behavioral health services based on anticipated member enrollment and health care needs of the member population; (e) an analysis of the number and types of behavioral health care providers required to furnish covered behavioral health services, the number and types of providers actively providing behavioral health services within the health care plan's network, and the number and types of providers accepting new patients; (f) an analysis of the collection and monitoring of data on provider-to-enrollee ratios, travel time and

distance to participating providers, percentage of participating providers accepting new patients, and appointment wait times; and (g) investigating the role of telehealth in providing access to behavioral health services.

90.    ***Training***. Respondents shall develop a written training protocol regarding the provisions in Paragraphs 78 through 89 above for all personnel involved in: administering Respondents' Online Provider Directory; ensuring directory accuracy; ensuring network adequacy; ensuring behavioral health parity; handling Member Complaints, grievances, and appeals relating to directory accuracy and/or network adequacy; and/or provider relations ("Relevant Personnel"), regardless of whether they are employed by Respondents or third parties, or are independent contractors. Respondents shall submit a written training protocol to OAG within thirty (30) days of OAG approval of the written policies and procedures described in Paragraphs  78-89.

    a.    Respondents shall train all Relevant Personnel based on the written materials. Key Relevant Personnel (as designated by Respondents and approved by OAG) shall be trained on the materials within three (3) months of OAG approval of such materials, and all other Relevant Personnel shall be trained within six (6) months of OAG approval of such materials. Thereafter, new Relevant Personnel will be trained within thirty (30) days of commencing their duties. Training will continue on an annual basis and must be provided to all Relevant Personnel no less than one time per year until three years after the Effective Date.

    b.    Respondents shall create and maintain records regarding all training conducted pursuant to this Paragraph, including records of attendance. Such records shall be reviewed by the Independent Monitor as part of its audits (as set forth below), and

provided to OAG no more than fourteen (14) days after a demand for such records is made.

91.    Respondents shall make new and meaningful investments in implementing the following initiatives and, during the period in which the Independent Monitor functions (see Paragraphs 92 through 96 below), shall report annually to OAG a summary of the investments made:

a.  Recruiting additional psychiatrists and psychiatric nurse practitioners who treat children and adolescents into Respondents' provider networks, through outreach efforts to: hospitals; clinics; professional associations; medical fellowship, residency and internship programs; medical schools; universities and colleges; behavioral health advocacy organizations; and other community resources.

b.  Providing assistance to members in navigating Respondents' Online Provider Directories and locating behavioral health providers who can timely treat them in a convenient setting. This shall include hiring additional staff for customer service, and complaints, grievances and appeals.

c.  Providing assistance to providers in navigating Respondents' directory information verification process. This shall include hiring additional staff for provider relations.

d.  Conducting outreach to members regarding mental health services spanning the continuum of care that is available in their communities and covered by Respondents.

**MONITORING AND OVERSIGHT BY INDEPENDENT MONITOR**

92.    Within thirty (30) days of the Effective Date, Respondents will designate a person or entity, subject to reasonable approval by OAG, with experience in directory accuracy and network adequacy processes, provider networks, behavioral health parity, and health insurance

claims processes, to serve as an independent monitor ("Independent Monitor"), who will submit to OAG bi-annual reports detailing Respondents' compliance with the requirements set forth in this Assurance, Paragraphs 78 through 90 (each, a "Compliance Report"). The first such Compliance Report shall be submitted to OAG nine (9) months after the Effective Date (the "First Compliance Report"). Subsequently, Respondents shall submit Compliance Reports every six (6) months, continuing until three (3) years after the First Compliance Report, subject to the provisions of Paragraph 95 below. In any case where the circumstances warrant, OAG may require an interim Compliance Report upon thirty (30) days' notice.

93.     Within thirty (30) days after the OAG approves the Independent Monitor, Respondents shall make all necessary information available to the Independent Monitor, including but not limited to the Online Participating Provider Directory, network adequacy information, provider network information, and health claims data systems.

94.     The Compliance Reports shall: (a) assess Respondents' compliance with the programmatic relief set forth above in Paragraphs 78 through 90; (b) describe the Independent Monitor's performance of the analyses set forth below in Paragraphs 97 through 103; and (c) report on administration of the restitution process set forth below in Paragraph 104. Each Compliance Report shall include: detailed results of the Independent Monitor's reviews, including relevant statistics; the Complaint Report (described above in Paragraph 88); the Behavioral Health Participating Provider Directory Deletion/Addition Report (described above in Paragraph 81); and a description and schedule of any corrective measures taken by Respondents or planned to be taken by Respondents.

95.     If, after the Independent Monitor has submitted at least (4) four Compliance Reports to OAG, Respondents demonstrate substantial compliance with the terms of this

Assurance, and OAG agrees that Respondents are substantially compliant with the terms of this Assurance, the Independent Monitor shall cease to function. For avoidance of doubt, OAG retains its right to begin a new investigation.

96.    If, after Respondents have submitted four compliance reports, OAG determines that Respondents are not substantially compliant with the terms of this Assurance, the Independent Monitor will continue to function and OAG shall produce a report setting forth Respondents' non-compliance with the terms of this Assurance and proposed steps for Respondents to come into compliance. Following such OAG report, the Independent Monitor, in consultation with OAG, shall develop a plan of corrective action for Respondents to achieve compliance with the terms of this Assurance. Thereafter, the Independent Monitor's role shall terminate upon the conclusion of a six-month reporting cycle that shall occur after OAG deems that Respondents are in substantial compliance with the terms of this Assurance. Respondents can exercise an option to replace the Independent Monitor if necessary, with OAG's consent, not to be unreasonably withheld.

97.    *Verification process review.* The Independent Monitor shall:

a.   take a statistically valid random sampling of Participating Providers who were subject to Respondents' Verification Process (the "Verified Providers");

b.   compare the Participating Provider Information of the Verified Providers that is contained in Respondents' Online Participating Provider Directory with current source documentation obtained through their Verification Processes and other quality control processes. The Independent Monitor may consult Respondents' documentation, including claims data, applicable scripts, email notices, other correspondences and telephonic recordings, as well as independent data sources

used in the Verification Process described in Paragraph 82;

c.  determine the percentage of those Verified Providers whose Participating Provider Information is accurately listed in Respondents' Online Participating Provider Directory (the "Accuracy Percentage"); and

d.  if Respondents' Accuracy Percentage falls below the requirements set forth under federal and New York laws and regulations, as indicated by OAG, the Independent Monitor shall develop and present to OAG an appropriate remedial action plan, including additional protocols, monitoring and/or retraining.

98.  *Access review*. The Independent Monitor shall:

a.  survey two statistically significant samples of Participating Providers (the "Access Sample") to determine their next available appointment. There shall be one sample for Participating Providers in Respondents' networks for commercial plans, and a second sample for Participating Providers in Respondent's networks for Medicaid, Essential Plan, and Child Health Plus plans;

b.  determine the percentage of the Access Sample who have an available appointment within the Access Time Frames set forth in Paragraph 85 above (the "Access Percentage");

c.  if Respondents' Access Percentage falls below the regulatory requirements set forth under federal and New York laws and regulations, as indicated by OAG, develop and present to Respondents and OAG an appropriate remedial action plan, including additional monitoring, recruiting, and/or retraining; and

d.  assess whether Respondents have approved in-network exceptions for all Members who were unable to access an appropriate Participating Provider within the wait

times set forth in Paragraph 85, in accordance with Paragraph 86(a).

99.    *Out-of-network utilization review*. The Independent Monitor shall analyze Respondents' claims data to calculate:

   a. by applicable rate code and provider type, the percentage of Members submitting claims for outpatient behavioral health treatment with out-of-network providers vs. in- network providers;

   b. by applicable rate code and provider type, the percentage of Members submitting claims for outpatient medical/surgical treatment with out-of-network providers vs. in- network providers; and

   c. the differences, if any, between (a) and (b).

100.    *Provider reimbursement review*. The Independent Monitor shall analyze a statistically valid random sampling of Respondents' claims data to calculate:

   a. by applicable rate code and provider type, reimbursement rates for behavioral health Participating Providers;

   b. by applicable rate code and provider type, reimbursement rates for medical/surgical participating providers; and

   c. the differences, if any, between (a) and (b).

101.    *Network breadth review*. The Independent Monitor shall calculate:

   a. the percentage of all behavioral health providers in Respondents' service area who are Participating Providers;

   b. the percentage of all medical/surgical providers in Respondents' service area who are Participating Providers; and

   c. The differences, if any, between (a) and (b).

102.    *Cultural competence review*. The Independent Monitor shall measure:

    a.   The percentage of Participating Providers who can communicate with patients in languages other than English, based on a provider attestation; and

    b.   The percentage of Participating Providers who have received cultural competence training, based on a provider attestation.

103.    *Consumer complaint review*. The Independent Monitor shall analyze Respondents' Complaint Reports and available related data to:

    a.   determine patterns of Complaints, grievances, and appeals regarding directory inaccuracy and network inadequacy;

    b.   determine opportunities for improvement, if any, in Respondents' responses to Complaints, grievances, and appeals; and

    c.   evaluate the sufficiency of Respondents' Complaint, grievance, and appeal mechanisms.

**RESTITUTION**

104.    Respondents shall implement a restitution process, with eligibility and payment determinations to be adjudicated by the Independent Monitor, as follows:

    a.   For the period beginning January 1, 2020 through the Effective Date (the "Restitution Period"), Respondents shall provide restitution to all Members who fall into one or more of the following categories:

        i.   Members who paid amounts in excess of any applicable in-network co-payment, coinsurance, or deductible for behavioral health services rendered by non-participating providers who were incorrectly listed as participating providers in Respondents' Online Participating Provider Directory at the time

they received services ("Listed Non-Par Providers"). Listed Non-Par Providers shall include, but not be limited to, those providers who had terminated or disputed their participation status, or had not verified their participation status, but continued to be listed as participating providers. Such claims shall be referred to as "Directory Claims."

ii.   Members who paid amounts in excess of any applicable in-network co-payment, coinsurance, or deductible for behavioral health services rendered by non-participating providers after being unable to secure an appointment with an appropriate in-network behavioral health provider. Such claims shall be referred to as "Network Claims."

iii.   Respondents shall provide notice on their member website regarding Members' ability to submit Directory Claims and Network Claims.

b.   Directory Claims.

i.   Respondents shall make available to the Independent Monitor records sufficient to enable it to identify and review Directory Claims received during the Restitution Period.

ii.   The Independent Monitor shall identify all Directory Claims and within sixty (60) days from the date that all Directory Claims are identified, Respondents shall issue restitution to each Member with a Directory Claim for amounts paid in excess of any applicable in-network co-payment, coinsurance, or deductible plus interest in the amount of 12 percent from the date of payment until the date restitution is issued, unless the Member has been reimbursed for

such Claim by another source. The Independent Monitor is permitted to request additional time to identify specific Directory Claims if needed.

iii. Members shall be entitled to submit additional Directory Claims to the Independent Monitor for services rendered during the Restitution Period by the Listed Non-Par Providers, which the Independent Monitor shall review to determine if such claims are valid Directory Claims.

c. Network Claims.

i. Within thirty (30) days of the Effective Date, Respondents shall submit to OAG for approval a form of notice ("Notice") that Respondents shall mail to all current and former Members, stating that Members may be eligible to submit Directory Claims and Network Claims. The Notice shall include:

1. a statement that all Members are entitled to submit restitution claims for services rendered by non-participating providers during the Restitution Period, after being unable to secure an appointment with an appropriate in-network behavioral health provider.

2. the procedures and timeframes for submitting a claim for restitution. Members will have one-hundred (100) days to submit claims from the date Respondents mail the Notices, except for Members who receive restitution for Directory Claims, who will have a one-time sixty (60) day period to submit additional Directory Claims after Respondents

mail the restitution payments.

3. A statement that Members may also submit Directory Claims for services rendered during the Restitution Period by the Listed Non-Par Providers.

ii. The Independent Monitor shall send the Notice to all Members within forty-five (45) days of OAG's approval of the Notice. Respondents shall also post the Notice in clear and conspicuous locations on their public and Member websites.

iii. The Independent Monitor shall evaluate each Network Claim to determine if the Member received services by a non-participating provider after being unable to secure an appointment with an appropriate in-network behavioral health provider (a "Valid Network Claim").

iv. Within thirty (30) days of the date of the Independent Monitor's determination of a Valid Network Claim, Respondents shall issue restitution to the Member for amounts paid in excess of any applicable in-network co- payment, coinsurance, or deductible plus interest in the amount of 12 percent from the date of payment until the date restitution is issued.

d. Within three (3) months of completion of restitution payments, the Independent Monitor shall submit to OAG a report documenting all Members who submitted claims for restitution, those to whom restitution was paid, those whose claims were denied, the provider's name and office address,

dates services rendered, restitution amount and date paid, and reason for denial, if applicable.

## GENERAL PROVISIONS

105.    Acceptance of this Assurance by OAG is not an approval or endorsement by OAG of any of Respondents' policies, practices, or procedures, and Respondents shall make no representation to the contrary.

106.    Compliance with Other Obligations. In the event that Respondents reasonably believe that the performance of their obligations under any provision of this Assurance would conflict with any federal or state law or regulation that may be enacted or adopted after the Effective Date of this Assurance such that compliance with both this Assurance and such provision of law or regulation is not possible, Respondents shall notify OAG promptly and the Parties shall meet and confer at their earliest convenience to attempt to resolve such alleged conflict.

107.    Respondents expressly agree and acknowledge that a default in the performance of any obligation under this Assurance is a violation of the Assurance against the defaulting Respondents, and that OAG thereafter may commence the civil action or proceeding contemplated in Paragraph 72, in addition to any other appropriate investigation, action, or proceeding, and that evidence that the Assurance has been violated shall constitute prima facie proof of the statutory violations described in Paragraph 68, pursuant to Executive Law § 63(15).

### Ongoing Cooperation

108.    Respondents agree to cooperate with all ongoing requests by OAG for information related to this investigation and to ensure compliance with this Assurance.

**Penalties, Fees, Costs**

109.    Respondents shall pay to the State of New York $2.5 million in penalties, fees, and costs. Payment shall be made in full by wire transfer within thirty (30) business days of the Effective Date of this Assurance. OAG shall provide transfer information to Respondents.

110.    The Parties agree that it would be difficult to value the damages caused by default in the performance of any obligation under this Paragraph, and therefore agree that Respondents shall pay to the State of New York a stipulated penalty of $10,000 for each and every such material default in the performance of any obligation under this Paragraph occurring after the Effective Date of the Assurance.

**Subsequent Proceedings**

111.    Respondents expressly agree and acknowledge that OAG may initiate a subsequent investigation, civil action, or proceeding to enforce this Assurance, for violations of the Assurance, or if the Assurance is voided pursuant to Paragraph 117, and agree and acknowledge that in such event:

   a.   any statute of limitations or other time-related defenses are tolled from and after the Effective Date of this Assurance;

   b.   OAG may use statements, documents or other materials produced or provided by Respondents prior to or after the Effective Date of this Assurance;

   c.   any civil action or proceeding must be adjudicated by the courts of the State of New York, and that Respondents irrevocably and unconditionally waive any objection based upon personal jurisdiction, inconvenient forum, or venue; and

   d.   evidence of a violation of this Assurance shall constitute prima facie proof of a violation of the applicable law pursuant to Executive Law § 63(15).

112.    If a court of competent jurisdiction determines that Respondents have violated the Assurance, Respondents shall pay to OAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including without limitation legal fees, expenses, and court costs.

### Effects of Assurance

113.    All terms and conditions of this Assurance shall continue in full force and effect on any successor, assignee, or transferee of Respondents. Respondents shall include in any such successor, assignment or transfer agreement a provision that binds the successor, assignee or transferee to the terms of the Assurance. No party may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of OAG, which shall not be unreasonably withheld.

114.    Nothing contained herein shall be construed as to deprive any person of any private right under the law.

115.    Any failure by OAG to insist upon the strict performance by Respondents of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and OAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Assurance to be performed by Respondents.

### Communications

116.    All notices, reports, requests, and other communications pursuant to this Assurance must reference Assurance No. 24-009, and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

If to Respondents, to: Michael Palmateer, or in his absence, to the person holding the title of Chief Legal Officer.

If to OAG, to: Michael Reisman, or in his absence, to the person holding the title of Bureau Chief, Health Care Bureau.

Any changes in the person to whom communications should be specifically directed shall be made in writing in advance of the change.

### Representations and Warranties

117.    OAG has agreed to the terms of this Assurance based on, among other things, the representations made to OAG by Respondents and their counsel and OAG's own factual investigation as set forth in Findings, Paragraphs 10 through 54 above.  Respondents represent and warrant that neither they nor their counsel have made any material representations to OAG that are inaccurate or misleading. If any material representations by Respondents or their counsel are later found to be inaccurate or misleading, this Assurance is voidable by OAG in its sole discretion.

118.    No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by Respondents in agreeing to this Assurance.

119.    Respondents represent and warrant, through the signatures below, that the terms and conditions of this Assurance are duly approved. Respondents further represent and warrant that Emblem Health, Inc., EHPI, HIP, and EHIC, by Michael Palmateer, as the signatory to this Assurance, is a duly authorized officer acting at the direction of the Boards of Directors of Emblem Health, Inc., EHPI, HIP, and EHIC.

### General Principles

120.    Unless a term limit for compliance is otherwise specified within this Assurance, Respondents' obligations under this Assurance are enduring.

121.    Nothing in this Assurance shall relieve Respondents of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

122.    Respondents shall not in any manner discriminate or retaliate against any health care providers who cooperated or are perceived to have cooperated with the investigation of this matter or any future investigation related to enforcing this agreement.

123.    Respondents agree not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in the Assurance or creating the impression that the Assurance is without legal or factual basis.  This paragraph shall not (a) preclude Respondents from acknowledging that, by entering the Assurance, it did not admit to the OAG's Findings and entered the Assurance to avoid the time and expense of litigation, (b) affect Respondents' testimonial obligations, or (c) affect Respondents' right to take legal or factual positions in response to, or defense of, any inquiry, audit, litigation or other proceedings, including, without limitation, any inquiry or action brought by an individual, entity, or governmental authority other than the OAG.

124.    Nothing contained herein shall be construed to limit the remedies available to OAG in the event that Respondents violate the Assurance after its Effective Date.

125.    This Assurance may not be amended except by an instrument in writing signed on behalf of the Parties to this Assurance.

126.    In the event that any one or more of the provisions contained in this Assurance shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

127.    Respondents acknowledge that they have entered this Assurance freely and

voluntarily and upon due deliberation with the advice of counsel.

128.    This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles. The Assurance and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

129.    This Assurance may be executed in multiple counterparts by the parties hereto. All counterparts so executed shall constitute one agreement binding upon all parties, notwithstanding that all parties are not signatories to the original or the same counterpart. Each counterpart shall be deemed an original to this Assurance, all of which shall constitute one agreement to be valid as of the Effective Date of this Assurance. For purposes of this Assurance, copies of signatures shall be treated the same as originals. Documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Assurance and all matters related thereto, with such scanned and electronic signatures having the same legal effect as original signatures.

130.    The Effective Date of this Assurance shall be February 19, 2026.

LETITIA JAMES
Attorney General of the State of New York
28 Liberty Street
New York, NY 10005


By:    *Michael D. Reisman*

        Michael D. Reisman
        Assistant Attorney General
        Health Care Bureau


Emblem Health, Inc., EmblemHealth Plan, Inc. f/k/a
Group Health Incorporated, Health Insurance Plan of
Greater New York d/b/a HIP Health Maintenance
Organization, and EmblemHealth Insurance Company
f/k/a HIP Insurance Company of New York


By:    *Michael Palmateer*

        Michael Palmateer
        Chief Executive Officer