**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE AMERICAN PSYCHIATRIC ASSOCIATION, THE NEW YORK STATE PSYCHIATRIC ASSOCIATION, on their behalf and in an associational capacity on behalf of their members, and VALERIA CALDERON, ELIZABETH CANTY, BONNIE DORIS ELLIOTT, MILEN BEYENE, DANIEL RICCOBONO, and NIMROD SHIMRONY, individually and on behalf of themselves and all others similarly situated,<br><br>    v.<br><br>EMBLEMHEALTH, INC., and EMBLEMHEALTH PLAN, INC.,<br><br>            Defendants. | Case No. 1:25-cv-10783-JGK<br><br>Hon. John G. Koeltl |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................ 1

FACTUAL ALLEGATIONS ......................................................................................................... 3

    A.    The Systemic Inaccuracies in EmblemHealth's Provider Directory. ............................... 3

    B.    The NYAG's 2026 Settlement with EmblemHealth. ......................................................... 4

    C.    EmblemHealth's Sole Disclaimer Does Not Cure Its Misrepresentations. ....................... 6

    D.    EmblemHealth's "Ghost Network" Injures Plan Members. ............................................... 6

    E.    EmblemHealth's "Ghost Network" Injures Mental Health Providers. ............................... 7

LEGAL STANDARD ..................................................................................................................... 8

ARGUMENT .................................................................................................................................. 9

I.    The Associations Have Standing to Bring Lanham Act Claims on their Members' Behalf... 9

    A.    The Associations' Members Suffered Cognizable Injuries Under the Lanham Act. ....... 10

        1.    Defendants Do Not Dispute that the Associations' Members Suffered Injuries Cognizable Under Lanham Act Section 43(a)(1)(A). .................................................... 10

        2.    The Associations' Members Suffered Injuries Cognizable Under Lanham Act Section 43(a)(1)(B). ..................................................................................................................... 12

    B.    The Associations' Claims Do Not Require Individual Member Participation. ................ 15

II.    The Court Has Supplemental Jurisdiction Over the Remaining Claims. ............................. 17

III.    EmblemHealth's Provider Directory Misleads Consumers. ................................................ 19

IV.    The AOD Does Not Eliminate Plaintiffs' Rights or Relief. .................................................. 21

CONCLUSION ............................................................................................................................. 24

## TABLE OF AUTHORITIES

**CASES**

*3M Co. v. CovCare, Inc.*,
  537 F. Supp. 3d 385 (E.D.N.Y. 2021) ................................................................................ 11, 12

*4 Pillar Dynasty LLC v. New York & Co., Inc.*,
  933 F.3d 202 (2d Cir. 2019) .................................................................................................... 12

*Achtman v. Kirby, McInerney & Squire, LLP*,
  464 F.3d 328 (2d Cir. 2006) .................................................................................................... 17

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
  671 F.3d 140 (2d Cir. 2011) ...................................................................................................... 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................... 8

*Atl. States Legal Found., Inc. v. Eastman Kodak Co.*,
  933 F.2d 124 (2d Cir. 1991) .................................................................................................... 23

*Bano v. Union Carbide Corp.*,
  361 F.3d 696 (2d Cir. 2004) .................................................................................................... 16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................................... 8

*Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*,
  448 F.3d 138 (2d Cir. 2006) .................................................................................................... 16

*Canon U.S.A., Inc. v. F & E Trading LLC*,
  2:15-cv-6015 (DRH)(AYS), 2017 WL 4357339 (E.D.N.Y. Sept. 29, 2017) ........................... 12

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016) ........................................................................................................ 8

*CDC Newburgh Inc. v. STM Bags, LLC*,
  692 F. Supp. 3d 205 (S.D.N.Y. 2023) .................................................................................... 12

*Chanel, Inc. v. WGACA, LLC*,
  18 Civ. 2253 (LLS), 2022 WL 902931 (S.D.N.Y. Mar. 28, 2022) ......................................... 11

*Charlton v. LG Energy Sol. Michigan, Inc.*,
  No. 321CV02142RBMJLB, 2023 WL 1420726 (S.D. Cal. Jan. 31, 2023) ......................... 21, 22

*Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*,
  843 F.3d 48 (2d Cir. 2016) ...................................................................................................... 13

ii

*Duran v. Henkel of America, Inc.*,
    450 F. Supp. 3d 337 (S.D.N.Y. 2020) ...................................................................... 21

*Edison Coatings, Inc. v. Freedom Cement, LLC*,
    No. 15-CV-2726, 2017 WL 462339 (S.D.N.Y. Jan. 30, 2017) ................................. 19

*Electra v. 59 Murray Enters., Inc.*,
    987 F.3d 233 (2d Cir. 2020) ................................................................................... 11

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*,
    647 F. Supp. 3d 145 (S.D.N.Y. 2022) ..................................................................... 11

*Friends of the Earth, Inc. v. Laidlaw Env't Servcs. (TOC), Inc.*,
    528 U.S. 167 (2000)................................................................................................. 23

*Genesee Brewing Co., Inc. v. Stroh Brewing Co.,*
    124 F.3d 137 (2d Cir. 1997) ................................................................................... 11

*Holster v. Gatco, Inc.*,
    618 F.3d 214 (2d Cir. 2010) ................................................................................... 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)................................................................................................... 9

*In re Scotts EZ Seed Litig.*,
    No. 12 CV 4727 (VB), 2017 WL 3396433 (S.D.N.Y. Aug. 8, 2017) ...................... 19

*Int'l Code Council, Inc. v. UpCodes Inc.*,
    43 F.4th 46 (2d Cir. 2022) ...................................................................................... 21

*Kommer v. Ford Motor Co.*,
    No. 1:17-CV-296 (LEK/DJS), 2017 WL 3251598 (N.D.N.Y. July 28, 2017)......... 22

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017)............................................................................. 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..................................................................................... 12, 13, 14

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................................... 8

*Mantikas v. Kellogg Co.*,
    910 F.3d 633 (2d Cir. 2018) ................................................................................... 21

*McCabe v. Nat'l Presto Indus., Inc.*,
    24-CV-6552 (AMD) (RML), 2025 WL 2371080 (E.D.N.Y. Aug. 14, 2025) .......... 21

iii

*Melendez v. City of New York*,
   16 F.4th 992 (2d Cir. 2021) .................................................................................. 8

*Plavin v. Grp. Health Inc.*,
   35 N.Y.3d 1 (2020) ................................................................................... 22, 24

*Sedhom v. Pro Custom Solar LLC*,
   No. 2:17-CV-07559 (ADS)(AYS), 2018 WL 3429907 (E.D.N.Y. July 16, 2018) .................. 19

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ................................................................................... 18, 19

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
   659 F.3d 234 (2d Cir. 2011) ................................................................................ 17

*Simeone v. T. Marzetti Co.*,
   No. 21-CV-9111 (KMK), 2023 WL 2665444 (S.D.N.Y. Mar. 28, 2023) .................................. 1

*Souza v. Exotic Island Enters., Inc.*,
   68 F.4th 99 (2d Cir. 2023) ............................................................................... 11, 12

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ........................................................................................... 8

*Sugasawara v. Ford Motor Co.*,
   No. 18-CV-06159-LHK, 2019 WL 3945105 (N.D. Cal. Aug. 21, 2019) ................................ 22

*Travel Leaders Grp., LLC v. Corley*,
   19 Civ. 1595 (GBD) (JLC), 2019 WL 6647319 (S.D.N.Y. Dec. 5, 2019), *report and
   recommendation adopted*, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022) ................................ 14

*United States v. SCRAP*,
   412 U.S. 669 (1973) ........................................................................................... 8

*Walker v. Thompson*,
   404 F. Supp. 3d 819 (S.D.N.Y. 2019) ........................................................................ 10

*Warth v. Seldin*,
   422 U.S. 490 (1975) .......................................................................................... 16

**STATUTES**

28 U.S.C. § 1332(d)(4) ....................................................................................... 18

28 U.S.C. § 1367(a) .......................................................................................... 17

42 U.S.C. § 300gg-115(a)(2)(A)–(C) ........................................................................... 20

**OTHER AUTHORITIES**

3 McCarthy on Trademarks and Unfair Competition § 24:2 (5th ed.) ........................................ 11

**RULES**

N.Y. Ins. Law § 3217-A(a)(17) ............................................................................................... 20

Plaintiffs the American Psychiatric Association ("APA") and the New York State Psychiatric Association ("NYSPA") (together, the "Associations"), on behalf of their members, and Valeria Calderon, Elizabeth Canty, Bonnie Doris Elliott, Milen Beyene, Daniel Riccobono, and Nimrod Shimrony (together, the "Plan Member Plaintiffs") respectfully submit this memorandum in opposition to the motion to dismiss filed by Defendants EmblemHealth, Inc. and EmblemHealth Plan, Inc. (together, "EmblemHealth" or "Defendants").

**INTRODUCTION**

In February 2026, six weeks after Plaintiffs filed this lawsuit, the New York Attorney General ("NYAG") revealed that it had been investigating the *very same* misconduct and issued findings *confirming* the central allegation underlying Plaintiffs' claims: that EmblemHealth's network of mental health care providers is a "ghost network" that has obstructed patients' access to the care they need.[1] The NYAG found, for example, that:

- "***Thousands of behavioral health providers*** listed in [EmblemHealth's directory] do not treat [EmblemHealth] Members," AOD ¶ 40 (emphasis added);

---

[1] The NYAG's findings are set forth in an Assurance of Discontinuance ("AOD"), which Defendants submitted in support of their motion. *See* Freyre Decl. Ex. B, ECF No. 31-2. Citations to the AOD throughout this brief refer to Defendants' Exhibit B.

Defendants ask the Court to take judicial notice of the AOD. Mem. of Law in Supp. of Defs.' Mot. to Dismiss Pls.' Complaint ("Mem."), ECF No. 30, at 1 n.1. Plaintiffs agree that the Court may take judicial notice of the AOD without converting Defendants' motion to dismiss into a summary judgment motion. *Simeone v. T. Marzetti Co.,* No. 21-CV-9111 (KMK), 2023 WL 2665444, at *1 (S.D.N.Y. Mar. 28, 2023).

1

- As of January 2025, only **22 percent** of the mental health providers on EmblemHealth's directory were available for an appointment, and only **10 percent** would be available within ten days, AOD ¶ 38; and

- Calls attempting to schedule appointments with listed mental health providers had only an **8 percent** success rate, AOD ¶ 39 (citing a report by Carelon Behavioral Health, Inc., EmblemHealth's vendor for mental health services).

Faced with the NYAG's damning findings—which were based in part on EmblemHealth's *own* analyses and secret-shopper surveys—EmblemHealth settled with the NYAG, agreeing to provide certain forms of relief to avoid an enforcement action. AOD ¶ 72. Yet, rather than admit wrongdoing and seek a prompt resolution here, Defendants manufacture a meritless motion to dismiss.

Defendants' chief argument—that the Associations lack standing to bring Lanham Act claims on their members' behalf—fails because it ignores Plaintiffs' False Affiliation claim entirely; misapprehends applicable law on injuries cognizable under the Lanham Act; and fails to acknowledge that Plaintiffs' claims and right to the requested injunctive relief will be proven using the same generalized evidence that supported the AOD's findings, so that individual member participation is not required.

Defendants' grounds for urging the Court to decline supplemental jurisdiction over Plaintiffs' state law claims are equally specious. Defendants disregard 28 U.S.C. § 1367, instead invoking an inapposite exception to *diversity* jurisdiction under the Class Action Fairness Act of 2005 ("CAFA") and a New York procedural rule that binding Supreme Court precedent—which Defendants do not even cite—has rendered inapplicable to class actions in federal court.

Defendants' contention that Plaintiffs' claims are foreclosed, as a matter of law, by a limited disclaimer buried in a drop-down menu on the directory is also meritless, and at best, raises a disputed factual question that cannot be resolved on a motion to dismiss.

Finally, citing no relevant legal authority, Defendants argue that the entire case should be dismissed because of their settlement with the NYAG. Mem. 3. But Plaintiffs have independent rights to pursue their claims, which Defendants cannot foreclose by settling an enforcement action with government regulators. Moreover, the AOD does not reflect the perspective of the Associations' psychiatrist members, who seek distinct relief not provided in the AOD. The Plan Member Plaintiffs, likewise, suffered injuries the AOD does not remedy. Perhaps most significantly, none of the Plaintiffs have any ability to enforce the AOD. Given EmblemHealth's fifteen-year history of failed compliance with prior AODs *addressing the same "ghost network" at issue here,* this action is not only proper, but necessary.

## FACTUAL ALLEGATIONS

EmblemHealth is one of the nation's largest not-for-profit health insurers, serving more than three million people in New York City and the tristate area and issuing or administering approximately thirty health insurance plans. Compl. ¶¶ 2, 42.

### A.    The Systemic Inaccuracies in EmblemHealth's Provider Directory.

As alleged in detail in the Complaint, and confirmed in the AOD, EmblemHealth's mental health provider directory is a "ghost network"—a directory replete with inaccuracies and duplications that misrepresents the size, quality, and accessibility of EmblemHealth's network. *Id.* ¶¶ 5–13, 56–99.

*False affiliations.* In a 2023 report, the NYAG found that 82% of "secret shopper" calls to mental health providers listed in EmblemHealth's directory revealed "ghost listings," with success in reaching providers only 18% of the time. *Id.* ¶¶ 9, 56; *see also* AOD ¶¶ 29–33. Plaintiffs' expert

3

similarly determined that approximately 70% of the mental health providers listed that could be matched to a Psychology Today profile did not actually participate in EmblemHealth's network. Compl. ¶ 58.

*Multiple listings inflating network size.* Most provider listings in EmblemHealth's directory are duplicate entries for the same providers. *Id.* ¶ 60. For example, about 90% of results generated when searching for mental health providers in six New York cities were duplicates. *Id.* ¶ 61. Another search for providers within a 200-mile radius from New York, NY, yielded over 1,000 listings, but only 50 unique providers. *Id.* ¶ 62. One psychiatrist appears in the directory *twenty-nine times*. *Id.* ¶¶ 63–64.

*Miscategorization of provider credentials, inflating network size and quality.* EmblemHealth's directory artificially inflates the number of psychiatrists in its network by returning non-psychiatrists in search results for "psychiatrist." *Id.* ¶¶ 65–66 (only 110 out of the first 300 results of a search for "psychiatrist" in New York, NY were actually psychiatrists).

*Inaccessible providers.* Of provider listings with "New York, NY" addresses, approximately 60% are associated with private entities whose providers cannot be contacted directly by plan members, *id.* ¶¶ 67–69, and about 40% are telehealth-only providers who cannot be seen in-person. *Id.* ¶¶ 70–72. Many other listed providers are hospital-based practitioners who provide only inpatient services and cannot be accessed for the outpatient treatment that the vast majority of those seeking mental health care require. *Id.* ¶¶ 73–76. And a majority of provider listings contain incorrect contact information: in Plaintiffs' "secret shopper" testing, 53% of attempted contacts were inaccurate, non-working, or unreturned. *Id.* ¶¶ 77–78.

**B.      The NYAG's 2026 Settlement with EmblemHealth.**

The AOD confirms Plaintiffs' allegations that Defendants' directory is a "ghost network" of mental health providers.  *See*, *e.g.*, AOD ¶¶ 38– 40. The NYAG's findings also conclusively

4

establish that EmblemHealth knew about, and intentionally did not fix, the inaccuracies in its directory. *See also* Compl. ¶¶ 142–53. For example:

- A consultant informed EmblemHealth in June 2020 that "[t]here is no functional capability for a provider to attest to the accuracy of their data displayed in the [provider directory] nor to notify the health plan of any changes that may be required." AOD ¶ 19.

- EmblemHealth "did not monitor its [directory] processes after 2020." AOD ¶ 22.

- EmblemHealth's corporate representative testified there was "a heavy reluctance to remove a provider from the directory" and that "having accurate listings means removing some providers from the [directory] and having a less robust network, which [was] a concern." AOD ¶ 23.

- EmblemHealth did not "systematically remove behavioral health [providers from its directory] due to failure to verify [provider] information until 2025, and only if such providers did not verify their information for more than one year." AOD ¶ 24.

The 2026 AOD is not the NYAG's first settlement regarding EmblemHealth's "ghost network." EmblemHealth previously entered into *two* prior AODs with NYAG to address the same problems. A 2010 AOD determined that EmblemHealth had "failed to maintain an accurate Online Provider Directory in compliance with New York law," Compl. ¶ 52, and required the company to correct or remove inaccurate listings annually, confirm participating-provider status at least annually, prominently display a disclaimer on every page of its directory, and implement remedial measures to maintain a 95% accuracy rate. *Id.* ¶ 53. A second AOD, in 2014, concerned improperly denied mental health claims and concluded that "[a]ccess to adequate behavioral health care appears to be an issue for Emblem members." *Id.* ¶ 54. Both prior AODs are still in effect. *See* AOD ¶¶ 18, 51.

### C.      EmblemHealth's Sole Disclaimer Does Not Cure Its Misrepresentations.

EmblemHealth's directory contains a single disclaimer, buried behind a drop-down menu on the initial "Find a provider" page, that does not appear on any other page of the directory and provides no warning about the scope of the directory's systemic inaccuracies. Compl. ¶¶ 88, 90–91, 95–97. The disclaimer fails to disclose that the majority of listed providers do not actually participate in EmblemHealth's network; that listings are duplicated dozens of times; or that many providers are telehealth-only, hospital-based, or otherwise inaccessible. *Id.* ¶¶ 94–97. No reasonable consumer reviewing EmblemHealth's directory and its disclaimer would understand that most of the listed mental health providers do not accept EmblemHealth insurance, are not accessible, or cannot even be contacted. *Id.* ¶ 97.

Indeed, plan members are confused and misled by Defendants' inaccurate directory. *Id.* ¶ 135 (Plan Member Plaintiffs' experiences demonstrating the confusion caused by directory). And EmblemHealth has received countless negative reviews (*id.* ¶¶ 136–38); has a 1.1 out of 5 stars Yelp rating (*id.* ¶ 139); and is no longer accredited by the Better Business Bureau (*id.* ¶ 140).

### D.      EmblemHealth's "Ghost Network" Injures Plan Members.

Since the size and quality of a provider network is an important factor in an individual's choice of health care plan, EmblemHealth's illusory network has helped it to secure more plan members and more employer plan sponsors. *Id.* ¶¶ 8–9, 100–05, 114, 155–56. EmblemHealth plan members, in turn, are overcharged for their insurance, select plans they otherwise would not have selected, spend hours searching for providers, and often must either go out-of-network to find mental health care, or delay or forego such care. *Id.* ¶¶ 38, 107–08, 115–19.

The six Plan Member Plaintiffs are all EmblemHealth plan participants, who have each used EmblemHealth's directory in attempting to obtain in-network mental health care, and each has suffered concrete injury as a result of the directory's inaccuracies. *Id.* ¶¶ 21–26.

6

**E.      EmblemHealth's "Ghost Network" Injures Mental Health Providers.**

The Associations are membership organizations representing approximately 39,000 and 3,700 psychiatrists nationwide and in New York, respectively. *Id.* ¶¶ 16, 18. Both organizations dedicate significant institutional resources to addressing the problem of "ghost networks," including by conducting research, advocating for legislation, educating regulators, and testifying before Congress. *Id.* ¶¶ 17, 19.

The Complaint alleges in detail the concrete commercial injuries that EmblemHealth's "ghost network" inflicts on the Associations' psychiatrist members:

- *Loss of control over reputations.* EmblemHealth's false affiliation and false advertising cause the Associations' members to lose control over their professional identities, names, and reputations—identities that psychiatrists work for years to build and that are increasingly susceptible to damage in the era of online reviews. *Id.* ¶¶ 39, 120–22.

- *Reputational harm.* Psychiatrist members must field calls from confused potential patients who were misled by EmblemHealth's directory to believe that the psychiatrist participated in EmblemHealth's network or provided the services advertised. Those interactions damage psychiatrists' reputations and divert prospective patients. *Id.* ¶¶ 39, 122.

- *Administrative burdens.* Psychiatrist members are forced to spend significant time and resources attempting to correct EmblemHealth's inaccurate listings and responding to mistaken patient inquiries. *Id.* ¶¶ 39, 123–28. And because EmblemHealth frequently does not make requested updates, providers are often forced to undertake that burden multiple times. *Id.* ¶ 126. These tasks are especially onerous for psychiatrists, who are often in solo or small practices. *Id.* ¶ 128.

- *Suppressed reimbursement rates.* Because EmblemHealth's inflated directory creates the appearance of an adequate network, EmblemHealth can avoid raising the reimbursement

rates necessary to attract and retain participating providers. *Id.* ¶¶ 129–31, 161–62.

The Associations seek only equitable and injunctive relief on their members' behalf. *Id.* ¶¶ 20, 191, 202, 209.[2] They expressly disclaim any legal or equitable monetary recovery, save for reasonable attorneys' fees and costs. *Id.* ¶ 209.

## LEGAL STANDARD

Defendants' Rule 12(b)(1) challenge to Plaintiffs' standing is subject to the same liberal standard as a Rule 12(b)(6) motion: the Court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016). Plaintiffs need only "allege facts that affirmatively and plausibly suggest that [they have] standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). To satisfy Article III, Plaintiffs must plead an injury-in-fact, fairly traceable to the challenged conduct, that is likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), and even an "identifiable trifle" of harm is enough, *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973).

Under Rule 12(b)(6), a complaint need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "accept all factual allegations as true [and] draw all reasonable inferences in favor of the plaintiff." *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021) (citation omitted).

---

[2] The Associations will not be pursuing claims in their own right.

## ARGUMENT

**I.      The Associations Have Standing to Bring Lanham Act Claims on their Members' Behalf.**

Associations have Article III standing to bring claims on behalf of their members if "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they seek] to protect are germane to [their organizational] purpose; and (c) neither the claims asserted nor the relief requested requires the participation of the individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Defendants erroneously argue that the Associations fail the first and third *Hunt* factors and therefore lack standing to bring the Lanham Act claims.[3] To the contrary, the Complaint more than plausibly pleads that the Associations' psychiatrist members suffered injuries giving them standing to sue, and neither of the Lanham Act claims requires the members' individual participation.

---

[3] Defendants do not (and cannot) dispute that the interests the Associations seek to protect are germane to their purposes. Challenging misrepresentations about their members and ensuring access to care for their members' patients are directly aligned with the Associations' missions. *See*, *e.g.*, Compl. ¶ 16 (APA mission to "champion psychiatrists' medical leadership in advancing mental health and delivering high-quality care to improve patients' lives."); *id.* ¶ 17 (APA works "to ensure that insurance plans do not misrepresent its psychiatrist members' participation and make it more difficult for those in need to access quality mental health care."); *id.* ¶¶ 18–19 (similar allegations as to NYSPA).

A.     **The Associations' Members Suffered Cognizable Injuries Under the Lanham Act.**

1.     Defendants Do Not Dispute that the Associations' Members Suffered Injuries Cognizable Under Lanham Act Section 43(a)(1)(A).

Although Plaintiffs plead two causes of action under the Lanham Act—Unfair Competition and False Affiliation in Violation of the Lanham Act Section 43(a)(1)(A) (the "False Affiliation" claim), Compl. ¶¶ 183–92, and False Advertising in Violation of the Lanham Act Section 43(a)(1)(B) (the "False Advertising" claim), *id.* ¶¶ 193–203—Defendants' arguments only address the legal standards for False Advertising claims.[4] As such, Plaintiffs' False Affiliation claim is effectively undisputed, and the Court should deny the motion with respect to Plaintiffs' First Cause of Action for that reason alone.

In any case, Plaintiffs more than adequately allege facts showing the Associations' members have standing for their False Affiliation claim. Lanham Act Section 43(a)(1)(A) requires proof that the defendant "(1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is *likely* to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." *Walker v. Thompson*, 404 F. Supp. 3d 819, 824 (S.D.N.Y. 2019) (emphasis added). It is well established that the *likelihood* of consumer

---

[4] Defendants do not cite a single case that addresses standing to pursue a False Affiliation claim at the pleadings stage. Mem. 12. The only case Defendants cite that mentions a False Affiliation claim at all is *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99 (2d Cir. 2023), in which the Second Circuit affirmed a summary judgment ruling against plaintiffs who alleged False Affiliation and False Advertising claims. *Souza*'s standing discussion, however, addressed only the plaintiffs' False Advertising claim. *Id.* at 118.

10

confusion is sufficient injury for a False Affiliation claim. *See, e.g.*, *Souza*, 68 F.4th at 110 (plaintiff must prove "that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant") (quoting *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 257 (2d Cir. 2020)); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir. 1997) ("a showing of likelihood of confusion . . . establishes irreparable harm") (citation omitted); *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 647 F. Supp. 3d 145, 222 (S.D.N.Y. 2022) ("[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act" because "the Act requires only a likelihood of confusion.") (citation omitted).

A likelihood of consumer confusion causes harm sufficient for Article III standing because "even if a plaintiff cannot point to lost sales to prove injury, it may still be harmed by 'a loss of control … over how the public perceives' its goods or services." *Chanel, Inc. v. WGACA, LLC*, 18 Civ. 2253 (LLS), 2022 WL 902931, at *5 n.6 (S.D.N.Y. Mar. 28, 2022). *See also 3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385, 403 (E.D.N.Y. 2021) (likelihood of confusion "threatens [plaintiff] with a loss of goodwill and control over its reputation"); 3 McCarthy on Trademarks and Unfair Competition § 24:2 (5th ed.) ("a plausible pleading of a likelihood of confusion is also a plausible pleading of an intangible injury of loss of sales and resulting foreclosure of a related market or injury to reputation").

The Complaint extensively pleads a reasonable likelihood of confusion, and even actual confusion of consumers caused by EmblemHealth's inaccurate directory. *See* Compl. ¶ 135 (Plan Member Plaintiffs' experiences demonstrating the confusion caused by EmblemHealth's directory); *id.* ¶¶ 136–38 (numerous examples of online complaints about the confusion caused by EmblemHealth's directory); *id.* ¶ 117 (plan members mistakenly selecting an EmblemHealth plan based on inaccurate provider information); *id.* ¶ 122 (plan members contacting providers falsely

listed as in-network). These allegations plainly suffice to plead injury giving rise to a False Affiliation claim at this stage. *See Canon U.S.A., Inc. v. F & E Trading LLC*, 2:15-cv-6015 (DRH)(AYS), 2017 WL 4357339, at *6 (E.D.N.Y. Sept. 29, 2017) ("Numerous district courts have stressed that '[t]he likelihood of confusion test is a fact-intensive analysis that ordinarily does not lend itself to a motion to dismiss.'") (citation omitted).

Since the Associations' members have alleged "a loss of goodwill and control" over their reputations caused by the likely consumer confusion arising from EmblemHealth's inaccurate directory, the Associations' members—undisputedly—have Article III standing to bring the False Affiliation claim in their own right. *See 3M Co.*, 537 F. Supp. 3d at 403.

### 2. The Associations' Members Suffered Injuries Cognizable Under Lanham Act Section 43(a)(1)(B).

To establish standing to assert a False Advertising claim, "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014). *See also Souza*, 68 F.4th at 119 (false advertising plaintiffs can allege injury in the form of "direct diversion of sales or by a lessening of goodwill associated with its products.") (citation omitted). In other words, the plaintiff must "articulate[] an economic or reputational injury that flows directly from" the allegedly false advertisement. *CDC Newburgh Inc. v. STM Bags, LLC*, 692 F. Supp. 3d 205, 232 (S.D.N.Y. 2023). Contrary to Defendants' argument, Mem. 10-11, false advertising claims do not require proof of "actual injury."[5] Even "[a]t

---

[5] As the Supreme Court stated in *Lexmark*, "although diversion of sales to a direct competitor may be the paradigmatic direct injury from false advertising, it is not the only type of injury cognizable under § 1125(a)." 572 U.S. at 138. *See also 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 211–14 (2d Cir. 2019) (rejecting argument "that our case law demands

the liability stage, the Lanham Act demands only proof providing a *reasonable basis* for the belief that the plaintiff *is likely to be damaged* as a result of the false advertising." *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) (citation and quotation marks omitted). And as *Lexmark* confirmed, "[e]ven when a plaintiff cannot quantify its losses with sufficient certainty to recover damages," it can still seek injunctive relief for a False Advertising violation. *Lexmark*, 572 U.S. at 135–36 (citation omitted).

The Complaint more than plausibly alleges that EmblemHealth's inaccurate directory caused false advertising injuries to the Associations' psychiatrist members. *First*, the reputational damage caused by EmblemHealth's false advertising of the Associations' members is not merely abstract, but has concrete effects. Falsely-listed psychiatrists are called by confused consumers to make an appointment. Compl. ¶ 122. When they are forced to tell the consumer that they do not accept EmblemHealth insurance, despite being listed on the directory, or are unable to provide the care Defendants advertised that they would, reputational damage is caused that harms that psychiatrist's practice. *Id.* These effects are even broader when amplified by negative online reviews, which have significant impact on consumer decisions. *Id.* ¶ 121. This is especially true for health care providers, as "online reviews are gaining popularity for patient decision-making processes," and "negative reviews [about providers] have a stronger impact than positive ones." *Id.*

---

that a Lanham Act plaintiff seeking an award of an infringer's profits prove actual consumer confusion" and affirming disgorgement of full profits even though "Plaintiffs introduced no evidence of actual consumer confusion").

13

Moreover, the Associations' members have suffered commercial injury because of the association with EmblemHealth—which has received countless negative reviews (*id.* ¶¶ 136–38); has a 1.1 out of 5 stars rating (*id.* ¶ 139); and is no longer accredited by the Better Business Bureau (*id.* ¶ 140). *See Lexmark*, 572 U.S. at 138 (reputational injury can occur when "the defendant damages the product's reputation by, for example, equating it with an inferior product"); *Travel Leaders Grp., LLC v. Corley*, 19 Civ. 1595 (GBD) (JLC), 2019 WL 6647319, at *8 (S.D.N.Y. Dec. 5, 2019) ("[Plaintiff's] reputation is likely to be injured when those consumers receive potentially sub-par services from a company they associate with [it]."), *report and recommendation adopted*, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022).

*Second*, Defendants do not dispute that EmblemHealth's faulty directory creates administrative burdens for the Associations' psychiatrist members. They instead argue that such burdens are "just ordinary costs of market participation that exist regardless of any alleged deception." Mem. 11. This is incorrect. Most of the administrative burdens Plaintiffs allege are directly—*and only*—caused by the fact that EmblemHealth's directory is inaccurate. It is only because EmblemHealth's directory is inaccurate that psychiatrists have to correct the incorrect information and field calls from confused consumers seeking in-network care from them. Likewise, it is only because EmblemHealth's directory is inaccurate that providers improperly listed as taking EmblemHealth insurance—who would otherwise have no need to interact with EmblemHealth at all—must shoulder the burden of getting removed from the directory, sometimes multiple times. Compl. ¶ 126. These tasks are especially onerous for psychiatrists, who are often in solo or small practices. *Id.* ¶ 128. The administrative burdens alleged in the Complaint are clearly not merely "ordinary costs of market participation," but are caused directly by EmblemHealth's deception.

14

**B.    The Associations' Claims Do Not Require Individual Member Participation.**

Defendants also insist that "[i]ndividual participation by each Association Member is … indispensable." Mem. 11–12. Not so. The Associations can prove their False Affiliation and False Advertising claims—both of which arise from EmblemHealth's common business practices— through aggregate evidence, without any individualized proof whatsoever.

Most of Plaintiffs' allegations can be proven by analysis of *the directory itself*. For example, Plaintiffs allege that a majority of the mental health providers in EmblemHealth's directory are listed multiple times, falsely making the network appear to be vastly larger than it is. Compl. ¶¶ 59–64. These multiple listings are found *on the directory*. Likewise, analysis of the directory itself proves Plaintiffs' allegations that a majority of the results for a search for "psychiatrist" are not psychiatrists, *id*. ¶¶ 65–66; that most of the listed providers are affiliated with large private entities that members cannot contact directly, *id*. ¶¶ 67–69; that almost half of the listed providers are telehealth-only providers, *id.* ¶ 70–72; and that many providers are hospital-based. *id*. ¶¶ 73–76.

The only inaccuracies not established solely by analyzing the directory can be established using aggregate sources of data. For example, whether the provider is in-network can be assessed by comparison against EmblemHealth's own records (indeed, this is the analysis that EmblemHealth itself undertook to evaluate its listed providers' network status, AOD ¶ 40). Incorrect contact information can be identified using the Associations' records for their psychiatrist members.

Defendants object that "[n]o amount of generalized statistical evidence or 'secret shopper' surveys can substitute" for individual psychiatrist participation. Mem. 13. Yet Defendants *themselves* relied on statistical evidence and "secret shopper" surveys to evaluate their own directory's accuracy—the same types of evidence they now claim are insufficient for the task. *See*

AOD ¶ 38 ("secret shopper" survey conducted by EmblemHealth); *id.* ¶ 39 ("secret shopper" survey by Carelon); *id.* ¶ 40 (EmblemHealth's comparison of listed providers against claim information).[6] The NYAG also found such aggregate evidence sufficient to support its AOD findings. *See id.* Thus, the Complaint's reliance on the same types of generalized evidence is more than sufficient to demonstrate that the Associations can prove their claims without individual member participation. *See* Compl. ¶¶ 56–57 (NYAG "secret shopper" survey); *id.* ¶ 58 (Plaintiffs' expert analysis); *id.* ¶¶ 77–79 (Plaintiffs' "secret shopper" studies).

Moreover, associational standing is particularly appropriate here, because the Associations seek only systemic injunctive relief. While the third *Hunt* factor is not "automatically satisfie[d]" when an association requests injunctive relief, *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004), "it can reasonably be supposed that the [equitable relief], if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *see also Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006) ("because the Trades Council seeks civil penalties and injunctive relief only, not money damages, its claims do not require 'individualized proof,' and "[t]he third prong of the *Hunt* test for associational standing is therefore also clearly satisfied").[7]

---

[6] EmblemHealth's analysis of claims it received from 2019 through 2024 found that "6,475 of [listed providers] did not file a *single behavioral health claim* for treatment of a Member; 4,495 filed no claims at all." AOD ¶ 40 (emphasis added).

[7] In *Bano*, by contrast, the plaintiff associations sought to recover damages and obtain remediation for property damage and bodily injury suffered by their members, not a set of generally-applicable business process changes. 361 F.3d at 714.

16

The type of injunctive relief the Associations seek—for example, the addition of more specific information in provider listings, and procedures to eliminate multiple provider listings—requires no individualized evidence whatsoever. The individualized proof proposed by Defendants—"negative reviews from failed appointment attempts, damaged relationships with referring physicians, lost referrals," Mem. 13—would only be potentially relevant to an assessment of individual damages, and is wholly irrelevant to the injunctive relief requested here.[8]

## II.   The Court Has Supplemental Jurisdiction Over the Remaining Claims.

The Court has supplemental jurisdiction over Plaintiffs' state-law claims because they "form part of the same case or controversy" as Plaintiffs' Lanham Act claims. 28 U.S.C. § 1367(a). *See also* Compl. ¶ 32 (alleging that supplemental jurisdiction arises under 28 U.S.C. § 1367). Plaintiffs' federal and state claims "derive from a common nucleus of operative fact" because "the facts underlying" the claims "substantially overlap[,]" and presenting "the federal claim necessarily [will bring] the facts underlying the state claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (internal quotation marks and citations omitted). EmblemHealth does not even attempt to argue otherwise—nor could it.

"Where section 1367(a) is satisfied, the discretion to decline supplemental jurisdiction is available *only if* founded upon an enumerated category of subsection 1367(c)." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (internal quotation marks and

---

[8] Defendants' argument to the contrary, Mem. 12, again mistakenly relies on an "actual injury" standard for Plaintiffs' Lanham Act claims. Since proof of actual injury is not required, "individualized inquiries into harm," *id.*, are not needed, either.

17

citations omitted). None of the four circumstances specified in 28 U.S.C. § 1367(c) applies here—and, again, EmblemHealth does not argue otherwise.

Instead, EmblemHealth contends that the Court should decline to exercise supplemental jurisdiction based on an exception to the CAFA, which is wholly inapposite. Mem. 15. That exception, when established, requires a court to decline to exercise *diversity* jurisdiction arising *under CAFA*. S*ee* 28 U.S.C. § 1332(d)(4) (specifying when courts "shall decline to exercise jurisdiction *under paragraph (2)*") (emphasis added). CAFA exceptions are not among the limited circumstances listed in Section 1367(c). Nor would it make any sense to decline to exercise supplemental jurisdiction arising from the overlap between federal and state law claims based on a rule applicable only in diversity cases.

EmblemHealth's other rationale for urging this Court to decline supplemental jurisdiction is foreclosed by binding Supreme Court precedent. EmblemHealth urges the Court to dismiss Plaintiffs' state law claims—even if it does not dismiss their Lanham Act claims—because a New York procedural rule would have barred Plaintiffs from seeking statutory damages under GBL §§ 349 and 350 on a class basis *if the case had been filed in state court*. Mem. 15–16 (discussing New York Civil Practice Law & Rules ("CPLR") § 901(b)). But this suit was not filed in state court, and almost two decades ago, the Supreme Court held that class actions seeking statutory damages under New York law may proceed in federal court even if they would be barred in state court. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406–08 (2010); *id.* at 416 (Stevens, J., concurring). *See also*, *e.g.*, *Holster v. Gatco, Inc.*, 618 F.3d 214, 217 (2d Cir. 2010) ("Under *Shady Grove,* … if the requirements of Rule 23 are met and if federal jurisdiction otherwise exists, C.P.L.R. 901(b)'s bar of New York class-action suits seeking statutory damages is irrelevant."); *In re Scotts EZ Seed Litig.*, No. 12 CV 4727 (VB), 2017 WL 3396433, at *6

18

(S.D.N.Y. Aug. 8, 2017) ("[CPLR] Section 901(b) is no longer valid in federal court after *Shady Grove*."); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 502 (E.D.N.Y. 2017) ("statutory damages under [GBL § 349] are available on a class basis in federal court, even though they would be barred by section 901(b) if the same action were to proceed in New York state court"); *Sedhom v. Pro Custom Solar LLC*, No. 2:17-CV-07559 (ADS)(AYS), 2018 WL 3429907, at *3 (E.D.N.Y. July 16, 2018) (holding that CPLR § 901(b) does not apply in federal court and noting that "[t]he case law on this point is vast, and well-settled.") (citing cases).[9]

In light of *Shady Grove*, EmblemHealth's accusation of "forum manipulation" is misplaced. Mem. 16. Plaintiffs have valid federal claims and state law claims that arise from a "common nucleus of facts" and therefore qualify for supplemental jurisdiction under Section 1367. The fact that the "case may follow a different course" in this Court than if it had been filed in state court "is the inevitable (indeed, one might say the intended) result of a uniform system of federal procedure," not a reason to decline supplemental jurisdiction. *Shady Grove*, 559 U.S. at 416.

## III.    EmblemHealth's Provider Directory Misleads Consumers.

Defendants next urge the Court to hold, as a matter of law, that all of Plaintiffs' claims fail because EmblemHealth's provider directory "would not have misled a reasonable consumer." Mem. 17. Defendants' only support for this argument is a disclaimer on the directory which supposedly states that "the information is self-reported by providers and verified only at initial

---

[9] EmblemHealth's failure to cite *Shady Grove* or any of the cases in this Circuit following it is improper. *See*, *e.g.*, *Edison Coatings, Inc. v. Freedom Cement, LLC*, No. 15-CV-2726, 2017 WL 462339, at *2 (S.D.N.Y. Jan. 30, 2017).

credentialing and every three years." [10] *Id.* (citing Compl. ¶¶ 87–88). But Defendants neglected to include the first words of the disclaimer, which confine its application *only to practice location*: "The practice locations at which the provider/facility will see members is self-reported and verified during the initial credentialing process and every three years." Compl. ¶ 88. Thus, the disclaimer is far more limited than Defendants represent; and in any case, it is woefully inadequate to alert consumers to the pervasive and systemic inaccuracies in the directory. The disclaimer—buried in a drop-down menu found only on the initial search webpage, *id.*—does not disclose that many of the providers listed are entirely unreachable; not actually in-network; identified in duplicate listings, sometimes many times over;[11] only offer telehealth services; only see patients in the hospital; or otherwise cannot be contacted or seen by members. Put more simply, reasonable consumers consulting EmblemHealth's provider directory would not interpret such a disclaimer as a warning that the majority of listed providers are, in fact, inaccessible to them.

---

[10] This disclaimer conflicts with the federal No Surprises Act, which requires insurance companies to update and verify their provider directories at least every 90 days, and within 2 business days of receiving an update from a provider. 42 U.S.C. § 300gg-115(a)(2)(A)–(C). It also runs afoul of New York law, requiring insurers to update their directories within 15 days of a provider change, and otherwise update their directories annually. N.Y. Ins. Law § 3217-A(a)(17).

[11] Also contrary to Defendants' representation, Mem. 17, paragraph 152 of the Complaint alleges that the many duplicates would have put *EmblemHealth* on notice of a "serious problem with its directory's accuracy"; it does not allege that no reasonable consumer would have been misled by the multiple provider listings. Compl. ¶ 152. Consumers had no knowledge of the directory's inaccuracies; EmblemHealth did.

20

Moreover, whether a reasonable consumer would be deceived despite a disclaimer is an issue that requires discovery and cannot be resolved as a matter of law at the pleading stage. *See Mantikas v. Kellogg Co.*, 910 F.3d 633, 639 (2d Cir. 2018) (reversing dismissal where plaintiffs had made "sufficient factual allegations to state a claim that Defendant's conduct was, plausibly, deceptive"); *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 62 (2d Cir. 2022) ("[W]e disagree with the district court that a disclaimer on Upcodes's website can shield the defendants from liability at this early stage. . . . [T]he sufficiency of UpCodes's disclaimer depends upon its effect on consumers, which raises factual questions that are not well suited for resolution on a motion to dismiss."); *McCabe v. Nat'l Presto Indus., Inc.*, 24-CV-6552 (AMD) (RML), 2025 WL 2371080, at *5 (E.D.N.Y. Aug. 14, 2025) (denying motion to dismiss because disclaimer was capable of multiple interpretations and there were "factual questions about the location and wording of the disclaimer"); *Duran v. Henkel of America, Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (whether a misrepresentation is cured by a disclaimer "is generally a question of fact not suited for resolution at the motion to dismiss stage"). Accordingly, the Court cannot conclude as a matter of law that EmblemHealth's disclaimer made it impossible for a reasonable consumer to be deceived, especially in light of the pervasive inaccuracies and limited disclaimer present here.

## IV.    The AOD Does Not Eliminate Plaintiffs' Rights or Relief.

Finally, Defendants incorrectly argue that this case should be dismissed because "plaintiffs have already received the relief they seek through parallel regulatory action [the AOD]." Mem. 19. The only legal authorities Defendants cite for their position are three inapposite, unreported product defect cases from other districts holding that the plaintiffs did not plead an injury-in-fact for standing purposes where the defendants had offered a free repair of the specific defect alleged. *Charlton v. LG Energy Sol. Michigan, Inc.*, No. 321CV02142RBMJLB, 2023 WL 1420726 (S.D. Cal. Jan. 31, 2023); *Sugasawara v. Ford Motor Co.*, No. 18-CV-06159-LHK, 2019 WL 3945105

(N.D. Cal. Aug. 21, 2019); and *Kommer v. Ford Motor Co.*, No. 1:17-CV-296 (LEK/DJS), 2017 WL 3251598 (N.D.N.Y. July 28, 2017).[12] Plaintiffs here have alleged injuries that Defendants have made no attempt to remedy, through the AOD or otherwise.

There is a good reason Defendants could find no relevant legal authority: because private plaintiffs have statutory and common law rights that are distinct from the NYAG's regulatory enforcement authority. The AOD does not, and could not, eliminate those independent rights of action. *See, e.g.*, *Plavin v. Grp. Health Inc.*, 35 N.Y.3d 1, 9 (2020) (New York legislature "amended both section 349 and 350 to add a private right of action" as a supplement to the NYAG's enforcement authority). Moreover, the AOD was negotiated between EmblemHealth and the NYAG. Plaintiffs were not parties to the AOD and had no role in its negotiation. This is especially relevant for the Associations' psychiatrist members, whose provider perspective and participation are critical to the remediation of EmblemHealth's "ghost network."

Perhaps most significantly, Plaintiffs are not able to enforce the AOD. If EmblemHealth fails to comply with the AOD, only the NYAG can enforce it; Plaintiffs have no means by which to compel compliance. This enforcement ability is, unfortunately, especially necessary here given EmblemHealth's history of failed compliance with *two* prior AODs with the NYAG on the *same* provider directory and mental health network issues. Compl. ¶ 54 (2014 AOD); *id.* ¶¶ 52–53 (2010 AOD). A defendant's voluntary compliance with regulators cannot moot a private suit unless the defendant sustains the "heavy burden" of showing it is "absolutely clear that the allegedly

---

[12] Each court granted the plaintiffs leave to amend to allege additional facts to establish standing. *Charlton*, 2023 WL 1420726, at *5; *Sugasawara*, 2019 WL 3945105, at *7; *Kommer*, 2017 WL 3251598, at *6.

22

wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servcs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (citation omitted); *see also Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991) (reversing dismissal of citizen suit where district court made no finding that "the settlement [with] New York authorities has caused the violations alleged . . . to cease and eliminated any realistic prospect of their recurrence"). Given EmblemHealth's 15-year history of continued misconduct despite prior AODs, it is impossible for Defendants to make this showing.

Finally, the AOD does not provide all relief available to Plaintiffs. It does not provide all equitable and injunctive relief, especially measures specific to the Associations' members—for example, the addition of more provider information to directory listings, including treatment modality, provider schedule, in-patient and/or outpatient services provided, and other information critical to selecting among providers and their practices. It also does not offer reasonable attorneys' fees and costs to the Associations, which they may recover in this action under 15 U.S.C. § 1117 and under New York unfair competition law.[13]

As to the Plan Member Plaintiffs, the AOD does not adjudicate the statutory violations that give rise to their private rights of action under New York law; does not award statutory or actual damages to injured plan members[14]—including the damages available under GBL §§ 349 and 350;

---

[13] Even if the AOD mooted every other aspect of the Associations' case—and it did not— an award of attorneys' fees and costs to the Associations would still be appropriate before dismissal. *See Atlantic States*, 933 F.2d at 128.

[14] The AOD provides for restitution only to plan members who incurred costs from out-of-network providers after being unable to secure an appointment with an in-network provider, or

and does not provide for attorneys' fees. *See Plavin*, 35 N.Y.3d at 7 n.2 (permitting plaintiffs to pursue their GBL §§ 349 and 350 claims even though EmblemHealth's predecessor had previously agreed to an AOD addressing the same misrepresentations).

## CONCLUSION

Defendants' motion to dismiss should be denied.

Dated: May 26, 2026

Respectfully submitted,

**Mark Health Law PLLC**
By: */s/ Sara Haviva Mark*
Sara Haviva Mark
Sara@MarkHealthLaw.com
909 Third Avenue, #792
New York, NY 10150
(646) 504-1850

**Zuckerman Spaeder LLP**
By: */s/ Caroline E. Reynolds*
Caroline E. Reynolds
CReynolds@Zuckerman.com
2100 L Street NW, Suite 400
Washington, DC 20037
(202) 778-1800

Jason S. Cowart
JCowart@Zuckerman.com
485 Madison Ave., 19th flr.
New York, NY 10022

---

who incurred costs from services provided by a listed provider who was not in reality in-network. AOD ¶ 104(a).

(212) 704-9600

**The Hufford Law Firm PLLC**
By: */s/ D. Brian Hufford*
D. Brian Hufford
dbhufford@huffordlawfirm.org
76 Midland Avenue
Rye, NY 10580
(614) 371-3657

**Janove PLLC**
By: */s/ Raphael Janove*
Raphael Janove
Raphael@janove.law
500 7th Ave., 8th Fl.
New York, NY 10018
(646) 347-3940

*Attorneys for Plaintiffs*

25

## CERTIFICATE OF COMPLIANCE

I, Caroline E. Reynolds, an attorney duly admitted to practice before this Court , hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") and Rule 3(D) of Judge John G. Koeltl's Individual Rules and Practices in Civil Cases (the "Individual Rules"), that the foregoing Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss was prepared using Microsoft Word, contains 6,934 words in accordance with the Local and Individual Rules, and otherwise complies with the formatting requirements specified in the Local and Individual Rules. In making this calculation, I have relied on the word count of the word-processing program used to prepare the document.

Dated: May 26, 2026

*/s/ Caroline E. Reynolds*
Caroline E. Reynolds
*Attorney for Plaintiffs*

26